1             IN THE UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF RHODE ISLAND

3

4
      * * * * * * * * * * * * * * *   C.R. NO. 13-135M
5                                 *
   UNITED STATES OF AMERICA     *
6                                 *
       VS.                        *   JANUARY 22, 2015
7                                 *   9:30 A.M.
   JOHN J. FALL                   *
8                                 *
      * * * * * * * * * * * * * * *   PROVIDENCE, RI
9

10         BEFORE THE HONORABLE JOHN J. McCONNELL, JR.,

11                      DISTRICT JUDGE

12

                     (Jury Trial -- Volume VI)
13

14   APPEARANCES:

15   FOR THE GOVERNMENT:   JOHN N. KANE, ESQ.
                           JEFFREY BRIAN BENDER, ESQ.
16                         U.S. Department of Justice
                           Tax Division
17                         601 D Street, N.W., 7th Floor
                           Washington, D.C.  20530
18
   FOR THE DEFENDANT:    JOHN J. FALL, PRO SE
19                         108 Princess Avenue
                           Cranston, RI  02920
20
                           KEVIN J. FITZGERALD, ESQ.
21                         Federal Defender's Office
                           10 Weybosset Street, Suite 300
22                         Providence, RI  02903

23   Court Reporter:       Karen M. Wischnowsky, RPR-RMR-CRR
                           One Exchange Terrace
24                         Providence, RI  02903

25

1

2                             <u>I N D E X</u>

3        <u>GOVERNMENT WITNESS</u>                          <u>PAGE</u>

4        <u>Michael Pleshaw</u>
              Direct Examination by Mr. Kane              5
5             Cross-Examination by Mr. Fitzgerald        81
              Redirect Examination by Mr. Kane          115
6

7

8

9

10       <u>DEFENSE WITNESS</u>                            <u>PAGE</u>

11       <u>John Fall</u>
              Direct Examination by Mr. Fitzgerald     131
12            Cross-Examination by Mr. Bender          194

13

14

15

16

17

18

19

20

21

22

23

24

25

E X H I B I T S

| COURT | FOR ID | IN FULL |
|-------|--------|---------|
| 13 | 90 | |

| GOVERNMENT | FOR ID | IN FULL |
|------------|--------|---------|
| 401-A through F | | 14 |
| 402-A through F | | 14 |
| 403-A through F | | 14 |
| 404-A through F | | 29 |
| 405-A through E | | 14 |
| 406-A through D | | 14 |
| 407-A through G | | 14 |
| 408-A through E | | 14 |
| 409-A through E | | 14 |
| 410-A through E | | 14 |
| 411-A through F | | 14 |
| 412-A through D | | 14 |
| 413-A through D | | 14 |
| 414-A through D | | 14 |
| 415-A through D | | 14 |
| 416-A through D | | 14 |
| 417-A through C | | 14 |
| 418-A through C | | 14 |
| 419-A through D | | 14 |
| 420-A through D | | 14 |
| 421-A through E | 61 | |
| 422 | | 70 |
| 423 | | 70 |
| 424 | | 70 |
| 424-A | | 70 |
| 425-A through C | | 70 |
| 426-A and B | | 70 |

1    22 JANUARY 2015 -- 9:30 A.M.

2         (The jury is present for the following.)

3         (The Defendant is not present for the

4    following.)

5         THE COURT:  Good morning, everyone.  Did you

6    have a good evening?  I'll take that as yes.  I'm not

7    sure I'm not reading a little more into it than I

8    probably should.

9         And can, once again, you all assure me that you

10   followed the Court's order about not discussing this

11   case with anyone or doing any independent research or

12   posting anything on social media?  Great.  All the

13   jurors are signifying in the affirmative.

14        And, with that, the Government is calling its

15   next witness.

16        MR. KANE:  Yes, your Honor.  The United States

17   calls summary witness Michael Pleshaw.

18        THE COURT:  I assume you know the drill.

19        **MICHAEL PLESHAW, GOVERNMENT WITNESS, SWORN**

20        THE CLERK:  Would you please state your name and

21   spell your last name for the record.

22        THE WITNESS:  It's Michael Pleshaw,

23   P-L-E-S-H-A-W.

24        MR. KANE:  May I proceed, your Honor?

25        THE COURT:  Yes.

1          **DIRECT EXAMINATION**

2      **BY MR. KANE:**

3      **Q.**   Mr. Pleshaw, tell the jury what you do for a

4      living.

5      **A.**   I'm a revenue agent for the Internal Revenue

6      Service.

7      **Q.**   And where is your post of duty?

8      **A.**   Boston, Massachusetts.

9      **Q.**   How long have you been a revenue agent with the

10     Internal Revenue Service?

11     **A.**   I started in June of 1987.

12     **Q.**   And what have your responsibilities been as a

13     revenue agent over the years?

14     **A.**   Over the years, when you start as a revenue agent,

15     at first I audited partnerships, corporations and

16     individuals to determine their correct tax liability.

17           And then in June of 2000, I was -- I went to a

18     group called the Special Enforcement Program, and

19     basically a revenue agent there helps Criminal

20     Investigation in the tax criminal cases and assists the

21     U.S. Attorneys in tax criminal cases.

22     **Q.**   And how long have you been in the special

23     enforcement unit?

24     **A.**   I've been there since June of 2000.

25     **Q.**   And what types of cases have you worked on?

1    **A.**    The cases would involve unreported income,

2    political corruption, drug dealers, insurance fraud,

3    et cetera.

4    **Q.**    Agent Pleshaw, did you participate in the

5    investigation of this case?

6    **A.**    Yes, I did.

7    **Q.**    And your participation involves a review of

8    financial records?

9    **A.**    Yes.

10   **Q.**    And is your appearance here today for the purpose

11   of summarizing financial records?

12   **A.**    Yeah, summarizing evidence.

13   **Q.**    Can you tell the jury what your understanding is

14   of your assignment here today.

15   **A.**    My assignment for this particular trial was to

16   summarize the bank records that was put in evidence,

17   summarize the Comfort Dental tax return adjustments,

18   summarize Mr. Fall's income, and also summarize the tax

19   due and owing by Mr. Fall.

20   **Q.**    Have you been in this courtroom during the trial?

21   **A.**    Yes, I have.

22   **Q.**    Have you listened to the witnesses?

23   **A.**    Yes, I have.

24   **Q.**    Have you seen the exhibits entered into evidence?

25   **A.**    Yes, I have.

1   **Q.**   And will your testimony be based strictly on the

2   admitted evidence in addition to certain financial

3   records?

4   **A.**   Yes, I will.

5   **Q.**   In front of you --

6         THE COURT:  Mr. Kane, just hold on one second.

7   Are there certain financial records that are not

8   admitted into evidence that he's relying on?

9         MR. KANE:  Yes, if you'd like to address that at

10  sidebar, your Honor.  These are 1006 that we addressed

11  with the Court.

12        THE COURT:  I don't need to hear anymore.  Thank

13  you.

14        MR. KANE:  And I will cover those and let the

15  Court know which ones they are as we go through the

16  next exhibit.

17        THE COURT:  But the 1006 exhibits will all be

18  summary exhibits based on admitted evidence.

19        MR. KANE:  No.  Some of them will be based on

20  the admitted evidence.  Some are in lieu of admitted

21  evidence pursuant to Rule 1006 because they're so

22  voluminous.

23        THE COURT:  You can proceed.  Thank you,

24  Mr. Kane.

25  **Q.**   449 is in front of you.  Do you have that?

1    **A.**   Yes, I do.

2         MR. KANE:  Your Honor, I believe you have a copy

3    of that as well.

4         THE COURT:  I do.

5    **Q.**   Is that a summary of the list of exhibits and

6    summaries that you prepared in this case?

7    **A.**   Yes.

8    **Q.**   And the exhibits begin with 401-A and continue

9    through, I think, four pages.  Next to each item there

10   are initials.  Are those your initials?

11   **A.**   Yes, they are.

12   **Q.**   And what do they signify?

13   **A.**   That basically I checked over the list against the

14   exhibits that are going to be -- that I'm going to

15   present.

16   **Q.**   And are these all summaries -- with the exception

17   of certain demonstratives at Exhibit 421, are these all

18   summaries that you prepared?

19   **A.**   Yes.

20   **Q.**   And can you tell the jury a little bit about how

21   you went about preparing these summaries.

22   **A.**   Basically all the records that came in through

23   evidence, all the bank statements, most -- all the

24   summaries that come off the bank statements.

25        So I had to go through all the bank statements,

1    all the checks, all the deposit items, and I inspect

2    each and every sheet that has a picture of some bank

3    statement on it, and then I come up with a summary for

4    each and every account on this list.

5    **Q.**   How much time do you figure that took you?

6         MR. FITZGERALD:  Objection.

7         THE COURT:  Overruled.

8    **A.**   I've been doing this particular case probably a

9    couple years now.

10   **Q.**   Not full time?

11   **A.**   No.

12   **Q.**   But many hours were spent preparing these

13   summaries?

14   **A.**   Yes.

15   **Q.**   And if we look at summary sheet 449, the first few

16   accounts appear to be in the name of Financial Factors.

17   Do you see that?

18   **A.**   Yes.

19   **Q.**   And you prepared those summaries?

20   **A.**   Yes, I did.

21   **Q.**   And there are some additional accounts in the name

22   of Mountain Management?

23   **A.**   Yes.

24   **Q.**   And you prepared those summaries?

25   **A.**   Yes.

1    **Q.**   And you compared the summaries against the actual

2    financial information, including the bank records?

3    **A.**   Yes, I did.

4    **Q.**   And are those summaries fair and accurate

5    summaries of the underlying bank records?

6    **A.**   Yes, they are.

7    **Q.**   And if we continue, you prepared summaries for

8    Stratford Management account, which was in Colorado; is

9    that correct?

10    **A.**   Yes.

11    **Q.**   And did you compare your summaries against the

12    underlying records?

13    **A.**   Yes, I did.

14    **Q.**   And are they true and accurate summaries of the

15    underlying bank records?

16    **A.**   Yes.

17    **Q.**   If we continue, we have Olympic Business Systems

18    beginning at Exhibit 406-A as identified on 449.  Did

19    you review those bank records?

20    **A.**   Yes, I did.

21    **Q.**   Did you prepare summaries for those bank records?

22    **A.**   Yes, I did.

23    **Q.**   Are the summaries true and accurate summaries of

24    the underlying bank records?

25    **A.**   Yes.

1    **Q.**    Those records, there are two accounts with respect
2    to Olympic Business Systems; is that right?
3    **A.**    Yes, there are.
4    **Q.**    Were those voluminous accounts?
5    **A.**    Yes.
6    **Q.**    And if we just go back to the Financial Factors
7    account 1159, account number 1159, and the Mountain
8    Management account, account number ending 1245, were
9    those voluminous accounts?
10   **A.**    Yes, they were.
11   **Q.**    Looking at 449, the summary sheet, continuing
12   beginning at 408-A, you summarized some accounts for
13   Avagon, accounts titled in the name of Avagon; is that
14   right?
15   **A.**    Yes, I did.
16   **Q.**    Are the summaries that you prepared true and
17   accurate summaries against those financial records?
18   **A.**    Yes.
19   **Q.**    And continuing, it appears you prepared some
20   summaries for an account in Iowa for Accurate
21   Bookkeeping; is that correct?
22   **A.**    Yes, I did.
23   **Q.**    And you prepared summaries, and are those
24   summaries true and accurate summaries against the
25   underlying financial bank information?

1    **A.**    Yes.

2    **Q.**    Continuing, beginning at 412-A as identified on

3    449, Liberty Bookkeeping appears to be an account you

4    summarized?

5    **A.**    Yes.

6    **Q.**    Are your summaries true and accurate against the

7    underlying records for that account?

8    **A.**    Yes.

9    **Q.**    JV Services bank account down in Texas, did you

10   prepare summaries for those?

11   **A.**    Yes.

12   **Q.**    Are they true and accurate against the underlying

13   records?

14   **A.**    Yes.

15   **Q.**    Beginning at 414-A, you prepared summaries for

16   NERH account down in Texas; is that right?

17   **A.**    Yes.

18   **Q.**    Are those summaries true and accurate against the

19   underlying records?

20   **A.**    Yes.

21   **Q.**    And if we continue through on 449, you summarized

22   accounts for Washington Allocation, another account for

23   NERH at Fidelity, an account in the name of Smart

24   Buyer, and accounts in the name of Broad Street

25   Investments, and that takes you through Exhibit 420-D.

1    Do you see that?

2    **A.**   Yes.

3    **Q.**   And are your summaries true and accurate against

4    the underlying bank records?

5    **A.**   Yes.

6         MR. KANE:  Your Honor, I'd move the admission of

7    the following exhibits based on -- as identified on

8    449:  401-A through 401-F, 402-A through 402-F, 403-A

9    through 404-F, inclusive of all sub-exhibits as

10   identified on 449; and those last exhibits we move

11   pursuant to Rule 1006 in lieu of admission of the

12   underlying records.

13        Continuing, we'd move the admission of 405-A,

14   405-B, 405-C, 405-D and 405-E.  The Government moves

15   the admission of 406-A through 408-E, inclusive of all

16   sub-exhibits as identified on 449; and we move those

17   particular exhibits pursuant to Rule 1006 in lieu of

18   admission of the voluminous underlying records.

19        Continuing, we'd move the admission of 409-A

20   through 411-C, inclusive of the sub-exhibits as

21   identified on 449.

22        Continuing to the third page of 449, we move the

23   admission of 411-D, 411-E, 411-F.  Continuing, we'd

24   move the admission of 412-A through 419-B inclusive of

25   all sub-exhibits as identified on 449.

1          Continuing to the fourth page of 449, we'd move

2     the admission of 419-C, 419-D, 420-A through 420-D at

3     this time.

4          MR. FITZGERALD:  I'm going to object, your

5     Honor.

6          THE COURT:  Do you want to be heard any further?

7          MR. FITZGERALD:  No, your Honor.

8          THE COURT:  All right.  The objection is

9     overruled.  The following exhibits will be admitted as

10    stated by Mr. Kane under the rules of evidence,

11    including Rule 1006:  401-A through F, 402-A through F,

12    403-A through F, 405-A through E, 406-A through D,

13    407-A through G, 408-A through E, 409-A through E,

14    410-A through E, 411-A through F, 412-A through D,

15    413-A through D, 414-A through D, 415-A through D,

16    416-A through D, 417-A through C, 418-A through C,

17    419-A through D and 420-A through D.

18          (Government Exhibits 401-A through F, 402-A

19    through F, 403-A through F, 405-A through E, 406-A

20    through D, 407-A through G, 408-A through E, 409-A

21    through E, 410-A through E, 411-A through F, 412-A

22    through D, 413-A through D, 414-A through D, 415-A

23    through D, 416-A through D, 417-A through C, 418-A

24    through C, 419-A through D and 420-A through D admitted

25    in full.)

1      MR. KANE:  Let's have 401-A.

2  **Q.**   Agent Pleshaw, let's talk about the first account.

3  Do you recall evidence concerning certain bank accounts

4  in the state of Massachusetts admitted at trial?

5  **A.**   Yes.

6  **Q.**   And this particular account at 401-A is in the

7  name of Financial Factors; is that correct?

8  **A.**   That's correct.

9  **Q.**   What is this particular exhibit showing us?

10  **A.**   This is a fact sheet basically telling us certain

11  facts on that particular account.

12  **Q.**   And how many -- how much in deposits for this

13  particular account?

14  **A.**   A little over 1.7 million.

15  **Q.**   You have a line there, number of payees and

16  depositors.  Can you tell the jury what that is.

17  **A.**   Yeah.  The total number of payees and depositors,

18  it classifies -- the number is 83, which basically

19  means there's 83 types of entities that have flowed

20  through this account that are running their income or

21  checks through this account.

22  **Q.**   Are you familiar with the term "warehouse

23  account"?

24  **A.**   Yes, I am.

25  **Q.**   Is that a term of art the IRS uses?

1    **A.**    Yes.

2    **Q.**    And is this a warehouse account?

3    **A.**    Yes, it is.

4    **Q.**    And what distinguishes a warehouse account?

5    **A.**    Basically a warehouse account is an account set up

6    in this case under Financial Factors, is the name of

7    the account, but the account actually funnels money

8    from all different types of entities and people.

9           So the checks you see going through this

10   account, you're going to see different names.  You'll

11   hardly ever see Financial Factors as, you know, the

12   payee or depositor.

13   **Q.**    Other entities will be appearing as the payees?

14   **A.**    Yeah.  Correct.

15   **Q.**    And how does that affect the traceability of the

16   source of funds?

17   **A.**    In a tax audit, it makes it very difficult to

18   trace where the money goes, and that's -- when people

19   do that, it makes it very hard to find the money.

20   **Q.**    Let's take a look at 401-B, and if you could just

21   tell us -- tell the jury what this document is.  Again,

22   this is the same account at UniBank?

23   **A.**    Yup, same account.  Basically 401-B is just a

24   summary of the monthly deposits and withdrawals that

25   has gone through this account from 6/1999 to 3/2000.

1    Q.   Let's go to 401-C, same account, entitled

2    identified deposit items.  What is this document?

3    A.   Basically this particular document has -- 401-C

4    has 51 pages to it; but the first page, basically this

5    is a chart summarizing all the deposits that I could

6    identify in this account from 1999 to 2000.

7    Q.   And that comes from actually reading the deposits,

8    the checks in the account?

9    A.   Yes.

10   Q.   And were there some that you couldn't identify

11   because you couldn't read the check?

12   A.   Oh, yes.  Yes.

13   Q.   And the columns here obviously provide the date

14   that the check was written, the check number.  What is

15   this column, payee and depositor?

16   A.   Payee and depositor, that's basically -- that

17   would be the person that's getting the check, you know,

18   and that's like -- in this first one, 21st Century

19   Dental, that's the person that's getting the check for

20   whatever services they did.

21   Q.   And what is this column, deposit source text?

22   A.   That's the source.  That would be, again, say an

23   example of 21st Century Dental, it's coming from a Jay

24   Weiner, I think; and so he paid Century Dental for some

25   type of service.  So he's the guy paying them.

**Q.**   So when we look at the deposit check, we'll see
Jay Weiner basically where the return address would be
part of the check?

**A.**   That's correct.

**Q.**   And obviously the amount of the deposit is over to
the right?

**A.**   That's correct.

**Q.**   And there's 51 pages to this summary.  Was this a
voluminous account?

**A.**   Oh, yes.

**Q.**   Were there --

         MR. FITZGERALD:  Objection.

         THE COURT:  Sustained.  The jury will disregard
the last statement.

**Q.**   If we can go to the second page.  Do other payees
appear on this page?

**A.**   Yes, they do.

**Q.**   And that's ACS?

**A.**   ACS, yes.

**Q.**   Let's go to page 36.  Do you see payments to
Revenue Management Services?

**A.**   Yes, I do.

**Q.**   And who are those payments from?

**A.**   Looks like some were coming from Steverman and
then a Taylor and then some more from Robert Stone,

1    Inc., Realtors.

2    **Q.**    And if we can go to the next page to continue.

3    Are there more deposits to Revenue Management Services

4    in this account?

5    **A.**    Yeah.  Again, Robert Stone, Allied Mortgage

6    Capital and it looks like Robert Logan.

7    **Q.**    Was there evidence concerning Revenue Management

8    Services admitted at trial?

9    **A.**    Yes, there were.

10   **Q.**    Let's have 65-A at 1.  Do you have that document

11   in front of you?

12   **A.**    Yes, I do.

13   **Q.**    It's on letterhead of Revenue Management Services?

14   **A.**    Yes.

15   **Q.**    And what is this document?

16   **A.**    This is a bill to Dan Sheehan or Allied Mortgage

17   Capital for billing hours from Mr. John Fall.

18   **Q.**    And who is listed as the general partner for

19   Revenue Management Services?

20   **A.**    That's correct.

21   **Q.**    Is it John Fall?

22   **A.**    John Fall, yeah.

23   **Q.**    65-B, please.  Do you have that document in front

24   of you?

25   **A.**    Yes, I do.

1    **Q.**   The date of this document is 9/30, 2000?

2    **A.**   Yes, it is.

3    **Q.**   And it states at the top "from," and can you tell

4    us who it's from?

5    **A.**   It states from John Fall, general partner of

6    Revenue Management Services.

7    **Q.**   74-D, please, at 1.  Can you tell us what this

8    document is.

9    **A.**   Yes.  This is a request form for -- from Office

10   Services, which basically Revenue Management Services

11   is asking for I believe some checks being deposited

12   into that account.

13   **Q.**   And the general manager of Revenue Management

14   Services?

15   **A.**   Yeah.  I can't read it that clear, but I believe

16   it's John Fall.  Oh, there you go.  John Fall, general

17   partner of Revenue Management Services.

18   **Q.**   Now, with respect to the payors to Revenue

19   Management Services that we saw, Robert Stone, I think

20   a Silverman, was there any evidence concerning those

21   names at trial?

22   **A.**   Yes.

23   **Q.**   Let's take a look at 259-B at page 3.  Is this a

24   deed from John J. Fall?

25   **A.**   Yes, it is.

1   **Q.**   General partner of Revenue Management Services?

2   **A.**   Yes.

3   **Q.**   And who is it to?

4   **A.**   Where you circled, James Steverman and Susan

5   Steverman.

6        MR. KANE:  Please zoom out.

7   **Q.**   Does this concern property on Webster Street?

8   **A.**   Yes, it does.

9        MR. KANE:  We can withdraw that.

10  **Q.**   Let's take a look at 94-D at 1, and can you tell

11  me what this document is.

12  **A.**   Yeah.  It's to James Taylor from John Fall,

13  managing director of NE Realty Holding.  I believe it's

14  an eviction notice to Mr. Taylor.

15  **Q.**   And does Mr. Taylor appear on those checks to

16  Revenue Management Services?

17  **A.**   Yes, he does.

18  **Q.**   92-P at page 6, please.  Do you have that document

19  in front of you?

20  **A.**   Yes, I do.

21  **Q.**   It appears to be some information for John Fall,

22  offices in Lynnfield, Braintree, Marshfield.  Do you

23  see that?

24  **A.**   Yes.

25  **Q.**   There's a phone number and a fax underneath?

1    **A.**    Yup.  Phone number 781, yup.

2    **Q.**    And there's some e-mails listed?

3    **A.**    Yup, John, Smart Buyer Company, Smart Buyer

4    Company, John.

5    **Q.**    And then there's a broker license equals Robert

6    Stone Real Estate.  Do you see that?

7    **A.**    That's correct.

8    **Q.**    And that name appears as a payor on the checks to

9    Revenue Management Services?

10    **A.**    Yes.

11    **Q.**    All right.  Let's go to 401-D, your next summary.

12    401-D, as in Dan.  Tell the jury what this document is.

13    Again, we're sticking with the same account.

14    **A.**    Yeah.  Basically this is, as I explained before,

15    the list of 83 payee/depositors on that fact sheet.

16    This actually lists out all of them that I was able to

17    find while I was going through checking this account,

18    and I believe 83 was the figure.

19    **Q.**    Let's go to the next page.  And does Revenue

20    Management Services appear on this page as one of 83

21    payees on this account?

22    **A.**    Yes, it does.

23    **Q.**    You can put that away.  401-E, the next document

24    with respect to this account.  What is this?

25    **A.**    This document identifies the withdrawals from

1    Financial Factors for this account, and it just

2    summarizes all the withdrawals that I could identify

3    when I went through the records.

4    **Q.**    And the withdrawals, how do they appear coming out

5    of this account?  What checks are they on, drawn off

6    of?

7    **A.**    They're drawn off Financial Factors checks.

8    **Q.**    Would there be any checks drawn off of Revenue

9    Management Services, for example?

10   **A.**    Oh, no.  They would be Financial Factors.

11   **Q.**    Let's go to 401-F, the last exhibit for this

12   particular account.

13   **A.**    In this particular account, there were several

14   checks that were cashed, cashed checks.  Basically

15   these particular items were cashed by the payee name,

16   and those people were able to get cash out of this

17   company.

18   **Q.**    And those were the signatories on the account; is

19   that correct?

20   **A.**    That's correct.

21   **Q.**    And you're not suggesting the Defendant cashed

22   these checks.  You're just summarizing the cash volume

23   in this account?

24   **A.**    That's correct.

25   **Q.**    Let's go to the next account, Agent Pleshaw,

1    402-A.   And I believe this is another fact sheet for

2    the second account we're looking at?

3    **A.**   Yes, it is.

4    **Q.**   And just so the jury knows, you prepared similar

5    types of summaries for each of these accounts as we go

6    through?

7    **A.**   Yes.

8    **Q.**   Tell us what this account is.

9    **A.**   This is a Financial Factors account.  It's located

10   at Citizens Bank in Providence, Rhode Island.  It was

11   opened in January of 2000, and it was closed in August

12   of 2000.

13           And, again, total deposits, a little over

14   $4 million went through this account during that time;

15   and then it had 72 payees and depositors.

16   **Q.**   Let's take a look at 402-B, and this is just a

17   summary of volume, both deposits and withdrawals?

18   **A.**   That's correct.

19   **Q.**   Let's go to 402-C.  What is this document?

20   **A.**   This is a document that identifies the deposits

21   that went through this account.

22   **Q.**   And the payee again, in this column is listed all

23   the different payees appearing on these checks?

24   **A.**   That's correct.

25   **Q.**   And I think you said there were over 70 payees?

1    **A.**    I believe.  Yeah.  Yup.

2    **Q.**    All right.  Let's go to page 60 of this document.

3    Do checks to Revenue Management Services appear on this

4    particular page?

5    **A.**    Yes, they do.

6    **Q.**    And are they from the same payors that we had

7    taken a look at a few moments ago?

8    **A.**    Yes.

9    **Q.**    Let's go to 402-D.  And what is this document?

10   **A.**    This is the list of the payees/depositors.

11   **Q.**    And if we go to the next page, does Revenue

12   Management Services appear as a payee on this account?

13   **A.**    Yes.  Yes.

14   **Q.**    And when you look at this account and the

15   deposits, the actual checks in the account, are the

16   Revenue Management Services deposits, for example,

17   commingled in and around other payee checks?

18   **A.**    Yeah, they are.

19   **Q.**    402-E, and what is this?

20   **A.**    This is just a chart that identifies the

21   withdrawals coming out of that account for the year

22   2000.

23   **Q.**    Again, what do the checks read at the top?

24   **A.**    Oh, it would be coming out of the Financial

25   Factors account.

1    **Q.**   How difficult, if at all, is it to determine whose
2    expenses or withdrawals these are?
3         MR. FITZGERALD:  Objection.  It's beyond the
4    scope of a summary witness, your Honor.
5         THE COURT:  Overruled.
6    **A.**   Can you ask the question again, please.
7    **Q.**   I mean, how difficult is it to determine -- let me
8    back up.  You had a list of payees and depositors into
9    the account?
10   **A.**   Correct.
11   **Q.**   Is there any way to tell whose withdrawals these
12   are as to those payees?
13   **A.**   No, not unless you have even more backup to the
14   check.
15   **Q.**   Let's go to 402-F, and what is this?
16   **A.**   This is just a chart that summarizes the cashed
17   checks coming out of that account for the year 2000.
18   **Q.**   And, again, your purpose in this summary is not to
19   suggest the Defendant cashed these checks but to give a
20   sense of the volume of cashed checks in this account?
21   **A.**   Correct.
22   **Q.**   Let's go to 403-A, the next account.  What is this
23   account?
24   **A.**   It's a fact sheet for Financial Factors for the
25   account ending in 1159.

1    **Q.**   And this is in Massachusetts as well?

2    **A.**   Medway, Massachusetts, yes.

3    **Q.**   And the signatory on the account?

4    **A.**   Dale Christiansen.

5    **Q.**   How much in deposits in this account?

6    **A.**   Deposits, a little over 2.3 million.

7    **Q.**   And how many payees in this account?

8    **A.**   A hundred and three that I found.

9    **Q.**   Let's go to the next document, 403-B, and this is

10   a summary of monthly deposits and withdrawals?

11   **A.**   Yes, it is.

12   **Q.**   And the purpose is just to give a sense of volume

13   in and out?

14   **A.**   Correct.

15   **Q.**   On a monthly basis?

16   **A.**   Yes.

17   **Q.**   403-C, and what is this document?

18   **A.**   Again, it's a chart that summarizes the deposit

19   items from 1999 to 2001 that ran through this account.

20   **Q.**   And how many pages to this summary exhibit?

21   **A.**   Ninety-eight.

22   **Q.**   And you reviewed all the items?

23   **A.**   Yes, I did.

24   **Q.**   To verify the accuracy?

25   **A.**   Yes, I did.

1    **Q.**   Let's go to page 56 and 57 of this exhibit.   On

2    page 56 of this exhibit, are there deposits and checks

3    payable to Revenue Management Services?

4    **A.**   Yes.

5    **Q.**   And if we continue to the next page, are there

6    additional deposits payable to Revenue Management

7    Services?

8    **A.**   Yes.

9    **Q.**   403-E.   Again, this is a listing of the

10   withdrawals which would be on checks from Financial

11   Factors, not from Revenue Management or any of those

12   other payees?

13   **A.**   Correct.

14   **Q.**   And 403-F.

15   **A.**   Excuse me?

16   **Q.**   403-F.   And what is this summary?

17   **A.**   Again, it's a summary chart of the cashed checks

18   coming out of this particular account.

19   **Q.**   And, again, you're not suggesting the evidence is

20   Mr. Fall cashed these checks.   You're simply giving the

21   volume of cashed checks in this account?

22   **A.**   That's correct.

23         MR. KANE:   One final account from Massachusetts

24   before we talk about Stratford Management.   Can I have

25   404-A, please.

1          THE COURT:  Mr. Kane, just before you proceed, I

2     just looked at my notes, and I might have not misspoken

3     but failed to include, at least according to the

4     transcript, 404-A through F as admitted exhibits when I

5     was going through the list.  It appears I might have

6     left those out.  So 404-A through F are admitted, fully

7     admitted exhibits.

8          MR. KANE:  Sorry.  I didn't catch that, your

9     Honor.  Thank you.

10          THE COURT:  You're welcome.

11          (Government Exhibits 404-A through F admitted in

12     full.)

13     **Q.**     404-A, do you have that in front of you?

14     **A.**     Yes, I do.

15     **Q.**     And this is a fact sheet for a fourth account?

16     **A.**     Yeah, a fact sheet for Mountain Management,

17     account last four number 1245, located in Boston,

18     Massachusetts, Sovereign Bank.

19     **Q.**     And how much in deposits ran through this account?

20     **A.**     A little over 6.8 million.

21     **Q.**     How many payees?

22     **A.**     Ninety-seven that I found.

23     **Q.**     And 404-B is, again, just a summary of deposits

24     and withdrawals for this account; is that right?

25     **A.**     That's correct.

1   **Q.**   And then if we go to 404-C, this is a listing of

2   all the identified deposits you were able to find and

3   view in the account?

4   **A.**   That's correct.

5   **Q.**   If we can go to page 47 and 48.  Beginning at the

6   bottom, were there checks payable to Revenue Management

7   Services?

8   **A.**   Yes, there was.

9   **Q.**   And now on page 48, are there additional checks

10  payable to Revenue Management Services?

11  **A.**   Yes, there were.

12  **Q.**   And were there other payees commingled in and

13  around Revenue Management Services in this account?

14  **A.**   Yes.

15  **Q.**   404-D is a listing of the payees; is that right?

16  **A.**   That's correct.

17  **Q.**   And if we go back, I'm sorry, to 404-C and page

18  35, this is the identified deposits, was there at least

19  one check payable to John Fall?

20  **A.**   Yes, there was.

21  **Q.**   404-E is a listing of the withdrawals?

22  **A.**   Yes.

23  **Q.**   And this would be on Mountain Management checks,

24  not Revenue Management Services or any of those other

25  payees?

1    **A.**    No, it would be on Mountain Management's account.

2    **Q.**    And 404-F.  What is this?

3    **A.**    This is a summary of the cashed checks coming out

4    of Mountain Management for the years 2001 and 2003.

5    **Q.**    Again, this is to indicate the volume of cashed

6    checks?

7    **A.**    Correct.

8    **Q.**    Now, I want to go back to 404-C on this account

9    for a moment, and I want to look at page 88 to 89.

10   Again, this is the identified deposits.  Do you have

11   that in front of you, sir?

12   **A.**    Yes, I do.

13   **Q.**    Down at the bottom there are some checks payable

14   from Stratford Management to Office Services; is that

15   correct?

16   **A.**    That is correct.

17   **Q.**    And if we continue onto the next page, there's

18   another check for $25,000 payable from Stratford

19   Management to Office Services?

20   **A.**    Yes.

21   **Q.**    What were those deposit items?

22   **A.**    Those were deposited.  They were made out -- the

23   check was made out to Office Services deposited in this

24   bank.

25   **Q.**    Where were they from?

1    **A.**   They came from Stratford Management.

2    **Q.**   Is that another account you summarized?

3    **A.**   Yes.

4    **Q.**   Where was that account?

5    **A.**   Stratford Management I believe was in Colorado.

6    **Q.**   Let's take a look at Exhibit 200-D, which are some

7    items from the Stratford account, page 11.  Can we blow

8    that check up.  Is that a check from Stratford

9    Management to Office Services?

10   **A.**   Yes, it is.

11   **Q.**   Page 13 of the exhibit, is this another check to

12   Office Services?

13   **A.**   That's correct.

14   **Q.**   Signed Melissa Sugar?

15   **A.**   Yup.

16   **Q.**   Page 16, is this another check from Stratford

17   Management to Office Services?

18   **A.**   Yes.

19   **Q.**   Let's see if we can get better checks.  Let's try

20   18.  Is that a check to Office Services?

21   **A.**   Yup, from Stratford Management.  Yes.

22   **Q.**   Let's try 24.  Check from Stratford Management to

23   office -- can you make that out?

24   **A.**   It looks like Office Services.

25   **Q.**   And 39, page 39, is that a check payable to Office

1    Services?

2    **A.**   Yes, definitely.

3    **Q.**   All right.  Let's take a look at the Stratford

4    account.  You prepared summaries for that account.

5    And, first, let's take -- can I have Exhibit 41 on the

6    screen.  Do you remember the evidence concerning this

7    exhibit?

8    **A.**   Yes, I do.

9    **Q.**   And where was it from?

10   **A.**   This was from Melissa Sugar information, and I

11   believe it was -- I think, I don't know, Mr. Dickerman

12   maybe got it out of all the -- through the summons or

13   subpoena.

14   **Q.**   Okay.  Do you recall a search warrant being talked

15   about?

16   **A.**   Yeah, search warrant.  Yup.

17   **Q.**   And the UBAO name is Stratford Management?

18   **A.**   That's correct.

19   **Q.**   Who is the client?

20   **A.**   John Fall.

21   **Q.**   Are there other entities listed for Mr. Fall?

22   **A.**   Yes, there are.

23   **Q.**   And that would be Managed Skills, Sibling

24   Holdings, Professional Equipment and Profit Management?

25   **A.**   That's correct.

1    **Q.**    If we can withdraw.  Are there other entities

2    listed as well?

3    **A.**    Yes, there is.

4    **Q.**    Is Managed Skills one of them?

5    **A.**    Managed Skills, Sibling Holdings, Professional

6    Equipment, Profit Management, NE Realty Holdings and

7    Nathan Hale Associates.

8    **Q.**    405-A, please.  What is this document?

9    **A.**    As I explained in the other accounts, this is a

10   fact sheet for Stratford Management and located at

11   Compass Bank for the account ending 8152.

12   **Q.**    All right.  And how much in deposits ran through

13   this account?

14   **A.**    About $765,000.

15   **Q.**    Let's take a look at 405-B, and this is a summary

16   of monthly deposits?

17   **A.**    That's correct.

18   **Q.**    And there were deposits beginning as early as

19   2002; is that right?

20   **A.**    Yes, starting in -- the statement ends

21   January 31st, 2002, yes.

22   **Q.**    Let's go to 405-C.  And what is this document?

23   **A.**    This is a summary of the identified deposits in

24   this particular account, Stratford Management account.

25   **Q.**    Okay.  I noticed that there are a few identified

1     deposits for 2002.  Were you able to identify and

2     obtain the deposit items for this entire account?

3     **A.**   In 2002, if I can recall, there wasn't a lot of

4     clear pictures of the deposited items, and this is all

5     I could really see.  So that's what I put down.

6     **Q.**   Understood.  Are there payments to Nathan Hale

7     Associates?

8     **A.**   Yeah.  They start -- it looks like it's in 2003.

9     **Q.**   Are there payments from Comfort Dental to Nathan

10    Hale Associates?

11    **A.**   Yes, there are.

12    **Q.**   Allied Mortgage?

13    **A.**   Yes.

14    **Q.**   Well, Allied Mortgage is payable to Profit

15    Management; is that correct?

16    **A.**   Yeah.  In that particular instance, yes.

17    **Q.**   What was the evidence concerning who the payors

18    were into Nathan Hale Associates?

19    **A.**   Nathan Hale, I think it was Jorge Jaquez.  He

20    basically stated that Nathan Hale is the name on the

21    rent applications that they were getting out at Broad

22    Street.

23          MR. KANE:  If we could have that page back up,

24    please.  If we can go to the next page.

25    **Q.**   Are there some additional payments from Comfort

1    Dental to Managed Skills?

2    **A.**   Yes.

3    **Q.**   And you can withdraw that.  Some additional

4    payments from Allied Mortgage to Profit Management?

5    **A.**   Yes.

6    **Q.**   And if we can go to the next page, please.  Let's

7    go to 405-D.  What is this document?

8    **A.**   This is a summary of the total payees and

9    depositors that flow through this account, Stratford

10   Management.  There's five of them.

11   **Q.**   And other than Jorge Jaquez, are the remaining

12   entities associated with John Fall on the Exhibit 441

13   that you saw?

14   **A.**   Yes.

15   **Q.**   Let's go to 404-E (sic).  And what is this

16   document?

17   **A.**   This is the -- a chart that identifies the

18   withdrawals coming out of this account from 2002 to

19   2004.

20   **Q.**   And I see some withdrawals.  Office Services,

21   we've already looked at those; is that right?

22   **A.**   That's correct.

23   **Q.**   Withdrawals back to Broad Street; is that right?

24   **A.**   That's correct.

25   **Q.**   We can go to the next page and to page 3 of this

1    withdrawal summary.  There are some withdrawals to

2    Consignment Partners.  Do you see that?

3    **A.**   Yes, I do.

4    **Q.**   And what was that?

5    **A.**   That's another entity of John Fall's.

6    **Q.**   If we can go to the next page.  There's another

7    payee out of this account, a withdrawal to Avagon.  Do

8    you see that?

9    **A.**   Yes, I do.

10   **Q.**   How much is that for?

11   **A.**   That is for $37,000.

12   **Q.**   And what was Avagon?

13   **A.**   Avagon I believe was an account in Maryland.

14   **Q.**   And did you summarize what you could find from

15   that account?

16   **A.**   Avagon?

17   **Q.**   Yes.

18   **A.**   Yes, I did.

19   **Q.**   And we'll be looking at that in a few moments.

20   There's another withdrawal to Olympic Business Systems.

21   What was that?

22   **A.**   That looks like a wire for $195,000.

23   **Q.**   And where was that wire sent?

24   **A.**   It was sent to Olympic Business Systems, which I

25   believe is in Washington, the State of Washington.

1    **Q.**   And there are some withdrawals to Professional
2    Equipment as well?
3    **A.**   That's correct.
4    **Q.**   Do you know or recall where those checks went,
5    where they were deposited?
6    **A.**   Professional Equipment, I can't recall right now.
7    **Q.**   Let's take a look at the next page.  That's the
8    last page of the exhibit.  Okay.  You just mentioned a
9    wire up to Olympic Business Systems in the State of
10   Washington?
11   **A.**   Yes.
12   **Q.**   Did you summarize some records from that bank
13   account in the name of Olympic Business Systems?
14   **A.**   Yes.
15   **Q.**   Let's take a look at 406-A.  Can you tell us what
16   this is.
17   **A.**   This is a summary of the total payees and
18   depositors from Olympic Business Systems' account
19   ending in 9218, and this just totals all the payees and
20   depositors that I was able to identify.
21   **Q.**   If we can go to the next page, please, and the
22   third page.  I'm sorry.  You can stay there.  Is there
23   a payee in the name of Eleganza Leasing listed?
24   **A.**   Yeah.  It's number 60.  Yup.
25   **Q.**   And what was Eleganza Leasing?

1    **A.**    That was another entity that John Fall set up.

2    **Q.**    Let's take a look at 406-B.  Can you tell us what

3    this exhibit is.

4    **A.**    This is a chart that identifies the deposits that

5    were associated with Mr. Fall from Olympic Business

6    Systems, 9218.

7    **Q.**    And this was at U.S. Bank?

8    **A.**    Yes.

9    **Q.**    And what were the nature of the payments to Nathan

10   Hale Associates?

11   **A.**    Nathan Hale Associates, they would be -- they were

12   rent checks.

13        MR. KANE:  Let's go to the next page.  And the

14   next page.  This is page 3 of the exhibit.  And the

15   next page.

16   **Q.**    The last item on 406-B appears to be a check or a

17   payment to Eleganza Leasing.  Can you see that?

18   **A.**    Yes, I do.

19   **Q.**    From Duggan, Caccavaro & Ruboy.  Do you see that?

20   **A.**    Yes, I do.

21   **Q.**    How much is the amount?

22   **A.**    $214,924.39.

23   **Q.**    What was the evidence concerning that payment?

24   **A.**    I believe that was from a -- it was a -- paperwork

25   was on a transfer of a mortgage or -- either that or a

1  sale of land.  I can't remember exactly which one.

2  Q.  Do you recall Ohio Street, the sale of Ohio Street

3  being discussed in this trial?

4  A.  Yes.

5  Q.  Do you recall whether it was a payoff on Ohio

6  Street?  It's all right.  If you don't recall, we'll

7  move on.

8      Let's go to the withdrawal summary for the

9  Olympic account at U.S. Bank, 406-C.  And is this a

10  summary of the identified withdrawals?

11  A.  Yes, it is.

12  Q.  Now, this obviously is not a summary of all the

13  withdrawals out of this account; is that correct?

14  A.  Yeah.  It just is the one associated with

15  Mr. Fall.

16  Q.  Were you able to find -- well, strike that.  The

17  withdrawals, there are some withdrawals to Consignment

18  Partners?

19  A.  Yes, and Broad Street.

20  Q.  There's also withdrawal to Washington Allocation.

21  Do you see that?

22  A.  That's correct, yup, for 103,000.

23  Q.  This is an account in Seattle or in Washington,

24  the State of Washington, I think you testified.  Where

25  did this payment go for Washington Allocation?

1    **A.**   This payee -- it was 103,000.  I believe it went

2    into -- I can't recall where that 103,000 went.  I

3    believe it -- there are a lot of numbers here.  I

4    believe that account --

5    **Q.**   Don't guess.  Don't guess.  Do you recall

6    summarizing accounts down in Texas?

7    **A.**   Yes.  I summarized the Washington Allocation

8    account.

9    **Q.**   We'll be getting to that.  There's also a

10   withdrawal to American Century.  Do you see that?

11   **A.**   Yes.

12   **Q.**   Was there an account at American Century where

13   this money went?

14   **A.**   Yes, there was.

15   **Q.**   And how much was that?

16   **A.**   That was for 2,500.

17   **Q.**   Let's have 249-F at page 1.  Does that appear to

18   be the check --

19   **A.**   Yup, that would be the check for 2,500.  Yup.

20   **Q.**   Now let's go on to the second -- I believe there

21   is a second Olympic Business Systems account.

22        THE COURT:  Mr. Kane, before we do that, why

23   don't we take the mid-morning break.  It seems like a

24   reasonable time to break.

25        Ladies and gentlemen, continue not to discuss

1    this case amongst yourselves.  We'll be back in about

2    15 minutes.

3              (Recess.)

4              THE COURT:  Mr. Kane.

5              MR. KANE:  Thank you, your Honor.

6              THE COURT:  Agent Pleshaw, you're still under

7    oath.  Do you understand that?

8              THE WITNESS:  Yes.

9    Q.   Agent Pleshaw, we were discussing the summaries

10   you prepared for bank accounts in the State of

11   Washington, specifically in the name of Olympic

12   Business Systems.  We looked at one account.  I want to

13   show you the second account, if we can have 407-A.  Can

14   you tell us what that document shows.

15   A.   This is a fact sheet for the other Olympic

16   Business Systems account ending in 0015 at Bank of

17   America; and it was open from February 18th, 2003,

18   to August 22nd, 2006; and it has a little more than

19   6.7 million that went through this account.

20   Q.   And how many depositors?

21   A.   Twenty-seven that I could identify.

22   Q.   Did you find any Fall-related items in this

23   account?

24   A.   Yes.

25   Q.   If we could take a look at 407-C.  Do you have

1    that in front of you?

2    **A.**    Yes, I do.

3    **Q.**    And what does this show?

4    **A.**    This is a summary of the deposits that were

5    associated with Mr. Fall, and there were two wires from

6    Comfort Dental totaling 207,000.

7    **Q.**    And, again, this is not a summary of all the

8    deposits into this account; is that right?

9    **A.**    That's correct.

10   **Q.**    And what does it represent?

11   **A.**    This chart just represents the items that are

12   associated with Mr. Fall.  There were several other

13   items that didn't pertain to this trial.

14   **Q.**    Were you able to read all of the deposits?

15   **A.**    If I was able to read them, they would be on the

16   chart if they were associated with Mr. Fall.

17   **Q.**    And 407-D.  Is this a listing of all the payees?

18   **A.**    These are all the ones I could identify going

19   through this particular account ending in 0015.

20   **Q.**    And a few of these payees are Olympic Business

21   Systems itself, which is the name on the account; is

22   that right?

23   **A.**    That's correct.

24   **Q.**    And the checks from Comfort Dental were to Olympic

25   Business Systems?

1    A.    That's correct.

2    Q.    Let's move on to accounts in Maryland, and let's

3    take a look at 408-A.  Tell us what this is.

4    A.    This is a fact sheet for Avagon, LLC, which is

5    located in the Baltimore County Savings Bank.  The

6    account, last four numbers is 5645; and it is -- was

7    open from February 13th, 2002, until January 9th, 2006;

8    and a little over 4.1 million went through this account

9    during that period; and I was able to identify five

10   payees/depositors.

11   Q.    Let's take a look at 408-C.  And what is this

12   document?

13   A.    Again, this chart is -- identifies the deposits

14   only associated with Mr. Fall, and I was only able to

15   identify one for $37,000, a wire.

16   Q.    And where is that from?

17   A.    That's coming from Compass Bank.

18   Q.    And where was that located?

19   A.    Compass Bank, I believe Compass Bank was I think

20   Texas, but I'm not really sure.

21   Q.    Do you recall whether this is the Stratford

22   Management account?

23   A.    If I cross-reference it, probably.

24   Q.    I notice in this particular account there's one

25   item; but I believe your testimony earlier when we were

1    looking at the Stratford account, there were several

2    either wires or checks payable to Avagon.  Can you

3    explain what appears to be maybe a discrepancy.

4    A.    Again, depending on the copies you're getting from

5    the bank, sometimes you'll be able to identify it on

6    one bank but you won't be able to identify it in the

7    Avagon account; and that's what happened probably --

8    that happened a lot, but -- so you'll see, again, if

9    you went to the Compass Bank, you would probably see it

10   over there, but you won't see it come over here just

11   because the bank wasn't able to give me a clear picture

12   of the item.

13   Q.    All right.  And I believe you summarized two

14   additional Avagon accounts, one at Wachovia Bank as

15   well as Sun Trust Bank; is that correct?

16   A.    That's correct.

17   Q.    Why don't we take a look at the Avagon account at

18   Wachovia Bank, 410-A.

19   A.    Again, this is the fact sheet for Avagon at

20   Wachovia Bank.  Last four numbers is 4745 of the

21   account.  Account was open from March 21st, 2006, to

22   January 13th, 2007 -- excuse me, July 13th, 2007.  And

23   I was able -- total deposits were a little over

24   $230,000 running through this account.

25   Q.    Let's take a look at the withdrawals, the

1    identified withdrawals at 410-D.  And can you tell us

2    what this shows.

3    A.    Yeah.  This chart identifies the withdrawals

4    associated with Mr. Fall, and I was only able to

5    identify one to St. Mary's Bay View Academy for $3,000.

6    Q.    Let's take a look at 410-E.  And what does this

7    show?

8    A.    This is a summary chart showing all the checks

9    that were cashed out of this particular Avagon account

10   for the year 2007.

11   Q.    And if we look at the last page of this exhibit,

12   page 3, how much in total cashed checks?

13   A.    $144,982.27.

14   Q.    How did that compare to the overall deposits in

15   this account?

16   A.    I believe the overall deposits was about 300,000,

17   so almost half.

18   Q.    Was there any evidence admitted that the Defendant

19   received cash back to Broad Street through the mail?

20   A.    Yeah, I believe in one of the exhibits he was

21   requesting money back in the form of a package to

22   Comfort Dental.

23   Q.    Put that exhibit away.  Let's turn to the State of

24   Iowa.  Did you summarize bank records from the State of

25   Iowa?

1    **A.**   Yes, I did.

2    **Q.**   Taking a look at 411-A, tell us what this is.

3    **A.**   This is a fact sheet for the account in Iowa State

4    Bank, Accurate Bookkeeping Company, account 144045, and

5    basically the same facts that we've been mentioning on

6    other accounts.

7         In this case it was opened prior to

8    December 3rd, 2004, and it was closed May 29th, 2007,

9    there was a little over $2.5 million in deposits that

10   ran through this account for that period, and I was

11   able to identify 30 payees/depositors.

12   **Q.**   Let's take a look at the identified deposits for

13   this account, 411-C.  And what does this exhibit show?

14   **A.**   Again, this is a chart that summarizes the

15   deposits that are associated with Mr. Fall from this

16   particular account for -- from 2004 to 2006.

17   **Q.**   There are some payments from a Pamela McGrath to

18   NE Realty Holdings.  Do you see that?

19   **A.**   Yes, I do.

20   **Q.**   What was NE Realty Holdings?

21   **A.**   That was a company that Mrs. McGrath and her

22   husband were in the process of buying a house from, and

23   they were renting, also.

24   **Q.**   And Medical Marketing Associates -- I'm sorry,

25   Medical Marketing Professionals received a payment from

1    Comfort Dental; is that right?

2    **A.**   Yes, they did.

3    **Q.**   And what was Medical Marketing Professionals?

4    **A.**   That was an expense for advertising on Comfort

5    Dental.

6    **Q.**   And NE Realty Holdings from Shane McGrath -- I'm

7    sorry, Shane Gilreath, do you know what that is?

8    **A.**   Which one are we looking at?

9    **Q.**   I'm sorry, Shane Gilreath.  Let me withdraw the

10   question.  Do you recall Medical Marketing

11   Professionals being an entity of John Fall?

12   **A.**   Yes, I do.

13   **Q.**   And do you see checks from JV Services to Medical

14   Marketing Professionals, including a check for $32,500?

15   **A.**   Yes, I do.

16   **Q.**   And that particular payment from JV Services into

17   this account in Iowa, where's that check coming from?

18   **A.**   When I was looking at the JV Services account,

19   those checks were coming from Comfort Dental.

20   **Q.**   But the payment from JV Services here --

21   **A.**   Yes.

22   **Q.**   -- is that coming directly from Comfort Dental or

23   is that coming from another account somewhere?

24   **A.**   Oh, there's another account under JV Services.

25   Yeah.  Comfort Dental, then it would go to JV Services'

1    account, and then JV Services wrote out a check to

2    deposit in this account for Medical Marketing.

3    **Q.**   Do you recall -- the account that we're looking at

4    right now was from Iowa?

5    **A.**   Yes.

6    **Q.**   Do you recall in looking at the records where this

7    JV Services account was from which this check came?

8    **A.**   From the JV Services account, I believe it was --

9    **Q.**   That's all right.

10   **A.**   I can't recall right now.

11   **Q.**   That's all right.  We'll look at the records.

12   There's a lot to look at.  Why don't we put that

13   exhibit away.

14        Let's move to the accounts in Texas.  Did you

15   summarize accounts from Texas?

16   **A.**   Yes, I did.

17   **Q.**   Let's take a look at 412-A.  Can you tell us what

18   this is.

19   **A.**   This is a fact sheet for Liberty Bookkeeping

20   Systems at the Bank of America, Bank of Texas account,

21   last four numbers 7994.  This account was opened on

22   April 24th, 2004.  The records that I have showed that

23   it's still open as of the 29th of December of 2006, and

24   it was -- about $961,000 went through this account, and

25   I was able to identify 13 payees/depositors.

1    **Q.**   Okay.  And the title on the account is Liberty

2    Bookkeeping Systems?

3    **A.**   That's correct.

4    **Q.**   And the signature authority is Alison Lewis and

5    Mark Blessing?

6    **A.**   That's correct.

7    **Q.**   If we can go to 412-C.  Can you tell us what this

8    exhibit is.

9    **A.**   This exhibit is a summary chart of the identified

10   deposits that I was able -- associated with Fall that

11   were run through this particular bank account from 2005

12   to 2006, Liberty Bookkeeping Systems.

13   **Q.**   All right.  And are there checks from Broad Street

14   and Comfort Dental into this account?

15   **A.**   Yes, there are.

16   **Q.**   Are there checks to both Washington Allocation and

17   JV Services into this account?

18   **A.**   Yes, there are.

19   **Q.**   And for 2005, how much were those checks?  How

20   much did they total?

21   **A.**   They totaled $21,830.

22   **Q.**   Let's take a look at the second account from

23   American Bank of Texas.  If I can have 413-A.  Can you

24   tell us what this is.

25   **A.**   It's a fact sheet for an account titled

1    JVC Services, LLC (sic), located at the American Bank

2    of Texas.  Final account -- final four numbers of the

3    account is 8885.  It was opened on April 26th, 2005,

4    closed June 4th, 2007, and about $156,000 ran through

5    that account for that time period.

6    **Q.**   Again, the title on this account is JV Services,

7    LLC?

8    **A.**   Yes, it is.

9    **Q.**   Let's take a look at 413-C, and what does this

10   show?

11   **A.**   This is a chart that I produced that identifies

12   the deposit items that are associated with Mr. Fall

13   that ran through the JVC account from 2005 to 2007.

14   **Q.**   And who are the payments from?

15   **A.**   In this case they were all paid from Comfort

16   Dental.

17   **Q.**   And who were the payments to?

18   **A.**   All made to JVC Services.

19   **Q.**   And what was the total amount of payments?

20   **A.**   The grand total for all the years is $142,992.48.

21   **Q.**   And what was the evidence at trial as to how these

22   payments were being treated on the corporate returns?

23   **A.**   These were being written off under Comfort Dental.

24   **Q.**   Do you recall what line or as what --

25   **A.**   This was under -- it was either lease expense or

1    advertising.

2    Q.    Let's take a look at the third account at American

3    Bank of Texas.  If we could have 414-A.  Tell us about

4    this account.

5    A.    This account is under the New England -- NERH,

6    LLC, which is New England Realty Holdings, which is

7    another entity Mr. Fall set up.  This account is

8    located at American Bank of Texas; the last four

9    numbers of the account is 8826; and it was opened

10   April 29th, 2005, and it was closed January 29th, 2007;

11   and the total deposits were a little over 442,000.

12   Q.    Let's take a look at 414-C.  And what is this

13   document, 414-C?

14   A.    This is a chart I produced that identifies the

15   deposit items associated with Mr. Fall that ran through

16   this account from 2005 to 2007.

17   Q.    Do you see the payments from Allied Mortgage?

18   A.    Yes, I do.

19   Q.    And are they payable to NE Realty Holdings?

20   A.    Yes, they are.

21   Q.    What is NE Realty Holdings?

22   A.    That's an entity that Mr. Fall set up.

23   Q.    Let me show you 86-B.  Let's go to 86-B at page 1.

24   Do you have that in front of you?

25   A.    Yes, I do.

1    **Q.**   And the title at the top is Allied to Profit

2    Management and NE Realty Holdings.  Do you see that?

3    **A.**   Yes, I do.

4    **Q.**   And it says income and outgo?

5    **A.**   Yes.

6    **Q.**   This was from the Jorge Jaquez disks.  Did you

7    have a chance to look at this?

8    **A.**   Yes, I did.  Yup.

9    **Q.**   If we can go to the second page, we'll get a

10   better reading.  There are some payments reflected here

11   in this summary from Allied Mortgage to, for example,

12   NE Realty.  Do you see that?

13   **A.**   Yes, I do.

14   **Q.**   How was -- how were these payments characterized

15   by this document?

16   **A.**   The "I" would stand for income based on that

17   sheet.

18   **Q.**   Let's go back to 414-C.  There appear to be some

19   transfers from Olympic Business Systems to NERH into

20   this account; is that correct?

21   **A.**   That's correct.

22   **Q.**   And the item at the top, how much was that

23   transfer for?

24   **A.**   The total for 2005 was -- I believe that's

25   $263,000.

1    **Q.**   I'm sorry.  The transfer from Olympic Business

2    Systems, how much is that?

3    **A.**   The transfer from Olympic Business Systems was

4    $183,925.

5    **Q.**   All right.  Let's take a look at 414-D, which is

6    the withdrawals, and if I could have the ELMO.  What

7    does this document show?

8    **A.**   This is a chart that was produced to identify the

9    withdrawals associated with Mr. Fall from this NERH

10   account ending in 8826.

11   **Q.**   And there's a withdrawal of $90,000?

12   **A.**   Yes, there was.

13        JUROR:  Are we supposed to be seeing that?

14        MR. KANE:  Yes.

15        THE COURT:  You can put it down, Mr. Kane.

16        Now can you see it?

17        JUROR:  Yes.

18        THE COURT:  It's a fully admitted exhibit, so

19   you're certainly entitled to see it.

20   **Q.**   There are some payments out of this account to,

21   for example, Duggan & Caccavaro, one for $120,000.  Do

22   you see that?

23   **A.**   Yes, I do.

24   **Q.**   Do you recall what the evidence at trial was

25   concerning those payments?

1    **A.**   Again, it was either a sale of a property or a

2    mortgage that was refinanced.

3    **Q.**   Do you recall Mr. Caccavaro talking about the

4    private loans that he handled for NERH?

5    **A.**   Yes, he did.  Yes, I do.

6         MR. KANE:  Could I have the monitor again.

7    **Q.**   That was the third account from the American Bank

8    of Texas.  Let's take a look at the fourth account and

9    415-A, please.  Tell us about this account.

10   **A.**   Again, this is a fact sheet for the NERH account

11   at American Bank of Texas that ends in 8842.  It was

12   opened May 19th, 2005.  It was closed January 4th,

13   2007.  It had -- a little over $370,000 ran through

14   this account.

15   **Q.**   415-C.  This is a summary of the deposit items in

16   that account?

17   **A.**   Yes, it is.  It summarizes the items that were

18   associated with Mr. Fall from 2005, 2006.

19   **Q.**   And there was a transfer from Olympic Business

20   Systems in Washington down to this Texas account?

21   **A.**   Yeah.  It was a wire on 1/26, 2006, for 97,200.

22   **Q.**   And what was the check from John Greene?

23   **A.**   John Greene, that was a check for a closing on one

24   of the properties Mr. Fall owned.

25   **Q.**   Let's take a look at another Texas bank account.

1    Do you recall summarizing records at the Security Bank

2    of Whitesboro?

3    **A.**   Yes, I do.

4    **Q.**   Let's have 416-A.  Different bank, new account.

5    Can you tell us about this one.

6    **A.**   Again, this is a fact sheet for Washington

7    Allocation account, which is located at Security Bank

8    of Whitesboro, an account with last four digits 4022;

9    and it was opened on August 15, 2005, and it was closed

10   June 29th, 2007; and a little over $524,000 went

11   through this account.

12   **Q.**   416-C, please.

13   **A.**   Basically this is a chart that I produced that

14   identifies the deposit items that went through this

15   account that are associated with Mr. Fall.

16   **Q.**   And it includes items from Broad Street as well as

17   Comfort Dental?

18   **A.**   Yes.

19   **Q.**   If we can go to the next page, please.  All right.

20   Taking a look at 416-D, what is this chart?

21   **A.**   This chart is a chart I produced to identify the

22   withdrawals associated with Mr. Fall from this

23   particular account ending in 4022 from Washington

24   Allocation.

25   **Q.**   And are there withdrawals to Lexus Financial

1    Services?

2    **A.**   Yes, there are.

3    **Q.**   If we can go to the next page, please.  Is there a

4    withdrawal to Venture Lending Group?

5    **A.**   Yes.

6    **Q.**   And how much is that for?

7    **A.**   In this particular one, it looks like $15,000.

8    **Q.**   Let's go to the next page.  Is there a wire to

9    Avagon?

10   **A.**   Yup.  There's a wire for 97,500.

11   **Q.**   Is there another transfer to Avagon?

12   **A.**   Yup, another one for Avagon for 7,500.

13   **Q.**   Is there another one for Avagon?

14   **A.**   Another one for $4,000.

15   **Q.**   And another one for Avagon?

16   **A.**   That last one is 6,250.

17   **Q.**   Next page, please.  Is there another check to

18   Avagon?

19   **A.**   Yup.  That one's for $60,010.

20   **Q.**   That looks like a wire; correct?

21   **A.**   Yeah, that is a wire.  Yup.

22   **Q.**   All right.  Let's take a look at an account you

23   summarized in the name of NERH at Fidelity, 417-A, and

24   what was this account?

25   **A.**   This is a Fidelity account under NERH, the account

1    ending in 3287 at Fidelity.  It was opened by John

2    Joseph Fall, so he's the signature authority.  Date

3    opened was December 14th, 2007, and I have records that

4    it was still open as of December 31st, 2008; and

5    $22,500 ran through this account at that time.

6    **Q.**    417-C.  Is this a chart of the deposit items?

7    **A.**    Yes, this is a chart of the deposit items, and the

8    one I identified was for 22,500 from Allied Home

9    Mortgage Capital.

10   **Q.**    Did you summarize an account in the name of The

11   Smart Buyer at American Century Investments?

12   **A.**    Yes, I did.

13   **Q.**    418-A, please.  And what was this account?

14   **A.**    This is the account located at American Century

15   Investments under The Smart Buyer Company.  The

16   signature authority is John Fall.  It was opened on

17   August 18th, 2003, and it was still open as of

18   December 31st, 2007; and $53,207 ran through the

19   account.

20   **Q.**    If you can go back to the 449 exhibit, which is

21   the summary list of your summary exhibits.  Do you have

22   that in front of you?

23   **A.**    Yes, I do.

24   **Q.**    And if you could turn to the last page, there are

25   some additional exhibits identified beginning with 21-A

1    and going through 21-E.  Do you see that?

2    A.   Yes, I do.

3    Q.   And are those demonstrative exhibits that you

4    reviewed?

5    A.   Yeah.

6    Q.   And verified the numbers?

7    A.   Yeah, I reviewed -- I didn't produce the charts,

8    but I reviewed them and made sure they're accurate.

9    Q.   And it's your understanding that the IRS trial

10   illustration unit drew up these demonstratives?

11   A.   Yes.

12   Q.   And that they were provided to you to look at to

13   see if they were accurate?

14   A.   Yeah.

15   Q.   And a fair demonstration of some of the flows of

16   the money between the accounts?

17   A.   Yeah, basically charts to show the flow of the

18   money through the accounts we just went through, and I

19   just went through it and checked to make sure all the

20   numbers and exhibits were correct.

21   Q.   And these are just examples to show some of the

22   transfers going on?

23   A.   That's correct.

24   Q.   And are these demonstratives fair and accurate

25   demonstratives of some of the money flows between the

1    accounts?

2    **A.**   Yes.

3         MR. KANE:  Your Honor, I move --

4    **Q.**   And you did make some amendments to it.  They were

5    provided to you from the trial illustration unit

6    through counsel, and you did make some changes to that

7    to ensure their accuracy and their fairness?

8    **A.**   Yes, I did.

9         MR. KANE:  Your Honor, I move the following

10   exhibits for the limited purpose of demonstration:

11   41-A through -- 421-A through 421-E.

12        MR. FITZGERALD:  Your Honor, I'm not going to

13   object, but I'd ask the Court to give an instruction

14   for the purpose of demonstrative evidence.

15        THE COURT:  Well, I'm going to -- certainly you

16   can use them based on the testimony as demonstrative

17   evidence.  I want to hear whether or not they're

18   admitted as full exhibits, which has not been my

19   practice.  Rather, they're demonstratives that the jury

20   can use to aid and assist the testimony.

21        If you want to argue to me later, perhaps at

22   lunchtime, that they, in fact, should be admitted as

23   full exhibits, I'll hear you under 1006 or other rules;

24   but for now you've established what's necessary, this

25   Court believes, for purposes of using them as

1    demonstratives which the Court finds would aid and

2    assist the jury in determining the facts in this case.

3         So, ladies and gentlemen, at this time, though

4    the Court may revisit it, the purpose of you seeing

5    these documents are that they will assist you in

6    understanding the evidence that the Court has -- may or

7    may not assist you in understanding and appreciating

8    the evidence that the Court has admitted in.

9         As of right now they're not evidence, per se,

10   but rather demonstratives, sometimes we call them

11   chalks here, to assist you in understanding the

12   evidence.

13        MR. KANE:  Thank you, your Honor.

14        (Government Exhibits 421-A through E marked for

15   identification.)

16   **Q.**   Let's have 421-A.  Do you have that in front of

17   you?

18   **A.**   Yes, I do.

19   **Q.**   And the title of this summary is Transfers of

20   Money From Comfort Dental and Broad Street Tenants to

21   Colorado, Washington and Maryland Accounts, 2003

22   through 2004; is that right?

23   **A.**   That's correct.

24   **Q.**   Just focusing on the top part of the chart, just

25   take us through from left and right and tell us what

1    this shows.

2    **A.**    Okay.  You start off with the first box on the

3    left, right there.  It's Comfort Dental, Broad Street

4    tenants.  You take all those items that -- and the

5    total of those items for 2003 were $211,245.

6          And that's just showing that those checks went

7    from Comfort Dental into Stratford Management.  Okay.

8    That totaled 211,245.

9          And then at Stratford Management you can see a

10   check for $37,000 was made out and moved into the

11   Avagon account in Maryland.

12         So you're just trying to -- in this particular

13   instance, you're just trying to follow from Comfort

14   Dental and where the money went all the way to Avagon.

15   **Q.**    And the payment from Stratford to Avagon, you're

16   not suggesting that's all the payments or that you're

17   capturing the entire activity in this account.  You're

18   just isolating that payment to show movement between

19   accounts?

20   **A.**    That's correct.  That's the same with all the

21   charts.

22   **Q.**    Let's go to the bottom part, and just tell us what

23   this shows.

24   **A.**    Okay.  Again we're starting off with Comfort

25   Dental and Broad Street tenants, so the checks from

1    those particular entities for the year 2004, and I was

2    able to -- I was able to find three or four items that

3    moved from -- these particular checks that moved on to

4    Stratford Management.

5         And at the top you see one for 30,050.  That

6    check moved on to Stratford Management.  And that could

7    be one check.  It could be a combination of checks,

8    too.

9         And then right below that there's one for

10   $76,675.  Those checks or check were moved on and went

11   to Olympic Business Systems.  And then the bottom one

12   for $207,000, those checks or check was moved on to

13   Olympic Business Systems in that particular account.

14        And in this particular flow-through, you can see

15   from Stratford Management, right there, there's a check

16   for $195,000 that went from Stratford Management and it

17   went into the Olympic Business Systems account 9218.

18   So it just shows you the flow of how some of that money

19   coming out of Stratford Management ended up.

20        And then the final one was $225,711, and that

21   could be a combination of a couple of checks from

22   Consignment Partners that ended up in the Avagon

23   account.

24        And, again, this just shows you the flow of how

25   the money went from Comfort Dental all the way to

1   Avagon and it was going through these different

2   accounts.

3   **Q.**   Again, just for purposes of example and

4   demonstration, you're not capturing all the financial

5   activity in these accounts?

6   **A.**   No.

7   **Q.**   All right.  421-B.  And what does this show?

8   **A.**   This is a chart that shows the transfer of money

9   from Stratford Management to Office Services deposited

10  into the Mountain Management account for 2002.

11      And so basically you have your first block,

12  which is Stratford Management 8152 account, and that's

13  actually -- that particular figure, $437,000, was

14  deposited in that account for that particular time

15  period.

16      And then I was -- found items for Office

17  Services, again, it could be one check, it could be

18  maybe several checks, that were moved on to Mountain

19  Management account 1245.  So out of the $437,000,

20  $155,000 went to Office Services' account.

21  **Q.**   421-C.

22  **A.**   Okay.  Again, this chart's titled Transfers of

23  Money to the State of Washington and from Washington to

24  Texas for the Years 2004 to 2005.

25      Again, we'll start off on the left for the top

1   part.  Okay.  These are checks from Comfort Dental and

2   Broad Street from 2004 to 2005, and from there $89,975

3   of those checks ended up in the Olympic Business

4   Systems account 9218 in Washington.

5        And then from there I was able to find $103,000

6   of items or item that went to Washington Allocation

7   account 4022 in Texas.  So the flow is from, well,

8   Comfort Dental, Broad Street, Rhode Island, to an

9   account in Washington to an account in Texas.

10  Q.   And when you have Comfort Dental and Broad Street

11  tenants here, you're talking about two different

12  sources, the Comfort Dental operating account and then

13  the separate source which would be Broad Street

14  tenants?

15  A.   That's correct.

16  Q.   All right.  The bottom part of the chart.

17  A.   Okay.  Again, it starts off with checks from

18  Comfort Dental, and of those $207,000 of them ended up

19  in this Olympic Business Systems account out in

20  Washington, account 0015.

21       And then from there I was able to trace I think

22  it's $183,925 to NERH 8826 account in Texas; and,

23  again, that could be one item for 183 or it could be a

24  combination of items.

25  Q.   Okay.  421-D.

1    **A.**    Okay.  This is a chart that's classified as

2    Transfers of Money from the Sale of 35 Forbes Street.

3    **Q.**    Anthony DiBiase was the closing attorney?

4    **A.**    Yes, he was.

5    **Q.**    And a check was cut for $162,587 as a payoff to

6    Washington Allocation?

7    **A.**    Yeah, Washington Allocation account in Texas.

8    Yes.

9    **Q.**    And then what does the right side of the chart

10   show?

11   **A.**    Basically of that $182,000, Mr. Fall was able to

12   put monies in different accounts of Avagon.  On the top

13   was $6,250 ended up in the Avagon Maryland account, and

14   then $60,010 ended up in the Avagon 7097 account in

15   Maryland, and then on the very bottom $104,010 ended up

16   in the Avagon 709 account, too.

17   **Q.**    Exhibit 421-E.  And can you tell us what this

18   exhibit shows.

19   **A.**    Yup.  The title of this chart is Transfers of

20   Money, Deposition of Funds Paid from Comfort Dental to

21   JVC Services (sic).  So, again, we start from the left,

22   which is Comfort Dental, 2005, 2007.  And of that I was

23   able to determine $142,992 went to JVC Services account

24   8885, which is in Texas.

25        And then from there I followed monies going to

1    Accurate Bookkeeping Services, 144045, and I was able

2    to find more checks for $19,688 going to Accurate

3    Bookkeeping Services, 144045.

4         And then $26,000 went to Washington Allocation

5    4022 account in Texas, and the first two accounts in

6    Accurate Bookkeeping were in Iowa.  And then at the end

7    were JVC checks that were made to advertising

8    companies, and that totaled $48,710.

9    **Q.**   All right.  That last item, checks forwarded to

10   the advertising companies, did you hear the testimony

11   from Ken Cournoyer and perhaps other witnesses

12   concerning those payments?

13   **A.**   Yes.

14   **Q.**   And were those accounted for in the final audit

15   adjustment by the IRS?

16   **A.**   Yes, they were.

17   **Q.**   And you've prepared some summaries of the

18   adjustments as well, and are they accounted for in the

19   adjustment?

20   **A.**   Yes, they are.

21   **Q.**   And these other items, did they go to advertising?

22   **A.**   I believe so, yes.  Accurate Bookkeeping, I think

23   that was the -- the 55 was medical.

24   **Q.**   Did they go to advertising or did they go to other

25   accounts?

1    **A.**   Oh, oh.  The Washington Allocation and Accurate

2    Bookkeeping?

3    **Q.**   Yes.  Where are these -- where's Accurate

4    Bookkeeping located?

5    **A.**   Accurate Bookkeeping is in Iowa.

6    **Q.**   And where is the second Accurate Bookkeeping

7    entry, where was that?

8    **A.**   Iowa.

9    **Q.**   And Washington Allocation, that was another

10   account in Texas?

11   **A.**   That's another account in Texas.

12   **Q.**   And those payments didn't go to advertising?

13   **A.**   No.

14   **Q.**   All right.  421-F.  And what does this show?

15   **A.**   This shows the transfer of monies from the sale of

16   37 Sagamore Street and NERH, LLC, payoff.

17          So it starts with John Greene, who is the

18   attorney handling the sale of this property.  The check

19   for $153,239 ended up in NERH, LLC, account 8842 in

20   Texas; and from there I was able to find $180,000 going

21   to the -- I think it's Caccavaro attorney for private

22   loans.

23   **Q.**   And one final demonstrative, 421-G.  What does

24   this show?

25   **A.**   This shows the transfers of money, payments by

1    Comfort Dental and Broad Street to Washington

2    Allocation and the transition of funds thereafter.

3         So, again, we start off to the left.  You'll see

4    Comfort Dental and Broad Street for 2005.  I was able

5    to trace $51,183 worth of checks to Washington

6    Allocation 4022 account located in Texas, and from

7    there I was -- there was about 500 -- no, 5,600 of

8    those checks from Washington Allocation went to the

9    Lexus car payments and $44,000 went back to Broad

10   Street.

11   **Q.**   Okay.  Let's take a look back at your summary

12   sheet, and I want to show you the final set of

13   summaries.  And if you can look at the last page of 449

14   beginning at Exhibit 22.  Do you have that in front of

15   you?

16   **A.**   Four?

17        THE COURT:  422.

18   **Q.**   422 is the exhibit identified on 449.

19   **A.**   On the chart?

20   **Q.**   I'm sorry.  On the summary sheet, the list of

21   exhibits.

22   **A.**   Oh.

23   **Q.**   If you can turn to the last page.

24   **A.**   Yup, 422, identified deposits paid to Washington

25   Allocation.

1    **Q.**   And you prepared that chart?

2    **A.**   Yes, I did.

3    **Q.**   And 423 is a summary of advertising adjustments

4    that you prepared based on the admitted evidence?

5    **A.**   Yes.

6    **Q.**   And is that a fair and accurate summary based on

7    the admitted evidence?

8    **A.**   Yes, it is.

9    **Q.**   And 424 is a summary of your adjustments for

10   leasing expenses?

11   **A.**   Yes, it is.

12   **Q.**   And there are some additional summaries here

13   listed on 449 through 426-B.  Are they true and

14   accurate summaries of the admitted evidence?

15   **A.**   Yes.

16          MR. KANE:  Your Honor, I move the admission of

17   422, 423, 424, 424-A, 425-A, 425-B, 425-C, 426-A and

18   426-B.

19          MR. FITZGERALD:  I object, your Honor.

20          THE COURT:  Objection is overruled.  Exhibits

21   422, 423, 424, 424-A, 425-A through C, and 426-A and B

22   are admitted as full exhibits.

23          (Government Exhibits 422, 423, 424, 424-A, 425-

24   through C, and 426-A and B admitted in full.)

25   **Q.**   Let's take a look at 422.  Can you tell us what

1    this shows.

2    **A.**   This is a chart I produced that identifies the

3    deposit items paid to JVC, LLC, and Washington

4    Allocation from Comfort Dental for the years 2005 to

5    2007.

6    **Q.**   And if we can go to the second page of this

7    exhibit, what are the total payments by Comfort Dental

8    to these entities for those years?

9    **A.**   The total, the grand total is $262,184.09.

10   **Q.**   423.  Can you tell us what this is.

11   **A.**   Yeah.  This is a chart I produced that gives you

12   the breakdown of the advertising adjustments that I

13   proposed from 2005 to 2007 for Comfort Dental.

14   **Q.**   All right.  Let's just take the top part of the

15   chart.  And what does this show?

16   **A.**   We'll start with 2005.  Basically the first figure

17   is the per return figure.  That would be $119,496.

18   That's a figure that was claimed on the tax return.

19   Okay.

20         And the next figure is as corrected, which is

21   $68,335.50.  That figure is the figure I came up with

22   based on the evidence that was put through through

23   trial.

24         And the final figure is the adjustment, which is

25   $51,160.50.  That's the adjustment that was made --

1    that you would make on the return basically disallowing

2    $51,000 worth of advertising expenses in 2005.

3    **Q.**   Now, I think you testified that adjustment that

4    you made is based on the admitted evidence; is that

5    correct?

6    **A.**   That's correct.

7    **Q.**   And 2005 was not under audit by Ken Cournoyer that

8    we heard through trial; is that right?

9    **A.**   That's correct.

10   **Q.**   It was just 2006 and 2007?

11   **A.**   That's correct.

12   **Q.**   But you looked at other evidence in the case and

13   made a determination on 2005 as well?

14   **A.**   That's correct.

15   **Q.**   And if we go down further on the page, is this the

16   work you're showing on how you came about that figure?

17   **A.**   Yes, it is.

18   **Q.**   And this portion of the document shows checks to

19   JV Services; is that right?

20   **A.**   Yes.

21   **Q.**   Which would be disallowed; is that correct?

22   **A.**   That's correct.

23   **Q.**   Based on the admitted evidence?

24   **A.**   That's correct.

25   **Q.**   And if we could pull out.  And the bottom part is

1     amounts you're essentially giving back; is that right?

2     **A.**     Yeah.   I'm allowing the payments to these

3     advertising companies.

4     **Q.**     And the net difference is 51,160?

5     **A.**     Yes.

6     **Q.**     And did you perform the same calculation for 2006

7     and 2007?

8     **A.**     Yes, I did.

9     **Q.**     And are your figures and your adjustments for 2006

10    and 2007 the same as the IRS's adjustment during this

11    civil examination?

12    **A.**     Yes, it is.

13    **Q.**     And were you able to verify those calculations by

14    looking at the actual bank records and the deposits at

15    JV Services and the withdrawals?

16    **A.**     Yes, I did.

17    **Q.**     All right.   Let's look at 424.   And tell us what

18    this is.

19    **A.**     These are the adjustments to the Comfort Dental

20    tax return that I proposed for equipment lease and

21    lease expenses, dental x-ray, from 2002 to 2006 based

22    on the admitted evidence.

23    **Q.**     And the final adjustments are on the bottom line;

24    is that right?

25    **A.**     Yes, they are.

1    **Q.**   And that's what was disallowed based on the

2    admitted evidence?

3    **A.**   That's correct.

4    **Q.**   For 2002 through 2004, how did you come up with

5    this adjustment?  What evidence did you base your

6    determination on?

7    **A.**   It would be based on the evidence that was -- the

8    bank statements that were put through in trial and, you

9    know, inspected by me.

10   **Q.**   What was the evidence concerning Managed Skills,

11   do you remember?

12   **A.**   Oh, the Managed Skills, again, this is lease;

13   right?

14   **Q.**   Yes.

15   **A.**   The Managed Skills, that was the one that Mr. Fall

16   would give the paperwork and it would be based on the

17   percentage of sales, and then there would also be

18   sometimes based on the -- just a regular, you know,

19   figure each month; but there was Managed Skills and two

20   other entities that were getting paid.

21   **Q.**   Let's take a look at 87-B.  And this was an

22   admitted exhibit taken from the Jorge Jaquez disks, and

23   it's an income/outgo spreadsheet for Comfort Dental.

24   Do you see that?

25   **A.**   Yes, it is.

1    **Q.**   Let's turn to the second page to get a clearer

2    copy.  Do you have that in front of you?

3    **A.**   Yes, I do.

4    **Q.**   Were these payments from Comfort Dental to Managed

5    Skills, Profit Management and Professional Equipment?

6    **A.**   Yes, they are.

7    **Q.**   And how were these recorded by Mr. Fall?

8    **A.**   They were categorized as expense items.

9    **Q.**   Is this the document you used to calculate the

10   adjustments for 2002 through 2004?

11   **A.**   Yes, I did.

12   **Q.**   As well as the other evidence concerning Managed

13   Skills?

14   **A.**   Yup.  Yes.

15   **Q.**   All right.  Let's have 424 again, please.  And so

16   you made final adjustments for 2002, 2003, 2004, 5 and

17   6 for equipment leasing and expenses?

18   **A.**   Yes.

19   **Q.**   Let's go to 424-A.  And what does this show us?

20   **A.**   This is basically the summary of all the

21   adjustments that I proposed to Comfort Dental tax

22   returns from 2002 to 2007.

23   **Q.**   And the adjustments here for 2002 through 2004 are

24   adjustments that you made based on the admitted

25   evidence here?

1    **A.**    That's correct.

2    **Q.**    And 2006 and 2007 are consistent with the civil

3    examination by the IRS?

4    **A.**    They are.

5    **Q.**    And 2005 you based on the admitted evidence?

6    **A.**    Yes.

7    **Q.**    And the final adjustments for each year are on the

8    bottom line, total for all adjustments?

9    **A.**    That's correct.

10   **Q.**    And you also prepared some summaries concerning

11   the tax due and owing by John Fall, the Defendant?

12   **A.**    Yes, I did.

13   **Q.**    Let's have 425-A.  What does this show?

14   **A.**    This is a summary sheet showing taxes, penalties

15   and interest owed by John Fall from 1998 to the year

16   2000.

17   **Q.**    And what did you base these calculations on?

18   **A.**    These are based on the evidence that was put

19   through through the trial, the transcripts.

20   **Q.**    And did that include the examination file and the

21   calculations by the IRS civil exam?

22   **A.**    Yes.

23   **Q.**    And what is the tax due and owing for 1998?

24   **A.**    For 1998, it's $66,150.

25   **Q.**    And what's the tax due and owing for '99?

1    **A.**    $33,576.81.

2    **Q.**    And what's the tax due and owing for 2000?

3    **A.**    $11,760.82.

4    **Q.**    And what's the total tax due and owing for all

5    three years?

6    **A.**    The grand total is $111,438.13.

7    **Q.**    If we can zoom out.  And the next part of the

8    chart shows your work in terms of how you came to those

9    calculations?

10   **A.**    That's correct.  It's just the breakdown of how I

11   came up with the figures.

12   **Q.**    There are some penalties included here as well; is

13   that right?

14   **A.**    That's correct.

15   **Q.**    The actual tax owed is this line; is that correct?

16   **A.**    Yeah.  Each category's going to show you -- is

17   going to have the total for the taxes, which is one

18   category; then you have the total for the penalties;

19   and then if you go a little further, there's a total

20   for the interest, also.

21   **Q.**    The tax due and owing without penalties and

22   interest, just the tax due and owing for all three

23   years, approximates 27,000 plus 10,000 and change and

24   almost 5,000, so that's 42,000?

25   **A.**    Yeah, approximately.

1   **Q.**   And that is as a tax due and owing?

2   **A.**   That's only the tax, correct.

3   **Q.**   And then the penalties are down below?

4   **A.**   The penalties and interest are added on.

5   **Q.**   Now, this audit or these audits for '98 and '99

6   and 2000 were based on W2s, 1099s hitting the IRS

7   system; is that right?

8   **A.**   That's correct.

9   **Q.**   Do such examinations necessarily capture all the

10  taxpayer's income?

11  **A.**   No, because that's just the stuff that's getting

12  recorded at the IRS based on other companies sending in

13  letting them know how much this particular person

14  earned.

15  **Q.**   Was there other evidence in the case that for 1999

16  and 2000 Mr. Fall received additional payments?

17  **A.**   Yes, there was.

18  **Q.**   Let's have 425-B.  And what does this show?

19  **A.**   These are the summary of payments to either John

20  Fall or other entities for the year 1999 and 2000.

21  **Q.**   And you did this calculation just for the -- those

22  audit years; is that right?

23  **A.**   That's correct.

24  **Q.**   And how much by way of additional payments did you

25  find in these accounts for '99?

1   **A.**   $42,838.50.

2   **Q.**   And how about 2000?

3   **A.**   $56,947.05.

4   **Q.**   And did you perform a, or prepare a separate

5   summary building in these payments in order to

6   calculate a tax due and owing?

7   **A.**   Yes, I did.

8   **Q.**   Let's have 425-C.  And what is this summary?

9   **A.**   This is a summary of taxes, penalties and interest

10  owed by John Fall from '98 to 2000 adding in the tax

11  owed -- that would be owed on that additional income he

12  earned in 1999 and 2000.

13  **Q.**   And if we go down below where your work is set

14  forth, can you show us where -- well, I guess where the

15  taxes are set forth for '99, you have additional tax of

16  $12,782; is that right?

17  **A.**   Yes.

18  **Q.**   And that's based off of the total payments,

19  additional payments that you calculated in the previous

20  summary?

21  **A.**   That's correct.

22  **Q.**   And for 2000, there's an additional $17,050 in

23  additional tax?

24  **A.**   That's correct.

25  **Q.**   And that's based on the additional payments you

1    found for 2000?

2    **A.**   That's correct.

3    **Q.**   And if those payments are included, the additional

4    tax or the total tax due and owing for all three years

5    approximates $71,000, give or take?

6    **A.**   That's correct.

7    **Q.**   We can put that exhibit aside.  Two final

8    exhibits.  426-A.  Can you tell us what this exhibit is

9    intended to show.

10    **A.**   This is a summary that's -- I'm trying to identify

11    all the items associated with John Fall from all the

12    bank accounts we just spoke about from 1999 to 2007.

13    **Q.**   Now, this summary isn't intended to suggest this

14    is all income to Mr. Fall; is that correct?

15    **A.**   No.  This is just anything -- any deposit I was

16    able to identify that was associated with John Fall.

17    **Q.**   And it includes some transfers between accounts,

18    so you haven't accounted --

19    **A.**   Correct.

20    **Q.**   -- for deducting those?

21    **A.**   Yeah.  Again, it's just identified as the

22    deposits.  It's not classifying what's income and

23    what's not income, such as transfers.

24    **Q.**   Just to capture the financial activity?

25    **A.**   Exactly, trace it and showing you all the money

1   and where everything went.

2   **Q.**   And if we look at the last page of this exhibit,

3   number 17, how much by way of total deposits into

4   various accounts for this exhibit?

5   **A.**   The grand total for those years, a little over

6   $2.1 million.

7   **Q.**   And 226-B, that's just a summary of those payments

8   by year?

9   **A.**   That's correct, just to summarize all the numbers.

10           MR. KANE:  Okay.  Nothing further, your Honor.

11           THE COURT:  Thanks, Mr. Kane.

12           Mr. Fitzgerald.

13                          CROSS-EXAMINATION

14   BY MR. FITZGERALD:

15   **Q.**   Good afternoon, Agent Pleshaw.

16   **A.**   Good afternoon.

17   **Q.**   Okay.  Maybe it's easiest if we just kind of start

18   on a couple of the things you just talked about.

19   **A.**   Sure.

20   **Q.**   So we keep everybody a little focused here.

21   426-B, can I have that brought up, please.  426-B

22   was -- that's all of the items, all of the deposit

23   items from all of the accounts or entities or bodies

24   that are associated with Fall over the years?

25   **A.**   Yeah, from 1999 to 2007.

1    **Q.**   Okay.  So over that whole time, $2.1 million went

2    through all these entities and accounts?

3    **A.**   Correct.

4    **Q.**   Okay.  Now, I might have missed it, but if it goes

5    from one account to the next account to the next

6    account, was that taken -- did you take that into

7    account?

8    **A.**   Yeah.  As I stated, it's just identifying the

9    deposits.  It's not identifying whether it's a

10   transfer, which is a nontaxable item, or an income

11   item.  It's just capturing the actual deposit items.

12   **Q.**   Here's what I'm asking.  Maybe this will be a

13   little bit more clear.  If there was a deposit in the

14   Washington Allocation account --

15   **A.**   Yes.

16   **Q.**   -- okay, that would have been put on here; right?

17   **A.**   Yes.

18   **Q.**   And if there was a deposit in JV Services, that

19   would be in here; right?

20   **A.**   Correct.

21   **Q.**   And if it went from Washington Allocation to

22   JV Services, was that discounted?

23   **A.**   No.  It was captured.

24   **Q.**   Okay.  So it could be that this account, this

25   dollar figure, certain dollars could be counted twice?

**A.**   Oh, definitely.

**Q.**   Definitely.

**A.**   Yeah.

**Q.**   All right.  Just so we know or just so you can explain to the jury, cash is a fungible item?

**A.**   Right.  In this particular chart, it's just, again, it's just showing where all the money went and it just -- the flow.

And, again, yes, you are going to get some transfers because, like the attorney was saying, if it goes from Washington to JVC (sic), I would capture them both, yes.

**Q.**   So it's not -- so the actual dollar amount that is involved in this case is less than that amount there?

**A.**   Yes, it could be less.  Yes.

**Q.**   Well, we know it's less because there are some; right?

**A.**   Right.  There are some transfers.

**Q.**   Okay.  So this is not -- it's not -- this is not taxable income here; right?

**A.**   Nope.

**Q.**   It's not real dollars that Mr. Fall had in his pocket; right?  Not totally; right?

**A.**   Not the total at one point.  You mean the 2.1 million?

1        MR. FITZGERALD:  Your Honor, I'm going to move

2    that this exhibit be withdrawn or be removed from

3    evidence.

4        THE COURT:  Motion's denied.  The motion's

5    denied.

6    **Q.**   Okay.  And this is a total of the deposits.  Did

7    you also do a tally sheet of all the withdrawals from

8    these various accounts?

9    **A.**   No.

10   **Q.**   Okay.  And going back to the item at the top,

11   "associated with Fall," that's at the top of this --

12   **A.**   That's correct.

13   **Q.**   -- document; right?  You created these summaries;

14   right?

15   **A.**   Correct.

16   **Q.**   Did you come up with the title "associated with

17   Fall"?

18   **A.**   I'm sure we discussed amongst the team, but I'm

19   sure I probably came up with the idea.

20   **Q.**   Okay.  And "associated with Fall" means that --

21   that means any of these entities, Revenue Management

22   Services, JV Services, Comfort Dental, Broad Street,

23   Broad Street Investments, Allied Mortgage; right?

24   **A.**   Those are all of them.

25   **Q.**   These are all of the "associated with Fall"?

1    **A.**    Those are all the entities he created, yes.

2    **Q.**    Well, that's not what you wrote here.  You said

3    "associated with Fall," and there's a difference

4    between associated with Fall and entities that he

5    created; right?

6    **A.**    Yes.

7    **Q.**    Okay.  So "associated with Fall" does not mean

8    that's everything he created; right?

9    **A.**    Well, some of the items might be Mr. Fall, but

10   associated through the -- through his entities he

11   created.

12   **Q.**    Right.  At the beginning of your testimony, you

13   looked at a number of documents from Revenue Management

14   Services.

15   **A.**    Correct.

16   **Q.**    And those listed John Fall as the general partner;

17   right?

18   **A.**    Yes.

19   **Q.**    Fair to say that all of these entities that are

20   associated with Fall do not have those same kind of

21   documents that say they were created by Mr. Fall?  They

22   don't list Mr. Fall as the general partner, per se?

23   **A.**    The other ones that I looked at said he was

24   general partner.

25   **Q.**    For Revenue Management Services?

1    **A.**   Yes.

2    **Q.**   I'm talking about all of the entities associated

3    with Fall.  Not all of them are so clear-cut created by

4    Mr. Fall; right?

5    **A.**   They're not all clear-cut, but there's sheets that

6    tie him into those entities.

7    **Q.**   Right.  At some point either you or somebody else

8    over in the Government team here decided that these

9    entities were associated with Mr. Fall; correct?

10   **A.**   Uh-huh.

11   **Q.**   Either based on papers they saw; right?

12   **A.**   Yeah.  Through evidence, yeah.

13   **Q.**   Or Dr. Sanchez telling you; correct?

14   **A.**   Oh, correct.  Yup.

15   **Q.**   Mr. Fall didn't tell you he created all these

16   entities; correct?

17   **A.**   No, he hasn't said anything yet.

18   **Q.**   Right.  He didn't talk to you anyway; right?

19   **A.**   No, I've never talked to Mr. Fall.

20        MR. FITZGERALD:  All right.  Can I take that

21   down, please.  Now can I have 425-A, please.

22   **Q.**   All right.  This was the -- well, this is your

23   sheet, the tax, penalties and interest owed by

24   Mr. Fall?

25   **A.**   Correct.

1    **Q.**   Did you go back and do an assessment or did you

2    just take these figures from somebody else's

3    assessment?

4    **A.**   They're taken from the transcript, the official

5    transcript.

6    **Q.**   And I may be saying "assessment" instead of

7    "examination."  Whichever it is, you didn't do this,

8    these were the numbers that were in the transcripts?

9    **A.**   That's correct.

10   **Q.**   And I think you testified that this only

11   encompasses items of income that would have a 1099 or a

12   W2 or something like that.

13   **A.**   Correct.

14        MR. FITZGERALD:  All right.  Can we put up the

15   other one, 425-C, please.

16   **Q.**   Okay.  And this was all the income from the

17   documents plus the money or the deposit items from '99

18   and 2000, the items that were deposited in accounts

19   associated with him.

20   **A.**   Correct.

21   **Q.**   Is that correct?

22   **A.**   Correct.

23        MR. FITZGERALD:  Okay.  So just so I can come

24   full circle, if you can --

25        (Counsel confer.)

1  **Q.**   426-A.  Okay.  And on 426-A, page 1, we have 42?

2  Right there.

3       MR. FITZGERALD:  Can you bring that up a little

4  bigger so Agent Pleshaw can see it.  Thank you.  Maybe

5  just the box with the 42.

6  **A.**   I see it.

7  **Q.**   Okay.  That's the number that you attached onto

8  the -- to your tax estimation there?

9  **A.**   Right.  That's the additional income I attached,

10  yes.

11  **Q.**   And can you go to page 2, please.  And same thing

12  with this, that box there?

13  **A.**   Yes.

14  **Q.**   And that's the number you attached onto the --

15  your 2000?

16  **A.**   Yes.

17  **Q.**   Okay.  So those two dollar amounts there -- and

18  can I have 425-C back up now.  Okay.  So all you did

19  was take the items that were deposited into the items

20  associated with Mr. Fall and tack them on as income?

21  **A.**   That's correct.

22  **Q.**   You don't know if -- you just tacked them on as

23  income?

24  **A.**   I just tacked them on as income.

25  **Q.**   And let me ask you this.  We might as well just do

1    it with the one that's up here.

2    **A.**    Uh-huh.

3    **Q.**    425-C.  Down at the bottom you see the grand total

4    owed and the interest and all that?

5    **A.**    46,000?

6    **Q.**    Yes.  Interest as of when?

7    **A.**    The interest would be off the transcript that was

8    put in through evidence at the very beginning of the

9    trial.  That's where that figure came from.

10   **Q.**    Okay.  So if that was done back in 2005 or 2004,

11   whenever it was done, that was the interest that was

12   owed at that time?

13   **A.**    That's correct.

14   **Q.**    This isn't interest from up until today?

15   **A.**    No.  No.

16   **Q.**    And a number of these taxes were ultimately paid?

17   **A.**    Based on the transcripts, I didn't see a payment,

18   no.

19   **Q.**    The IRS seized property, money, that was applied

20   to this tax?

21   **A.**    Through the jeopardy assessment?

22   **Q.**    I don't know.  They applied money to this, didn't

23   they?

24        MR. KANE:  Objection.  Vague as to the time

25   period counsel's talking about.

1      THE COURT:  Why don't you rephrase,

2   Mr. Fitzgerald.

3   **Q.**   Ultimately property was seized, property, money

4   was seized and applied to this tax deficiency for the

5   '99 and 2000 years?

6   **A.**   I don't -- on the transcripts, I don't recall

7   seeing a payment, unless you have something else to

8   show me; but I don't know when that money was seized,

9   but at the time he owed this money based on those

10  transcripts.

11      MR. FITZGERALD:  Your Honor, I'm going to ask to

12  stop here.  It will take me a minute.

13      THE COURT:  Sure.

14      Ladies and gentlemen, we'll take our lunch break

15  now.  Continue not to discuss this case amongst

16  yourselves, don't do any independent research and enjoy

17  your lunch.

18      (The jury is not present for the following.)

19      THE COURT:  Just two things.  Court's Exhibit 13

20  will be a note that the CSOs received from Mr. Fall

21  when he came into the courthouse this morning.

22      (Court Exhibit 13 marked for identification.)

23      THE COURT:  Lori, could you just ask Gary to

24  come in quick.  Do you mind?  I just want to put on the

25  record about Courtroom 4.

1          Officer Palumbo, were you able to -- can you

2    verify to the Court that this morning Courtroom 4 was

3    made available to Mr. Fall and that Courtroom 4

4    contained a live audio and video feed of the trial

5    proceedings in Courtroom Number 3?

6          CSO PALUMBO:  It was, your Honor.

7          THE COURT:  And Mr. Fall was present in

8    Courtroom 4 during that period?

9          CSO PALUMBO:  Yes, sir.

10          THE COURT:  Unless there's anything else, we'll

11    stand adjourned.

12          (Recess.)

13          (The jury is present for the following.)

14          THE COURT:  I tried to put the temperature up a

15    degree or two.  I noticed a couple people may have been

16    chilly.

17          Agent, you understand you're still under oath?

18          THE WITNESS:  Yes, I do.

19          THE COURT:  Mr. Fitzgerald.

20          MR. FITZGERALD:  Thank you, your Honor.

21    **Q.**   Why don't we go to page 2 first.  Agent Pleshaw,

22    before -- Pleshaw?

23    **A.**   Pleshaw.

24    **Q.**   Agent, before we left at lunch, we were talking

25    about whether or not some of those taxes had been paid

1    in prior years?

2    **A.**   Uh-huh.

3    **Q.**   Okay.  And what's on the screen there is Exhibit

4    2-A.

5    **A.**   Yes.

6    **Q.**   Which you recognize; correct?

7    **A.**   Yes.

8    **Q.**   This was the exhibit that you listed as one of the

9    ones -- one of the exhibits that you relied on?

10   **A.**   Yes.  Correct.

11   **Q.**   For Exhibits 425-A and 425-C; right?

12   **A.**   Correct.

13   **Q.**   Okay.  And you recognize that's the first page of

14   the transcript; correct?

15   **A.**   Correct.

16         MR. FITZGERALD:  Can we have page 5, please.

17   All right.  If you could just bring up that area just

18   below there.  That's great.

19   **Q.**   Okay.  You'll see that $62,438?

20   **A.**   Yes.

21         MR. KANE:  Objection, your Honor.  It's

22   irrelevant and misleading.  It's after the date of the

23   Indictment.

24         THE COURT:  The objection's overruled.  You'll

25   have a chance on redirect to point out anything you

1     need to, Mr. Kane.

2     **Q.**   My question to you before was whether or not you

3     knew if any of those taxes had been paid; right?

4     **A.**   Correct.

5     **Q.**   And if you look at 2-A, you can see that a

6     substitute payment suit was filed and there was $62,438

7     paid towards that 1999 tax assessment; right?

8     **A.**   That was on the 1999 transcript tax assessment,

9     yes.  That would be a payment based on the suit, yes.

10     **Q.**   I'm sorry, the 1998 transcript?

11     **A.**   If it's '98, okay, '98.

12     **Q.**   My fault.  This is the '98 transcript, and that

13     shows that there was a payment?

14     **A.**   Yes, subsequent payment.  Must be on a suit.  I

15     don't know exactly what that means.

16     **Q.**   But this was -- so when I asked you about the

17     taxes on -- I'm sorry, the numbers on 425-A and I asked

18     you if you knew how much had been paid, I think you

19     said no, but that shows you how much was paid?

20     **A.**   Yes.  Yes.

21         MR. FITZGERALD:  And can I have 2-B, please,

22     page 2.

23     **Q.**   This is the transcript for 1999.  Do you recognize

24     that?

25     **A.**   Is this '99 or '98?

1    **Q.**    Right up here at the top.

2    **A.**    Yup, '99.  Okay.

3         MR. FITZGERALD:  Do you have it?  Okay.

4         And can I have page 4, and can you make the

5    bottom area larger, please.

6    **Q.**    And, again, right there, that $33,703?

7         MR. KANE:  Same objection, your Honor.  I'm

8    sorry.

9         THE COURT:  Overruled.

10   **A.**    Yeah, looks like a payment was finally made in

11   2011 for 1999.

12   **Q.**    So there were payments on those two tax

13   assessments?

14   **A.**    Correct.

15        MR. FITZGERALD:  Take that down, please, and

16   bring up 425-C, please.

17   **Q.**    Now, I understand those tax payments are not on

18   this exhibit here, 425-C, but this was your assessment

19   if you included these deposits from '99 and -- from '99

20   and 2000?

21   **A.**    That's correct.

22   **Q.**    Okay.  And that's if you included them in your

23   assessment and treated them as pure income, this would

24   be the tax; correct?

25   **A.**    That's correct.

1    **Q.**    And so this is theoretical; correct?

2    **A.**    This is based on the evidence that was put forth

3    in the trial.

4    **Q.**    But based on the assumption that it's all income?

5    **A.**    Based on the evidence that's in the trial, yes.

6    **Q.**    You're not going to agree with me?

7    **A.**    That was based on Revenue Management being income

8    to Mr. Fall.

9    **Q.**    You treated all the deposits as income?

10   **A.**    For those two years, yes.

11   **Q.**    So assuming that's income, pure income, then you

12   tax it as income?

13   **A.**    Tax would increase, that's correct.

14       MR. FITZGERALD:  Can I have 421-A, please.

15   **Q.**    Agent Pleshaw, this is one of the demonstrative

16   charts that you talked about earlier?

17   **A.**    Yup.

18       MR. FITZGERALD:  And if you could just bring the

19   top -- make the top half a little larger for me,

20   please.  I guess it's not really going to do it.  We'll

21   deal with this.

22   **Q.**    So what this is saying is that there was $211,000

23   that came from Comfort Dental and the Broad Street

24   tenants that went into Stratford Management?

25   **A.**    Correct.

1    MR. FITZGERALD:  I'm sorry.  Can you expand it

2  again.

3  **Q.**    Okay.  During the time period of 2003 to 2004?

4  **A.**    Correct.

5  **Q.**    That's basically all of the rental income for

6  Broad Street -- for 1482 Broad Street?

7  **A.**    For 2003?

8  **Q.**    Yes, for 2003 and 2004.

9  **A.**    Correct.

10  **Q.**    So all the income -- I'm sorry, all the rents plus

11  whatever Comfort Dental wrote a check for went into

12  Stratford Management and totals out to $211,000?

13  **A.**    Correct.

14  **Q.**    And then at some point I guess subsequent to that

15  $211,000 going into Stratford, $37,000 went out of

16  Stratford into this Avagon account?

17  **A.**    Correct.

18  **Q.**    Other than the $37,000 coming after the

19  $211,000 --

20  **A.**    Yup.

21  **Q.**    -- there's no relation between those two dollar

22  figures; right?

23  **A.**    The 37's the only item I showed from Stratford to

24  Avagon.

25  **Q.**    Right.  We're talking about the money being

1    fungible; and once it goes into the account, it's in

2    the account; right?

3    **A.**    That's right.

4    **Q.**    So you can't say that the 37,000 is part of that

5    211,000?

6    **A.**    It was part of that 211,000 that went into

7    Stratford Management, yes.

8    **Q.**    But there was more money than 211,000 in Stratford

9    Management; right?

10   **A.**    Could have been.

11   **Q.**    There was other money in Stratford Management

12   other than that 211,000?

13   **A.**    If you say so.

14   **Q.**    Well, you went through the records.

15   **A.**    Yeah, I know, but I don't have the charts of

16   Stratford Management in front of me.

17   **Q.**    Okay.  You didn't even draw up this chart, the one

18   we're looking at; right?

19   **A.**    No.  I checked it over.

20   **Q.**    So you know that there's other money in Stratford

21   besides just that $211,000?

22   **A.**    Correct.  Yeah.

23   **Q.**    So the chart says it goes from Comfort Dental to

24   Stratford and then Stratford to Avagon?

25   **A.**    Correct.

1   **Q.**   But the money that's in between there in those

2   arrows, not necessarily the same money?

3   **A.**   Oh, you're trying to say over and above the 211

4   that is deposited into Stratford could have went to

5   Avagon.

6   **Q.**   I'm not sure what I'm trying to say.  I'm trying

7   to ask you a question.

8   **A.**   There is more money; but in this particular case

9   it's Comfort Dental, it's 211 went into Stratford.  Out

10  of that 211, 37,000 went over.

11  **Q.**   And what I said before, the only relation is the

12  37,000 came out after the 211 went in?

13  **A.**   Yes.  That's correct.

14  **Q.**   And then down below you have these different

15  amounts going from Comfort Dental and the other tenants

16  at the Broad Street property going into these different

17  accounts; correct?

18  **A.**   Correct.

19  **Q.**   And you show the transfer from Stratford to

20  Olympic; correct?

21  **A.**   You're talking the 195,000?

22  **Q.**   Right.

23  **A.**   Correct.

24  **Q.**   Right.  And the reason that that 195 is on the

25  right is because it happened later in time to the ones

1    on the left of the screen; correct?

2    A.    Correct.

3    Q.    And then the same thing with the 225 at the bottom

4    that goes to Avagon?

5    A.    Correct.

6    Q.    Okay.  Not necessarily the same money?

7    A.    The money from those accounts, yes, that went on

8    to Avagon.

9    Q.    Right.  I'm saying the money on the left-hand side

10   of the chart and the money on the right-hand side of

11   the chart, not necessarily the same money?

12   A.    Right.  If you take that bottom one, 207 went in,

13   225 went out.  So obviously there's more money in the

14   account.

15        MR. FITZGERALD:  Obviously, yes.  There we go.

16   Thank you.  Can I have 421-B.

17   Q.    Okay.  So Stratford Management had 2002 -- in 2002

18   had $437,000 deposited --

19   A.    That's correct.

20   Q.    -- in the account?  Those were the total deposits

21   into that Stratford Management account?

22   A.    For 2002, yes.

23   Q.    For 2002?

24   A.    Yup.

25   Q.    Not necessarily Mr. Fall's -- I'm sorry, not

1    necessarily tracing back to the entities that we've had

2    identified as associated with Fall?

3    **A.**    In that particular year, there was only I think

4    three or four items I was able to identify associated

5    with Mr. Fall because the other stuff wasn't legible.

6    **Q.**    Well, there was other deposits that came from

7    other sources?

8    **A.**    That went into Stratford, correct.

9    **Q.**    Other people that had nothing to do with Mr. Fall;

10   right?

11   **A.**    Quite possible.

12   **Q.**    And the $155,000 that went to Office Services --

13   **A.**    Yes.

14   **Q.**    -- that doesn't have any relationship to the

15   437,000; correct?

16   **A.**    Yes, it was 155,000 of the 437 that went in.

17   **Q.**    Well, the 437 is just the deposits for 2002?

18   **A.**    Correct.

19   **Q.**    There was money before that in the account;

20   correct?

21   **A.**    Well, that's the money for 2002 that was deposited

22   in Stratford, correct.

23   **Q.**    But at some time in 2002, 155,000 went out to

24   Office Services?

25   **A.**    To Office Services, correct.

1    **Q.**   Other than the fact that that happened later in

2    2002 or after 2002, there's no relation between those

3    two numbers?

4    **A.**   Well, you had to get the money from somewhere, so

5    it would be from Stratford.

6         MR. FITZGERALD:  Can I have 421-C, please.

7    **Q.**   Okay.  Across the top, this is transfers of money

8    in 2004 and 2005.  So, again, Comfort Dental and the

9    Broad Street renters?

10   **A.**   Correct.

11   **Q.**   Almost $90,000 goes into Olympic Business Systems

12   from those entities?

13   **A.**   Correct.

14   **Q.**   And at some point later, $103,000 leaves Olympic

15   Business Systems and goes to Washington Allocation?

16   **A.**   Correct.

17   **Q.**   Again, not necessarily the same money?

18   **A.**   Olympic, there's a lot of entities in there; but

19   103 went over to Washington Allocation, correct.

20        MR. FITZGERALD:  And then can I have 421-E.

21   **Q.**   So, again, $142,000 from Comfort Dental to

22   JV Services?

23   **A.**   Correct.

24   **Q.**   And then a whole bunch of money out of JV Services

25   to these three accounts, plus the actual cost of the

1    advertising companies?

2    **A.**   Correct.

3    **Q.**   And you know that the dollar amounts don't add up?

4    The ones on the left and the right, you know they don't

5    add up?

6    **A.**   Correct.

7         MR. FITZGERALD:   And could I have 421-F.

8    **Q.**   Okay.   And this is a transfer of money for

9    37 Sagamore Street; right?

10   **A.**   Correct.

11        MR. FITZGERALD:   I don't need that anymore.

12   Thank you.   Let me ask you some questions about -- can

13   I have the ELMO.   This might be a little bit easier

14   this way.

15   **Q.**   All the summaries of the accounts that you

16   produced have this kind of cover sheet?

17   **A.**   I don't --

18   **Q.**   You don't have it?

19   **A.**   I don't have it.

20        MR. FITZGERALD:   Sorry.   We're getting there.

21        THE CLERK:   Is this admitted?

22        MR. FITZGERALD:   Yes.   I'm sorry.   These are all

23   admitted.

24   **Q.**   Is it up?

25   **A.**   Stratford Management?

1   **Q.**   Right.

2   **A.**   Yup.

3   **Q.**   You had a name for these cover sheets.  What did

4   you call them?

5   **A.**   They're fact sheets.

6   **Q.**   Fact?

7   **A.**   Fact sheets.

8   **Q.**   Not fax?

9   **A.**   Fact.  They're fact.

10   **Q.**   Fact sheets.  These are the fact sheets for --

11   well, this one is for Stratford Management, but you did

12   one for each of these accounts?

13   **A.**   That's correct.

14   **Q.**   Okay.  And on each of these accounts you have the

15   total deposits there, $765,988.38 for this particular

16   Stratford Management account?

17   **A.**   Correct.

18   **Q.**   And that's the total deposits for that time

19   period; right?

20   **A.**   Correct.

21   **Q.**   It's not the total deposits for entities or beings

22   or persons or companies that you've identified as

23   associated with Fall; correct?

24   **A.**   Correct.

25   **Q.**   That's all the money that went into that account

1    during that time period?

2    **A.**   That's all.  Yes.  Correct.

3    **Q.**   No matter where it came from?

4    **A.**   Correct.

5    **Q.**   I'm showing you what's 407-A.  This is your fact

6    sheet for Olympic Business Systems?

7    **A.**   Correct.

8    **Q.**   And this particular Bank of America account?

9    **A.**   Correct.

10   **Q.**   Six million seven hundred sixty-four thousand-plus

11   dollars?

12   **A.**   Correct.

13   **Q.**   Not associated with Fall?

14   **A.**   Some are.

15   **Q.**   Some is.  Do you know how much?

16   **A.**   In this particular one, I believe there's a sheet

17   that follows.  I'm not really sure.

18   **Q.**   But it's a lot less than $6.7 million?

19   **A.**   Probably.

20   **Q.**   Less than a million dollars?

21   **A.**   If you say so.

22   **Q.**   Well, do you remember?

23   **A.**   I would have to see my sheet.

24   **Q.**   408-A.  This is one of the Avagon accounts?

25   **A.**   Yes, it is.

1    **Q.**   Your fact sheet?

2    **A.**   That's correct.

3    **Q.**   $4.1 million?

4    **A.**   That's correct.

5    **Q.**   Not associated with Fall?

6    **A.**   Some is probably associated.

7    **Q.**   Much less than $4.1 million?

8    **A.**   Probably.

9    **Q.**   Well, actually I think we can agree on this

10   because you had that -- total amount of deposits was

11   only two million something; right?

12   **A.**   Oh, in the -- the first sheet we were talking

13   about before lunch, yes.

14   **Q.**   The first sheet we were talking about before

15   lunch.  I want to bring everybody up to speed on what

16   we're talking about, not just the agent and I.

17        426-B, that was the total deposits for all of

18   the associated entities for Fall, and that total was

19   2.1 million?

20   **A.**   That's correct.

21   **Q.**   And that included transfers between entities?

22   **A.**   That's correct.

23   **Q.**   So the actual dollar amount involved in this whole

24   case is less than that?

25   **A.**   Could be less, yes.

1    **Q.**   Well, it is less than that?

2    **A.**   If there are transfers, yes.

3    **Q.**   So when we look at 408-A, the Avagon account, a

4    total of $4.1 million, you know that it's a lot less

5    than $4.1 million?

6    **A.**   That's correct.

7    **Q.**   411-A, Accurate Bookkeeping, an account at Iowa

8    State Bank?

9    **A.**   Yes.

10    **Q.**   $2.5 million?

11    **A.**   That's correct.

12    **Q.**   Not all associated with Fall?

13    **A.**   That's probably correct.

14    **Q.**   Much less associated with Fall?

15    **A.**   Correct.

16         MR. FITZGERALD:  I think we've seen enough of

17    those.  Could I have 405-C up, please.  I'm sorry.

18    Could we go back to the computer.

19    **Q.**   Okay.  405-C, this is the identified deposit items

20    for this Compass Bank account, Stratford Management?

21    **A.**   Correct.

22    **Q.**   And there's a number of payors listed?

23    **A.**   Correct.

24    **Q.**   In particular, Comfort Dental; right?

25    **A.**   Is there one in here on this page?

1    **Q.**   Do you see my mark there?  Let's bring it up.

2    **A.**   Future Management?  Oh, yes, right above it.  Yes.

3         MR. FITZGERALD:  So we have that -- can you

4    bring it up a little bit, just the bottom half of the

5    page there.

6    **Q.**   Okay.  So we have March 11th, 2003, Comfort

7    Dental, Professional Corp., $4,500?

8    **A.**   Yes.

9    **Q.**   So that was a check from Comfort Dental; right?

10   **A.**   Yes.

11   **Q.**   Made out to Nathan Hale?

12   **A.**   Correct.

13   **Q.**   That was deposited in the Stratford account?

14   **A.**   Correct.

15   **Q.**   And the $4,500 was for rent.  Do you know that?

16   **A.**   I believe it is.

17   **Q.**   That was the rent that Comfort Dental paid every

18   month?

19   **A.**   Right.

20        MR. FITZGERALD:  Could I have the next page.

21   **Q.**   And if you see down towards -- pardon me.  Right

22   at the top, right there, another Comfort Dental,

23   $4,500, Nathan Hale?

24   **A.**   Yeah, I see that, 4,500.

25   **Q.**   4,500?

1   A.   Yes.

2   Q.   There are a number of those all the way through

3   this particular -- this document, through the six pages

4   of this document.  Okay.  I'll tell you if you add

5   those up it comes up to $58,500.

6   A.   Okay.

7   Q.   Okay?  Now, if you look at 405-E.  Can you bring

8   up the bottom half of the page.  The items listed here,

9   that's where the money was going to?

10  A.   Going back into Broad Street, correct.

11  Q.   So there was 58,000 that went in from Comfort

12  Dental, just Comfort Dental, okay, and that was rent?

13  A.   Correct.

14  Q.   And then Stratford Management then turned around

15  and paid out a whole bunch of money to Broad Street

16  Investments?

17  A.   Correct.

18  Q.   Okay.  And I'll add it up for you.  If you add up

19  all of them, it's like 139,500.

20  A.   Okay.

21  Q.   And what we didn't do on the first one, we didn't

22  add up all the other renters.

23  A.   Uh-huh.

24  Q.   Okay.  Do you know, though, if you take up all the

25  rents, all the money going into Stratford from Comfort

1      Dental and the rentals, okay, is it about even between

2      what went into Stratford and what went back out to

3      Broad Street Investments?

4    **A.**    I have no idea.

5    **Q.**    You don't.  Okay.  But you know that Broad Street

6      Investments is Carmen Sanchez's company?

7    **A.**    That's the rental company, yes.

8    **Q.**    It's a company that she owns?

9    **A.**    Correct.

10          MR. FITZGERALD:  I'm sorry.  Can I have -- can

11     you take that down, please.

12          Pardon me, folks.  Just one second, please, your

13     Honor.

14          THE COURT:  Sure.

15          (Pause.)

16          MR. FITZGERALD:  Can you bring up 224-B.

17   **Q.**    Agent Pleshaw, 224-B is, I believe, a collection

18     of checks that were deposited into Stratford

19     Management, I believe.

20   **A.**    Can you. . .

21   **Q.**    I'm sorry.  These are a number of items that were

22     deposited into Liberty Bookkeeping, which was at the

23     American Bank in Texas.  Do you remember that one?

24   **A.**    Yes, I do.

25   **Q.**    Okay.  And if we go to page 26, and can you bring

1    up the top two checks.  All right.  The top check

2    there, LBS Group --

3    A.    The Broad Street one?

4    Q.    No, no, the top one, LBS Group.

5    A.    Oh, LBS Group.  You mean the deposit ticket?

6    Yeah.

7    Q.    Do you see that one?

8    A.    Yes, I do.

9    Q.    That has nothing to do with this case; right?

10   A.    That's Liberty Bookkeeping Systems.

11   Q.    Okay.  But there's nothing about that particular

12   check, I don't even know if it's a check, frankly, a

13   deposit ticket, does that have anything to -- let me

14   take a step back.

15          Can we go to page 27 first.  Okay.  And now can

16   you bring up the top two.  Okay.  So this particular --

17   this MoneyGram here, it says pay to the order of Echo

18   Acres?

19   A.    All for $50, yes.

20   Q.    That's got nothing to do with this case; right?

21   A.    I don't recall that, Echo Acres, no.

22   Q.    That's just another deposit from somebody else

23   that's in this Liberty Bookkeeping Systems account?

24   A.    It could be.

25   Q.    And you don't have any recollection that it has

1    anything to do with this case?

2    **A.**    No.   Echo Acres, no, I don't.

3    **Q.**    Could we go back to page 26 now and just the top

4    half of the page.   Now, in this case, the bottom check,

5    Broad Street Investments paid to Washington Allocation;

6    right?

7    **A.**    Correct.

8    **Q.**    And that was deposited into Liberty Bookkeeping

9    Systems' account?

10   **A.**    Correct.

11   **Q.**    And that was signed by Carmen Sanchez?

12   **A.**    Correct.

13        MR. FITZGERALD:   Okay.   Can I have the ELMO

14   again.

15   **Q.**    And 412-A I'm showing you, that's your fact sheet

16   from Liberty Bookkeeping Systems?

17   **A.**    Yes.

18   **Q.**    Okay.   $961,000, not all associated with this

19   case?

20   **A.**    $961,000, correct.

21   **Q.**    But that number does include those checks from

22   Broad Street Investments signed by Carmen Sanchez;

23   right?

24   **A.**    Correct.

25   **Q.**    It does include those?

1   **A.**   Yes.

2          MR. FITZGERALD:  Can I have 410-A, please.

3   **Q.**   Okay.  This Avagon account showed a total deposit

4   of $233,000, almost $234,000; correct?

5   **A.**   Correct.

6          MR. FITZGERALD:  And can I have 410-E.  Go to

7   page 3, please.

8   **Q.**   And the cash -- so we have the total deposits of

9   almost $234,000, and then $144,000, $145,000 of checks

10  going out?

11  **A.**   Cashed checks, correct.

12  **Q.**   Cashed checks.  And do you remember Mr. Kane

13  pointing out that those two numbers didn't match?

14  **A.**   Correct.

15  **Q.**   And then he asked you about cash being used in

16  this case?

17  **A.**   Correct.

18  **Q.**   And there was evidence that people had used cash?

19  **A.**   Yes, there was.

20  **Q.**   Are you telling the jury that the difference

21  between 234 and 144 thousand was cash that went into

22  somebody's pocket somewhere along the way here?

23  **A.**   No, no.  This chart just -- this represents the

24  checks that were cashed and the cash that came out that

25  I could identify out of this account for that

1   particular time period.

2   **Q.**   Those two numbers, the difference between those

3   two numbers doesn't represent a cash amount that came

4   out?

5   **A.**   The difference between the 233 and the 144?

6   **Q.**   Yeah.

7   **A.**   No, that does not represent cash.  No.

8   **Q.**   And certainly not cash that went to Mr. Fall?

9   **A.**   The cash that went to Mr. Fall might be from this

10  cash.

11  **Q.**   It might be?

12  **A.**   It might be.

13  **Q.**   We don't even know if there is cash.  We don't

14  know what happened to the rest of the account?

15  **A.**   Oh, no.  I'm just talking about what's in front of

16  me.

17  **Q.**   Right.  But we don't know what happened to the

18  other money that was in that account?

19  **A.**   No.

20  **Q.**   We don't know where it went?

21  **A.**   No.

22       MR. FITZGERALD:  Can I have the ELMO again.

23  **Q.**   I'm just going to bring you back to that 426-B,

24  and the dollar amount there?

25  **A.**   2.1 million.

1    Q.   2.1 million.  We've seen a lot of fact sheets with

2    a whole bunch of money on them.  We see this one with

3    $2.1 million?

4    A.   Correct.

5    Q.   Do you know how much money went to Mr. Fall in all

6    this?

7    A.   Based on the 2.1 million?

8    Q.   Based on everything you've looked at, do you know

9    how much money went into his pocket?

10   A.   About 2.1 million was identified associated with

11   Fall.

12   Q.   Moving through accounts?

13   A.   Excuse me?

14   Q.   Moving through accounts?

15   A.   Moving through accounts, correct.

16   Q.   Some of that money went back to Broad Street

17   Investments, which was Carmen Sanchez; right?

18   A.   Correct.

19   Q.   But you don't know where it ended up?

20   A.   I don't know the exact amount Mr. Fall received,

21   no.

22   Q.   Do you know the exact amount of any money that

23   anybody received out of all of this?

24   A.   Based on this, Mr. Fall is associated with

25   2.1 million.

1  **Q.**   Okay.  Some of that 2.1 million is the same

2  dollars; right?

3  **A.**   Correct.

4  **Q.**   So it's not really 2.1 million; right?

5  **A.**   If you say so.

6  **Q.**   I'm asking you.

7  **A.**   Some of it's transfers.  I don't know the exact

8  figure.  It could be 1.9 million.

9  **Q.**   It could be 200,000?

10  **A.**   It could be.

11      MR. FITZGERALD:  I have no further questions.

12      THE COURT:  Thanks, Mr. Fitzgerald.

13      Mr. Kane.

14      MR. KANE:  Thank you, your Honor.

15                 <u>REDIRECT EXAMINATION</u>

16  <u>BY MR. KANE</u>:

17  **Q.**   Let me just follow up with that last series of

18  questions.  Counsel asked you whether you could

19  determine with definiteness exactly how much Mr. Fall

20  made or exactly where the money went.  I gather the

21  answer's no.

22  **A.**   Correct.

23  **Q.**   Can you tell the jury why in this case that was

24  so.

25  **A.**   As you saw, there are so many bank accounts and so

1    many entities that Mr. Fall created, it makes it very

2    difficult to trace where the money goes; and as you can

3    see in the charts, that the money moves from account to

4    account to account.

5         In order to trace back stuff to Mr. Fall, it

6    makes it very difficult; and that's, hence, why they

7    have these warehouse accounts to help people put money

8    through like that; and it makes it very difficult for

9    the IRS to trace the money.

10   Q.   And you mentioned warehouse banks in that

11   response, and let me go to that issue.  Counsel asked

12   you some questions about a number of those fact sheets.

13   A.   Correct.

14   Q.   Do you remember that?

15   A.   Yes.

16   Q.   And he highlighted the total deposits in those

17   accounts being in the millions of dollars?

18   A.   Correct.

19   Q.   And he asked you, and I think pretty clearly

20   established, that in many of those accounts, that's not

21   all of Mr. Fall's money; is that correct?

22   A.   Oh, that's correct.

23   Q.   And I think we discussed this on direct

24   examination.  Were there other people's monies in these

25   accounts?

1    **A.**   Yes, there were.

2    **Q.**   And is that the very nature of what a warehouse

3    bank is?

4    **A.**   Yes.

5          MR. KANE:  Can I have Exhibit 2-A, please.

6    **Q.**   This is the IRS transcript for Mr. Fall for the

7    1998 tax year.  Do you remember some questions with

8    respect to this document?

9    **A.**   Correct.

10   **Q.**   Let's go to page 5.  Now, as I understand it, you

11   used this document in part to summarize the tax due and

12   owing for Mr. Fall for 1998; is that right?

13   **A.**   That's right.

14   **Q.**   And if we look in the few pages before this, those

15   assessments will be set forth?

16   **A.**   That's correct.

17   **Q.**   And those assessments were rendered after an

18   examination by the IRS?

19   **A.**   That's correct.

20   **Q.**   Now, on this particular page, counsel directed you

21   to the $62,438 figure there as a payment to the IRS.

22   Do you see that?

23   **A.**   Yes, I do.

24   **Q.**   And can you tell me what the date is of that.

25   **A.**   It's January 13th, 2011.

1  **Q.**   And do you recall the testimony in this case from

2  Shauna Henline that this was a forced collection action

3  and not a voluntary payment by the Defendant?

4  **A.**   Yes.

5  **Q.**   And if we can go back to the third page of this

6  exhibit, I believe the assessments for this year are

7  set forth here; is that correct?

8  **A.**   That is correct.

9  **Q.**   It looks like 3,000 and change as well as 23,000

10 and change; is that right?

11 **A.**   That's correct.

12 **Q.**   And the dates those assessments were rendered is

13 what date?

14 **A.**   Assessment date is November 28th, 2005.

15 **Q.**   Okay.  Just focusing on 1998 and keeping in mind

16 that forced payment suit in 2011, did Mr. Fall have a

17 tax due and owing as of this point in 2005?

18 **A.**   Yes, he did.

19 **Q.**   Did he have a tax due and owing in 2006?

20 **A.**   Yes.

21 **Q.**   Did he have a tax due and owing in 2007?

22 **A.**   Yes.

23 **Q.**   Did he have a tax due and owing in 2008?

24 **A.**   Yes.

25 **Q.**   Did he have a tax due and owing in 2009?

1    **A.**    Yes.

2    **Q.**    Did he have a tax due and owing in 2010?

3    **A.**    Yes.

4    **Q.**    And do you know whether the charge in the

5    Indictment ends in 2010?

6    **A.**    I believe it ends in 2010.

7    **Q.**    But you don't really know?

8    **A.**    I don't really know, though.

9    **Q.**    Counsel asked you about some of the summaries that

10   characterize some of the items as associated with

11   Mr. Fall, and you were given instruction from counsel

12   to use a somewhat neutral term to identify some of

13   those deposits.

14   **A.**    Correct.

15   **Q.**    And was there evidence linking Mr. Fall to those

16   entities?

17   **A.**    Yes.

18   **Q.**    Was the evidence stronger than association?

19          MR. FITZGERALD:  Objection.

20          THE COURT:  Sustained.

21          MR. KANE:  Let's have 421-E.  Let's actually go

22   to 405-C.

23   **Q.**    Counsel asked you a number of questions about this

24   account.  Was this account a little different from some

25   of the other accounts?  Do you recall whether or not

1  the items in this account were all or most associated

2  with Mr. Fall?

3  **A.**   At Stratford Management they were associated with

4  Mr. Fall.

5  **Q.**   And there were a number of different payees that I

6  think you listed, maybe about five payees associated

7  with this account?

8  **A.**   Yes.  That's correct.

9  **Q.**   Why don't we go to 405-D.  And this is the summary

10  of those payees?

11  **A.**   That's correct.

12  **Q.**   And of all the payees in this account, was there

13  evidence admitted at trial associating Mr. Fall with

14  those entities?

15  **A.**   Yes.

16  **Q.**   Counsel also asked you, I believe, about the

17  withdrawals in this account, the total withdrawals

18  compared to the total deposits indicating that there

19  may have been some mismatch or more withdrawals than

20  deposits.  Do you recall those questions?

21  **A.**   Yes.

22  **Q.**   Let's go to 405-C again.  This is the chart for

23  identified deposits; is that correct?

24  **A.**   Correct.

25  **Q.**   Is this chart capturing all the deposits in the

1    account?

2    **A.**    No, it doesn't.

3    **Q.**    In fact, if we look at this chart, it says it has

4    a few items for 2001 and a few items for 2002; is that

5    right?

6    **A.**    That's correct.

7    **Q.**    And those are the only items that you can read or

8    that you can find in the admitted evidence; is that

9    right?

10   **A.**    That's correct.

11   **Q.**    But there were more deposits?

12   **A.**    Yes.

13   **Q.**    And we see that in 405-B?

14   **A.**    In the summary, yes.

15   **Q.**    Let's take a look at 405-B.  I think those

16   itemized deposits were 19 plus 5 or 6, so maybe $30,000

17   between 2001 and 2002?

18   **A.**    Correct.

19   **Q.**    And if we just pull up this part of the chart.

20   You did have the statements, the bank statements, for

21   all the accounts?

22   **A.**    Yes.

23   **Q.**    So you were able to determine the total deposits

24   for each account in a given period even though you

25   weren't able to identify exactly what those deposits

1    were?

2    **A.**   Correct.

3    **Q.**   And the amounts for 2002, for example, are far

4    more by way of deposits than you are able to identify?

5    **A.**   That's correct.

6    **Q.**   And there was no indication -- was there any other

7    indication in this account as to any other payees other

8    than the ones you identified in that summary?

9    **A.**   Only those five.

10   **Q.**   405-E, sticking with Stratford Management, this is

11   a chart of the identified withdrawals; is that correct?

12   **A.**   That's correct.

13   **Q.**   And counsel focused on payments back to Broad

14   Street.  Do you recall that?

15   **A.**   Yes.

16   **Q.**   And there are some payments back to Broad Street;

17   is that right?

18   **A.**   That's correct.

19   **Q.**   Were there also withdrawals to Olympic Business

20   Systems?

21   **A.**   I believe so.

22   **Q.**   Well, let's go to the fourth page and be sure.  Is

23   there a withdrawal to Olympic Business Systems in the

24   State of Washington?

25   **A.**   Yeah, $195,000.

1    **Q.**    And are there withdrawals to another entity,

2    Consignment Partner?

3    **A.**    Yes, there was.

4    **Q.**    And was there one for $27,000?

5    **A.**    Yes, there was.

6    **Q.**    And another withdrawal to Avagon in Maryland; is

7    that right?

8    **A.**    37,000.  Correct.

9    **Q.**    And other entities payable to Professional

10   Equipment, entities appearing on the Melissa Sugar

11   intake sheet that was seized as part of the search

12   warrant?

13   **A.**    Yes.

14   **Q.**    Listing Mr. Fall as the client?

15   **A.**    Correct.

16          MR. KANE:  Nothing further.

17          THE COURT:  Thanks.  Mr. Fitzgerald?

18          MR. FITZGERALD:  I don't have any further

19   questions.  Thank you, your Honor.

20          THE COURT:  Agent, you can step down.  Thank

21   you, sir.

22          Mr. Kane, could you collect the exhibits for

23   Ms. McGuire.  Does the Government have any further

24   witnesses or exhibits?

25          MR. KANE:  The Government rests.

1              THE COURT:  Thank you.  Ladies and gentlemen,

2      we're going to take a brief break now.  When the

3      Government rests in a case, there are certain matters

4      that the Court has to attend to.  So we'll take our

5      mid-afternoon break right now.

6              Remember, you've only heard the Government's

7      case to date.  We'll find out shortly whether the

8      Defendant is going to put on any evidence.  As I've

9      told you all along, he has absolutely no obligation

10     whatsoever to put any on.  So we'll hear from

11     Mr. Fitzgerald shortly on that.

12             But continue not to discuss this case amongst

13     yourselves.  We're almost at the end, as you can tell.

14     Don't do any independent research even if you could in

15     that room without your phones or internet, and we'll

16     see you back shortly.

17             (The jury is not present for the following.)

18             THE COURT:  Mr. Fitzgerald, do you have a

19     motion?

20             MR. FITZGERALD:  Yes, please, your Honor.

21     I'm going to move for a judgment of acquittal under

22     Rule 29, essentially that the Government hasn't made

23     its case --

24             THE COURT:  I apologize, but you probably should

25     get by the mike.  Thanks.

1           MR. FITZGERALD:  I apologize.

2           THE COURT:  Hold on one second.  The back door's

3      open.  It's now closed.

4           Mr. Fitzgerald.

5           MR. FITZGERALD:  Thank you, your Honor.  Your

6      Honor, I'm going to move under Rule 29 for a judgment

7      of acquittal, essentially arguing that the evidence put

8      forth so far is insufficient to sustain a conviction.

9           Your Honor, I'm not going to go through a litany

10     of issues; but I want to bring up one particular issue,

11     and that's the issue of identity.

12          Your Honor, Mr. Fall has not been in the

13     courtroom, obviously, so there was no identification

14     from the witness chair -- I'm sorry, from the witness

15     stand as we would normally see of, That's the Defendant

16     over there in the white shirt.

17          What we had was a number of individuals identify

18     Mr. Fall as, or identify a picture from the Registry of

19     Motor Vehicles that that's Mr. Fall's picture.  We have

20     the -- more pointed, I guess, we had Deputy McDonald,

21     Deputy U.S. Marshal McDonald identify the picture as a

22     picture of the person that he understands is the

23     Defendant in this case.  I don't think that's

24     sufficient.

25          THE COURT:  That he observed as the Defendant in

1    this case.

2         MR. FITZGERALD:  That he observed as the

3    Defendant in this case.  I don't think that's

4    sufficient.  Your Honor, we don't know the details

5    based on how he has observed this person as the

6    Defendant or his basis for making that connection as

7    the Defendant.

8         As the Court knows, when Mr. Fall's been in

9    here, he has multiple times declared that he's not the

10   Defendant in this case.  That's one thing.

11        So I don't know what the basis for Deputy

12   McDonald's identification is; and it could very well be

13   a matter of hearsay in that somebody else told him,

14   Yeah, that's the Defendant.  So that's one side of it.

15        There's another issue here that I think is a

16   little bit -- something else the Court should consider;

17   and that is that the deputy, the deputy U.S. marshal

18   who works in this courthouse who is part of the court

19   infrastructure, is the one on the stand making the

20   identification.

21        It's not as close as, say, having your courtroom

22   clerk make the identification; but it's still, I think,

23   somebody who's part of the court staff, close enough to

24   the court staff making that identification; and I think

25   there's problems there.

1          I'm concerned about the identification

2     essentially coming from the court as that's the

3     Defendant.  And when the deputy marshal makes that

4     identification, I think that's where it's coming from.

5          He's not here as the investigating officer and

6     he's part of the investigation.  He's here as part of

7     the court staff making that identification.  So I think

8     it's a consideration that the Court needs to think

9     about on the ID; but overall, I don't think the

10    identification has been proper or sufficient, I should

11    say, to identify that Mr. Fall is the one that

12    committed these crimes.  Thank you, your Honor.

13         THE COURT:  Thank you, Mr. Fitzgerald.

14         Mr. Kane, do you want to be heard?

15         MR. KANE:  Mr. Bender's up.

16         THE COURT:  Mr. Bender.  Mr. Kane wants you to

17    be heard.

18         MR. BENDER:  Thank you, your Honor.  As I think

19    defense counsel conceded, that there was a picture that

20    multiple witnesses identified as John Fall; and we have

21    evidence, sworn testimony by the deputy marshal that

22    the person in the picture is the person he observed as

23    the Defendant.

24         Now, the reason we don't have more testimony,

25    more evidence is because the Defendant -- defense

1    counsel, excuse me, objected to even that amount of

2    testimony regarding the Defendant's identity.  He had

3    ample opportunity to cross-examine the deputy marshal,

4    and he chose not to.

5         So to the extent he wants to raise issues and

6    speculate about the basis for the deputy marshal's

7    observations and testimony, he could have done that;

8    but there's no evidence in the record regarding any

9    question about his knowledge and his background in

10   knowing who the Defendant is.

11        There's no evidence he had any contact with the

12   jury, there's any problem with somebody who's

13   associated with the courts, yet I believe he testified

14   he's an employee of the Department of Justice, not the

15   court system.  So there's no problem with somebody

16   who's affiliated with the courts making such an

17   identification.

18        There's plenty of evidence the picture is the

19   Defendant and the picture is John Fall, and I think we

20   have more than enough to prove the Defendant's identity

21   beyond a reasonable doubt.  Thank you.

22        THE COURT:  Thanks, Mr. Bender.

23        I'm going to deny the Rule 29 motion by the

24   Defendant.  The evidence as presented in this case I

25   believe by a jury is certainly sufficient to sustain a

1    conviction of each of the four counts.

2            As to the issue of identity, the Court believes

3    that, in fact, the Government has proved to its

4    satisfaction beyond a reasonable doubt that the

5    Defendant is, in fact, John Fall, the Defendant, that

6    this Court has personally observed in this courtroom

7    over the course of a year or two of litigating this

8    case as well.

9            Anything further?  Mr. Kane?  Mr. Bender?

10           MR. KANE:  Nothing from the Government.

11           THE COURT:  Mr. Fitzgerald?

12           MR. FITZGERALD:  Your Honor, we would call John

13    Fall to testify next.

14           THE COURT:  Okay.  We're going to take a break

15    because Karen and Vickie and Gary haven't had a break

16    yet.  So we'll probably take probably about a 15-minute

17    break now.  I am not going to bring Mr. Fall in

18    beforehand.

19           MR. FITZGERALD:  Okay.

20           THE COURT:  I have concluded that Mr. Fall has

21    been sufficiently informed of what his obligations are

22    in this courtroom.  He certainly has a constitutional

23    right, which this Court will afford him, to testify

24    before a jury that's going to determine his fate; and

25    the Court will enforce the rules of order and the rules

1    that this Court has and will continue to follow on

2    issues of relevancy and decorum and obeyance with the

3    Court orders.

4          So with that, in about 15, 20 minutes we'll

5    bring the jury back in.  Mr. Fitzgerald, you can call

6    Mr. Fall.  And does the Defendant at this time

7    anticipate putting on any evidence other than that?

8          MR. FITZGERALD:  No.  No, your Honor.

9          THE COURT:  So assuming that at some point this

10   afternoon we get through Mr. Fall's testimony, I will

11   meet with counsel in chambers to begin going over jury

12   instructions; and we'll begin closing arguments

13   tomorrow followed by jury instructions tomorrow

14   morning.

15         We'll stand adjourned for about 15 minutes.

16         (Recess.)

17         (The jury is not present for the following.)

18         (The Defendant is present for the following.)

19         THE COURT:  Are we prepared to proceed?

20         MR. FITZGERALD:  Yes, your Honor.

21         THE COURT:  Gary, would you bring the jury in,

22   please.

23         (The jury is present for the following.)

24         THE COURT:  Good afternoon, ladies and

25   gentlemen.  Can you assure me that none of you

1  discussed this case amongst yourselves or with anyone

2  else?  Great.  Thank you.

3          Mr. Fitzgerald.

4          MR. FITZGERALD:  Your Honor, I call John Fall to

5  the stand, please.

6          **JOHN FALL, DEFENSE WITNESS, SWORN**

7          THE CLERK:  Would you please state your name and

8  spell your last name for the record.

9          THE WITNESS:  I, the man, John Joseph Fall,

10 appear solely in common law to provide my truth of my

11 beliefs by affirmation; and I am not the Defendant in

12 this matter.  I'm here to challenge the jurisdiction of

13 this matter and to move my two claims.

14         THE CLERK:  Thank you.  You may be seated.

15         THE COURT:  Mr. Fitzgerald.

16              **DIRECT EXAMINATION**

17 **BY MR. FITZGERALD**:

18 **Q.**  Good afternoon, Mr. Fall.  Where do you live?

19         THE COURT:  Mr. Fall, could you pull the mike

20 down close to your mouth.  Get yourself comfortable in

21 the chair, and then just keep it as close to your mouth

22 as you can.

23         THE WITNESS:  Would you mind if I stood?  I have

24 a real bad blood clotting problem in my leg.

25         THE COURT:  I don't mind as long as you pull the

1    mike up.  Actually, it's tradition in state court, I've

2    often told juries this, judges don't allow witnesses to

3    sit at all, some of the older judges in state court.  I

4    don't know.  It goes way back.

5          For a while we've traditionally in this court

6    allowed witnesses to sit, but you're most welcome to

7    stand.  Just make sure you -- why don't you try just

8    standing comfortably, and we'll proceed from there.

9    Thanks.

10   Q.   Mr. Fall, where do you live, just the city and

11   state, please?

12   A.   Sir, I just want to get on the record to answer

13   your question that I have not been presented with a

14   sworn statement of accusation that I've done wrong, and

15   it's going to be difficult for me to answer questions

16   relevantly and accurately until I see a sworn statement

17   of accusation that I've done wrong.

18         I've been in the other courtroom every day

19   listening to all of this, and I've yet to hear somebody

20   make a sworn statement of accusation that I've done

21   wrong.  So could you please provide that to me so I

22   have a relevant way of answering your questions.

23   Q.   Let me ask you this.  Do you understand that an

24   Indictment was returned in this case charging you with

25   several crimes?

1    **A.**    No.  I have not seen a sworn statement of

2    accusation that I've done wrong.  I've asked for it

3    many times in writing to the clerk, numerous times to

4    the prosecutors.

5            MR. BENDER:  Objection, your Honor.

6    **A.**    All of my letters have been ignored.

7            THE COURT:  Overruled.

8    **A.**    Completely ignored.  Not even a nice letter like

9    we'll get back to you.  I brought all the letters with

10   me.

11   **Q.**    Okay.  Mr. Fall, you heard all the testimony in

12   the past week or so?

13   **A.**    I've heard a lot of hearsay, but I have not heard

14   a sworn statement of accusation that I did wrong.  And

15   I believe I did no wrong.  I believe I've caused no

16   harm, I've caused no injury, and I've caused no

17   financial loss.  I never believed that I did.

18   **Q.**    There was -- one of the persons that testified was

19   a Dr. Carmen Sanchez.  Do you recognize that name?

20   **A.**    Yes, I do.

21   **Q.**    Who is Dr. Sanchez?

22   **A.**    Well, it depends.  There's a lot of Carmen

23   Sanchezes.

24   **Q.**    The one that came --

25   **A.**    If you're talking about my wife, Carmen Delora

1    Sanchez, she's got long brunette hair, she's kind of

2    pretty, she's got a nice voice, she works as a dentist

3    in Providence, that would be my wife.

4    **Q.**   I'm talking about the one that testified last

5    week.

6    **A.**   I couldn't see clearly on the screen.  Her voice

7    sounded like my wife.  I'm watching by audio in another

8    courtroom against my will.

9    **Q.**   Okay.  But you said that your wife is named Carmen

10   Sanchez?

11   **A.**   Well, her correct name that I was told when I

12   married her is Carmen Delora Sanchez.

13   **Q.**   Okay.  And when did you get married to her?

14   **A.**   I never failed on anniversary dates, so I'm going

15   to get it now.  June 21st, 1997.

16   **Q.**   And you have two children with her?

17   **A.**   I look at it like we have three because I took her

18   stepdaughter on as my own daughter.

19   **Q.**   And then two sons as well?

20   **A.**   Two by natural, yes.

21   **Q.**   Since 1997 -- at some point after 1997, there was

22   a divorce proceeding between you and your wife;

23   correct?

24   **A.**   I never consented to that due to my religious

25   beliefs.  As far as I'm concerned, I'm still married to

1    her.

2    **Q.**    Okay.  But at this point in time, she doesn't

3    consider herself married to you?

4    **A.**    That's her free will.

5    **Q.**    Am I saying it correctly?

6    **A.**    I would say that's -- I can't tell you what her

7    will is, but that's the apparent situation, yes.

8    **Q.**    You don't live with her?

9    **A.**    No, I don't.

10   **Q.**    Okay.  There was some testimony during the past

11   week or so about different entities.  Do you recall

12   hearing that?

13   **A.**    Well, like I just said to you, I'm going to be

14   happy to answer all these questions.  I have 20

15   affidavits that I filed into this court that I say

16   right now are the truth, and they're my evidence for

17   the jury, and I hope to get a chance to present all 20

18   affidavits.  Those affidavits are my sworn testimony.

19   They deal directly with all those issues.

20          And like I said earlier, I think it's improper

21   for me to answer a question until I have a sworn

22   statement of an accusation that I did something wrong.

23   I have not seen that.  I've not been presented with

24   that.

25          What did I do wrong?  I've just said on the

1    record I have not caused any harm; I've not caused any

2    injury; I've not caused any financial loss that's

3    stated as true, due and owing.

4          And I've listened to this testimony, and all

5    I've seen is misdirection and all peripheral issues,

6    mostly by people who weren't there and almost entirely

7    hearsay.

8          Is there a man or woman who's claiming I caused

9    a harm, injury or financial loss that's stated as true,

10   due and owing?  If not, I don't know why we're here.

11   **Q.**   Do you recognize --

12   **A.**   Sir, I don't mean to be rude, but you're not

13   answering my question.

14   **Q.**   No.

15   **A.**   Is there -- are you aware of a sworn statement

16   that I've caused a harm, injury or a financial loss

17   stated as true, due and owing?

18   **Q.**   Okay.  I'm not answering your questions because

19   I'm not the one testifying.

20   **A.**   I understand that, but -- I want to give you an

21   answer, but I need to relate that answer to a sworn

22   accusation against me.

23   **Q.**   Do you recognize an entity or a company called

24   Comfort Dental?

25   **A.**   What is your question related to?

1    Q.    Do you recognize Comfort Dental?  What is Comfort
2    Dental?
3    A.    I would imagine it's an artificial company.  It's
4    a corporation.
5    Q.    Do you know what the company does?
6    A.    Dentistry.
7    Q.    I'm sorry?
8    A.    Well, the company doesn't do anything.  The
9    company's a piece of paper filed with the state.  It
10   doesn't do anything.  The people who work under that
11   name do things.
12   Q.    Do you know who works there?
13   A.    Presently I don't, no.  I haven't been involved in
14   five years.
15   Q.    I think you said it was involving dentistry;
16   right?
17   A.    That's my guess.
18   Q.    And that's your wife's dental practice?
19   A.    I don't know anymore.  I've been living in
20   basements in financial destitute since they kicked me
21   out of the house five years ago.  I've had nothing to
22   do with it.
23   Q.    Do you know where Comfort Dental is?
24   A.    At the time when we were living together in our
25   home, it was at 1482 Broad Street.

1    **Q.**   Okay.  And you know that property, 1482 Broad
2    Street, correct, the building?
3    **A.**   I know it pretty well.
4    **Q.**   You've been there?
5    **A.**   I did know it pretty well.  I mean, I don't know
6    what they've done to change it.
7    **Q.**   You've been there, though?
8    **A.**   Yes.  Oh, yeah.  Sure.
9    **Q.**   And you know that there's a separate corporation
10   that handles the -- that owns that property from
11   Comfort Dental?  There's a company called Broad Street
12   Investments that owns that property?
13   **A.**   That wasn't my understanding when I was involved.
14   My understanding was Broad Street Investments owned the
15   real estate; and Comfort Dental was the name, for lack
16   of a better way of saying it, that my wife did business
17   in.  So they're really totally separate as far as I
18   remember.
19   **Q.**   Who owns Broad Street Investments?
20   **A.**   If I remember right, the way that was set up by
21   her attorney was -- Rhode Island allows sole
22   proprietorships.  What do they call that?
23   **Q.**   Do you know who the sole proprietor is?
24   **A.**   I'm using the wrong word; but Rhode Island, if I
25   remember what her attorney told us, is one of those

1    states that allows a corporation to be owned by one

2    person.

3    Q.   Okay.  You don't own Broad Street Investments?

4    A.   My wife has a lot of good qualities.  One of them

5    is not sharing.  She'd never let me on anything.

6    Q.   But -- so you don't own Broad Street Investments?

7    A.   No.  No.

8    Q.   You don't own that building, 1482 Broad Street?

9    A.   When you say "you" to me, I want to be clear I'm

10   answering you, are you referring to me, the man, or the

11   person?

12   Q.   Both, you and the person.

13   A.   Well, the person, then no.  The answer is no.  Can

14   I explain to the jury what I mean by that?

15   Q.   Sure.

16   A.   Yeah.  The man -- I'm a man.  Okay.  God created

17   me.  I'm a man.  If I wear a Maytag uniform and I go

18   out and fix washers and dryers, then I'm a person and

19   I'm a subject to the rules of that person wearing that

20   Maytag uniform.

21        I'm here today as a man.  The person has duties

22   and obligations to that uniform.  I was not involved in

23   any of these companies as either a man or a person.

24   Q.   Okay.  Do you know of -- I'm sorry.  Where does --

25   are you familiar with 180 Wheeler Street in Providence

1   or Cranston?  Are you aware of that address?

2   **A.**   Okay.  That's --

3   **Q.**   That property?

4   **A.**   I'm going to answer that question, but it's a

5   little tricky.  The property's on two town lines.

6   **Q.**   Right.

7   **A.**   So one town argues -- and we used to get taxed by

8   both of them.  It's still an ongoing issue.  It's kind

9   of funny.  So it's 178 Wheeler Ave. to the Cranston

10  people; and to Rhode Island, it's 180 Wheeler Ave.,

11  Providence.  So it depends.  It's both.

12  **Q.**   What's at that location?

13  **A.**   A home.  A single-family home.

14  **Q.**   And you know that home; right?

15  **A.**   Do I know the home?

16  **Q.**   Yes.

17  **A.**   I did know the home.  I don't know the home

18  anymore.

19  **Q.**   You used to live there; correct?

20  **A.**   Yes.

21  **Q.**   You lived there with Carmen for a while?

22  **A.**   Yes.

23  **Q.**   And you don't own that home; right?  You, the man.

24  **A.**   I've not owned anything in this marriage.

25  **Q.**   Okay.  That's Carmen's home?

1    **A.**    Ostensibly.  She's on the title, but the truth is

2    the bank owns everything.  I think all of us are

3    victims of that.

4    **Q.**    Let me ask you about some other names.  Are you

5    familiar with an entity known as NERH?  Does that mean

6    anything to you, those initials?

7    **A.**    So now you're going into the questions that I want

8    to answer with my affidavits.

9    **Q.**    Okay.

10   **A.**    But before I go down that road, I don't want to be

11   tricked into substantiating the presumption that the

12   prosecutors have done an excellent job at doing; and I,

13   therefore, require that you first show me the sworn

14   statement of an accusation that I did wrong or that I

15   caused a harm to someone or that I caused an injury to

16   someone or that I caused a specific financial loss

17   stated as true, due and owing.

18          Until I see that, I would be lying because I'm

19   going to be giving you an answer that doesn't relate to

20   a sworn statement anywhere.

21          THE COURT:  Mr. Fall, could you just stay near

22   the mike.

23          THE WITNESS:  I'm sorry.

24          THE COURT:  That's okay.

25          THE WITNESS:  I'm sorry, sir.

1        THE COURT:  Thanks.

2   A.   You do realize I'm the only one with a sworn claim

3   in this matter.  There is no one else with a sworn

4   claim in this matter.  In fact, I have two sworn

5   claims.  Both of them are for claims of trespass fraud,

6   once against the Plaintiff --

7        MR. BENDER:  Objection, your Honor.

8        THE COURT:  Sustained.

9        THE WITNESS:  Do you want to come up here and

10  testify that I'm not telling the truth?

11       THE COURT:  Put the next question to the --

12       THE WITNESS:  Sir, why don't you come up and

13  give counter-testimony.

14  Q.   Mr. Fall --

15       THE WITNESS:  I'm telling the truth.  I'm under

16  oath.  If I say something that's wrong, I'm going to be

17  accused of perjury.  So why don't you come up and

18  counter me.

19  Q.   Mr. Fall, if I can redirect you.

20  A.   Sir, I want to call your attention to *Trinsey v.*

21  *Pagliaro* says these guys can't make statements of fact

22  that influence the jury.  I'm sure you're well aware of

23  that.

24       THE COURT:  Ladies and gentlemen, I've

25  instructed you on a number of occasions that the Court

1    will instruct you what the law is, not any documents or

2    piece of evidence that you get in.  At the end of this

3    case, the Court will instruct you on the law to be

4    applied.

5         Mr. Fitzgerald.

6    **Q.**    Are you familiar with an entity known as

7    JV Services or Washington Allocation?

8    **A.**    It's all covered in my affidavits.

9    **Q.**    I'm sorry.  Are you familiar with those names?

10   **A.**    It's covered in my affidavits.  I'm not going to

11   allow you to trick me into the presumption that there's

12   a sworn accusation somewhere when there isn't one.

13        Let's first deal with that.  Where is the sworn

14   accusation that I've done wrong?  Sir --

15   **Q.**    Let me ask you this, Mr. Fall.  The Government

16   says that you caused Carmen and Comfort Dental to file

17   false tax returns.

18   **A.**    That's ridiculous.  I have an associate's degree

19   in electronics.  She always had the top-notch, best tax

20   advice people.  I've never, ever said to anybody this

21   specific number is tax deductible.  I wouldn't have a

22   clue what's tax deductible for a corporation.

23        I've taken no tax courses.  I have an

24   understanding of statutes at large, only from these

25   people persecuting me for the last 15 years.  I spent a

1    lot of hours at the library trying to understand it,

2    but I never really got my mind around it.

3         I heard some of the letters that were read.

4    Those letters were -- admittedly, I was very angry.

5    They were sitting outside of our house at night,

6    walking into our dental practice in a threatening way

7    unannounced.  It was terrorism.

8    Q.   In particular, one of the things the Government

9    has alleged is that you directed or you suggested that

10   Carmen pay fake companies for fake advertising and then

11   that those payments were then put into the tax returns

12   that were then filed.  Okay.  So in doing that, they're

13   alleging that you caused false tax returns to be filed.

14   Did you do any of that?

15   A.   That's absurd.  First of all, what motive would I

16   have for doing something like that?  Where is the

17   motive?  Where is the gain?  What motive -- just make

18   something up.  What motive would I have for doing the

19   things that they were talking about?

20        I'm, again, living in an eight-by-nine basement

21   with no heat.  I don't own a car.  I have three pairs

22   of clothes.

23        MR. BENDER:  Objection, your Honor.

24   A.   This is ridiculous.  And I've been living that way

25   for four years because I didn't consent to the divorce.

```
1          THE COURT:  The objection's overruled.

2          THE WITNESS:  I'm telling the truth, sir.  Why

3   don't you come up and counter me under oath and

4   affirmation.

5   Q.   Mr. Fall --

6          THE WITNESS:  I'm inviting you.  If you're going

7   to tell the truth, I'll step aside.  You can come up

8   and tell your truth under oath.

9   Q.   Mr. Fall --

10         THE WITNESS:  Or are you lying?

11  Q.   You had said before something about Carmen hiring

12  accountants to do her taxes.  Do you remember saying

13  that just a few seconds ago, something to that effect?

14  A.   I think you had them here, if I saw correctly on

15  the screen.  I mean big national companies.  These

16  aren't little rinky-dink guys.

17  Q.   And that was Mr. Seidman, Mr. Harrigan and

18  Mr. Rosen?

19  A.   I think Cain Watters has -- on their website I

20  believe they said they had 1,700 dental practices.  I

21  have zero.

22  Q.   Did you cause false information or wrong

23  information to go to them that they then, in turn, put

24  into the tax returns?

25  A.   Here's what I did.  They would call somebody in
```

1    the dental practice; and because of my background in

2    real estate, I'm familiar with reading contracts.  That

3    doesn't mean I'm good at it, but I've got probably more

4    exposure than the average person.

5            So I would go grab all the contracts, pull out

6    the numbers that were in the contracts and put them in

7    a sheet and give them to them.

8            I made no comments on whether they were tax

9    deductible or not.  There's lots of expenses that

10   corporations spend money on that aren't tax deductible,

11   like supporting the local youth baseball league.  How

12   would I know what's tax deductible for a corporation?

13   I never owned one.

14   **Q.**   You didn't direct the accountants as to how to

15   file the tax returns or what information to put in the

16   tax returns?

17   **A.**   I just answered you.

18   **Q.**   Do you remember the IRS auditing --

19   **A.**   And even if that was the truth, what would be the

20   motive?

21   **Q.**   Do you remember the IRS auditing Carmen and

22   Comfort Dental?

23   **A.**   I believe that started -- you know, our marriage

24   was great until that happened.  I mean, we had our

25   rough roads like everybody else, but we were getting

1    along pretty good.

2         So yeah, of course I remember.  Our marriage

3    took a turn after that.  It started in May 2008, and it

4    went for a long time, I think until November.  I mean,

5    it was ludicrous.  They were auditing her for five or

6    six months.

7    **Q.**   Did you tell Carmen not to cooperate with the IRS?

8    **A.**   No.  I didn't say that.

9    **Q.**   Did you tell her not to appear when the IRS asked

10   her to come to meetings?  Did you tell her not to go?

11   **A.**   No.  What we did was we sent a letter, and in the

12   letter -- I have the letter.

13        THE COURT:  Mr. Fall, I'm going to ask one more

14   time.

15        THE WITNESS:  I apologize.

16        THE COURT:  Maybe if you -- no, that's okay.

17   Maybe if you just move the whole mike up.

18        THE WITNESS:  Yes.  Thank you.  Sorry about

19   that.  I apologize.

20   **A.**   So let's back up here.

21   **Q.**   You said you had sent a letter.

22   **A.**   Like a lot of people, I got bad advice.  I was

23   calling people getting advice, but accidently the

24   advice actually worked good.

25        After the audit had gone on for five months, I

1    talked to a former special agent of the IRS; and he

2    said, John, if the audit doesn't produce big problems,

3    they can't take you to a summons.

4         And he showed me the code section, and then he

5    showed me a Federal District Court case in New York

6    that said the IRS has no power to summons, only a court

7    has power to summons.  They can invite you to a

8    summons, but they can't enforce it.

9         So I just put that all into a nice little

10   letter, and I sent it to Ken Cournoyer.  And I said,

11   Okay, we just did this exhaustive audit that cost us a

12   fortune and it didn't turn up anything, at least you

13   haven't shown us that it did, and so you're done.  You

14   don't have a basis for doing a summons according to

15   your codes, if I'm reading them right.

16        And I admit I don't understand legal

17   terminology, so I was reading them in common English

18   way of speaking.  I was reading them like they were in

19   English.

20        Maybe they meant something entirely different

21   than I read; but my intent was to show Cournoyer, hey,

22   you already cost us whatever it was, I think it was 40

23   or 60 grand at the time, nothing bad came out of it,

24   and now you want to do that to us again?

25        So I sent him a letter, and I said -- both of us

1    signed it, and the letter was really not a commentary.

2    It was just citing the Internal Revenue Code that said

3    they can't do that.

4         As a matter of fact, if I remember right, they

5    had four conditions that the IRS had to meet; and they

6    didn't meet any of them, as I recall.

7         But the more important issue was the Federal

8    District Court case said there can be no consequence

9    for not attending an IRS summons.  And so to me it

10   seemed logical.

11        I mean, these people, they make money the more

12   time they put into something.  Meanwhile we're losing

13   money.  We're paying 40 grand, 50 grand, 20 grand.  All

14   the way through Family Court was another $380,000.

15   They're all making money, and we're all getting bled to

16   death.

17        So that's my answer to your question, is yeah, I

18   sent them a letter.  I even did the courtesy of calling

19   him; and I said, Why are you doing this?  What's going

20   on here?  And he just -- he started asking me what I

21   didn't realize at the time were criminal investigation

22   questions.

23        Of course, I had no idea that was going on.  As

24   you well know, they're supposed to invite you to an

25   administrative hearing before they take you into a

1    criminal court.  They're supposed to say, Hey, this is

2    what we think's happening.  Do you want to discuss this

3    and we'll try to settle this privately?

4            I never got that opportunity.  It was just from

5    zero to let do this to him.  Let's drag him through

6    court for a year and a half.

7            MR. BENDER:  Your Honor, can we have an

8    instruction on the law, please.

9            THE COURT:  Ladies and gentlemen, as I've

10   consistently told you, certain evidence comes in for

11   limited purposes, as it did during the prosecution's

12   case where the Government would offer certain evidence

13   that mentioned the law; and the Court instructed you at

14   that time that regardless of what that says about the

15   law, the Court instructs you on what the law is.

16           And the Court wasn't admitting the evidence to

17   tell you what the law is.  It admitted the evidence to

18   either show or not show potentially Mr. Fall's state of

19   mind.

20           Mr. Fall's comments now about the law,

21   similarly, are coming in not on the issue of the law;

22   but the relevance of that testimony is or is not,

23   depending on what you determine as the triers of the

24   fact, as to his state of mind.

25           Mr. Fitzgerald.

1    THE WITNESS:  Sir, could I correct myself

2    because I think you just made a good point.

3    **Q.**   I think I can do that, Mr. Fall.  The times that

4    you've mentioned different laws or different cases,

5    what you told the jury, that's your understanding?

6    **A.**   It's my belief.

7    **Q.**   And your belief of --

8    **A.**   That's all it was.  My beliefs have been wrong

9    many times in my life.  That was my belief at the time;

10   and to be honest with you, to this day I still believe

11   we handled that correctly.

12        And, you know, when we did go into Federal

13   Court, I filed an affidavit in there and said, Hey,

14   I've been trying real hard to fix things with these

15   people.  All these years I've been writing letters,

16   offering to satisfy a claim, offering to file, because

17   I got a letter way back in 2000 that said -- because I

18   lost $100,000 to her friend.

19   **Q.**   I was going to ask you about that in a minute.

20   **A.**   Okay.  But this is relevant to the summons letter.

21   **Q.**   I promise.  We're going to get back to it.  One of

22   the things you had said, that letter that you sent, you

23   said that both you and Carmen signed that letter;

24   correct?

25   **A.**   Yes.

1   **Q.**   Okay.  There was some testimony last week about,

2   or this week, I guess, about Carmen signing documents.

3   Do you remember hearing any of that?

4        Let me ask you a different question.  There were

5   a number of contracts or documents that she signed.

6   She said that she signed them because you told her to.

7   Did you force your wife to sign things?

8   **A.**   What's your definition of "force"?  What's your

9   definition of "force"?  And then I'll give you a

10  truthful answer.

11  **Q.**   Let me ask you this.  Did you give her something

12  to sign and say, You should sign this, or did you give

13  her something and say, Sign it?

14  **A.**   It was really neither of those.  Usually the

15  situation was -- boy, this is hard to explain.  You'd

16  have to know our relationship.

17  **Q.**   Okay.

18  **A.**   The way things usually went between us was, I

19  would say, Carmen, I think the IRS is coming at us for

20  the wrong kind of tax, for alcohol, tobacco and

21  firearms, which is covered in great detail in my

22  affidavits that I hope you folks will take the time to

23  look at.

24       So even if I was wrong, my beliefs were sincere.

25  I believe that they were doing that, and I believe they

1   were doing it on purpose because I notified them of it

2   and they never answered me.  I never got an answer

3   saying, No, you're wrong.

4           So here's the answer to your question with that

5   as the backdrop.  I'd say, Carmen, I believe they're

6   coming at us for alcohol, tobacco and firearms.

7   Something must be screwed up in the computer.  I don't

8   know.  Here's how I think we can respond to this.

9           I'd sit her down.  I'd explain it to her.  You

10  know, she's not a dummy.  She went to college for 12

11  years.  And then she'd say, Okay.  Well, that makes

12  sense.

13          So she was an agreeable type of person in that

14  regard because she was nervous.  Not that she respected

15  my opinion so much.  She was just looking for an

16  answer.

17  **Q.**   Okay.

18  **A.**   "Force" would be an awfully strong word.

19  **Q.**   Okay.  You're talking about that particular

20  letter.  Early on, before the IRS was ever involved in

21  any of this stuff, there were a number of agreements

22  between Comfort Dental and different entities that she

23  signed off on.

24  **A.**   Right.

25  **Q.**   Did you make her sign or tell her to sign or

1   direct her to sign any of those documents?

2   **A.**   What do you mean by "direct"?

3   **Q.**   Carmen, you need to sign this.

4   **A.**   The only way I can answer that question is to give

5   a complete answer.

6   **Q.**   That's fine.

7   **A.**   If I give a partial answer, that's misleading.  So

8   my complete answer is, first of all, let me start by

9   this.  As far as I saw, everybody who testified over

10  the last week, not one of those people was present.

11  They're all based on conjecture.  Okay.  I was present.

12  So we got that down solid?  I want to make sure

13  everybody's clear on that.  I was there.  None of these

14  people were there.  So --

15  **Q.**   I'm clear.  Just so you know, when you're

16  testifying, you're talking to the jury.  So I'm clear

17  on it, yes.

18  **A.**   So I don't -- I mean, yeah, it was 15 years ago.

19  Some things I don't remember exactly, but most of it

20  I'm pretty clear on.  So that's the first thing.

21          The second thing is, I'm here.  I think I can be

22  punished for perjury if I lie, right, on the witness

23  stand?  I'm going to tell you every single one of those

24  entities provided a fair market value service.  Every

25  single one of them.

1          Carmen, as you saw, testified she was a

2    disconnect.  She just trusted everybody and said, Okay,

3    you do that, you do that.  She was disconnected.

4          So the very first one that came along was

5    Managed Skills, if I remember right.  We're going back

6    15 years.  I have a hard time remembering last week.

7          So where were we at then?  Okay.  Where we were

8    at is we had no credit.  I had no business credit

9    because I've never owned a business.  Carmen wasn't

10   even from this country.  She had no business credit.

11         And so we applied for loans.  That was something

12   I was fairly knowledge about because I've been in real

13   estate for so many years.  She got turned down by

14   everybody.  Even the SBA turned her down.

15         So I met this guy at a seminar, business

16   seminar, who was a business broker.  And he said, Well,

17   I can get you private vendors.  They're going to cost

18   you a little bit more, but they'll prefund you.  In

19   other words, they'll let you not make payments for a

20   few months until the money's coming in.  That's exactly

21   what you need when you're starting up a business.

22         So what Managed Skills did, if I can remember

23   correctly, they provided intellectual property on a

24   bonus and incentive system.

25         So we had several employees at the time.  I had

1    no experience managing employees, and definitely my

2    wife didn't.  So that was one thing.

3         Then there was customer service training, which

4    was excellent.  I mean, you see the growth of Comfort

5    Dental.  It's astonishing.  That growth came from this

6    business program.  This guy was sharp.  And he's the

7    one who put these things into play as we needed them;

8    but once they were in play, I was really not involved.

9         So that was the first one.  Then the next one I

10   think was -- you know, I think Venture Lending Group.

11   Q.   We were asking about Carmen's signature.  So there

12   was an agreement between Managed Skills and Comfort

13   Dental?

14   A.   I have all of them.  I have all the contracts,

15   receipts.  I'm sorry.

16   Q.   There was an agreement between Comfort Dental and

17   Managed Skills at some point?

18   A.   Yeah.  There's a contract signed.

19   Q.   And Carmen signed that?

20   A.   Carmen signed it.

21   Q.   Did you force her to sign it?

22   A.   No.

23   Q.   And --

24   A.   They were rescindable, by the way.  I don't think

25   there were any contracts that couldn't be rescinded.

1    I'll bring the contracts in.

2              MR. BENDER:  Objection, your Honor.  There

3    wasn't a question for that.

4              THE WITNESS:  Oh, you don't like that one

5    because that's the truth; right?  Why don't you come

6    back up here.

7              THE COURT:  Mr. Fall, answer the questions that

8    your attorney poses to you.  The Court will deal with

9    comments by opposing counsel.

10             Mr. Fitzgerald, put a question to Mr. Fall.

11   Q.   Mr. Fall, there was a -- Carmen wrote the checks

12   or signed the checks for Comfort Dental and for Broad

13   Street Investments; right?

14   A.   First of all, I want to apologize for barking at

15   him.  They've put my family through -- I apologize.  Go

16   ahead.  I'm sorry.

17   Q.   Carmen would sign the checks for Comfort Dental

18   and for Broad Street Investments; right?

19   A.   Correct.  Only she had authority to, with the one

20   exception of when she encouraged me to build a new

21   construction house using the Broad Street Investments.

22   And we built it, unfortunately, in 2006 when real

23   estate went down, and we lost our money on that.  But

24   other than that, only she signed documents.  Only she

25   had the authority to sign documents.

1   Q.   Okay.  Was there ever -- if you can remember, ever

2   a time that you forced her or told her or directed her

3   to sign a check that she didn't want to sign but you

4   told her to?

5   A.   No, but that doesn't really mean anything

6   because -- I'm trying to be truthful here, because

7   Carmen was just Carmen.  She just -- she just wanted to

8   do dentistry.  Anything else she just did to get it

9   over with.  So I don't know if that means anything, but

10  that's part of the formula.

11  Q.   Okay.  Mr. Caccavaro testified yesterday, Lou

12  Caccavaro.  You know Lou?

13  A.   Lou Caccavaro?

14  Q.   Yes.

15  A.   Yeah.  He made a lot of mistakes in his testimony.

16  Really inaccurate.

17  Q.   I'm not asking for an analysis of his testimony.

18  You know who he is, though?

19  A.   I do know who he is.  He's a nice man.

20  Q.   At some point the IRS tried to seize money that he

21  was holding in escrow.  Do you remember that testimony?

22  A.   Yes.

23  Q.   And he filed a -- what he called an interpleader,

24  but he filed a suit to have another Court decide the

25  disposition of that money.  Okay?

1    **A.**    Yes.

2    **Q.**    First of all, were you named as a Defendant in

3    that suit, do you know?

4    **A.**    No, I was not.  However, I was on some kind of cc

5    list where they cc'd me.  I think he was trying to play

6    it safe and was just letting everybody on the planet

7    know.

8    **Q.**    Did you do anything to interfere with the Court's

9    determination of where that money was going?

10   **A.**    My interpretation of what I did was to help the

11   Court.

12   **Q.**    Okay.  What did you do to help the Court?

13   **A.**    I filed an affidavit, which to this day has not

14   been rebutted.  Okay.  I want to make that point.  By

15   the way, none of my affidavits have been rebutted.

16   **Q.**    But that particular one, what --

17   **A.**    Yes, I filed an affidavit in the Court because I

18   read the thing.  David Steiner I believe was the

19   U.S. Attorney.  He's one of the 41 people that I

20   subpoenaed to be a witness in my favor under the Sixth

21   Amendment.

22           MR. BENDER:  Objection, your Honor.

23           THE WITNESS:  No, that's the truth.  Do you want

24   to come up and say that it's not the truth?

25           THE COURT:  Mr. Fall.  The objection is

1    sustained.  Put another question to Mr. Fall,

2    Mr. Fitzgerald.

3    **Q.**   What did you do to help the Court decide what was

4    going to happen with that money that Mr. Caccavaro was

5    holding in escrow?

6    **A.**   I didn't help the Court decide anything.  I just

7    put the truth in by my affidavit.

8    **Q.**   And what did you say in the affidavit to help

9    them?

10   **A.**   Basically I said I was not an officer.  I was a

11   Power of Attorney for another company that was the

12   officer of that company, which went nowhere.  They

13   approached me because of my real estate background and

14   wanted them to help lend money and, you know, develop a

15   clientele here.  It all was a thought.  It never went

16   anywhere.

17        But I was not an officer of the company.  I

18   never funded the company.  That's it.  I never funded

19   it, and I was not an officer.  And the other part of

20   the affidavit was -- of course, the most important

21   thing is they were trying to take the funds on the

22   false accusation that it was my money.

23        And what they had done, if I remember correctly,

24   this is a major error, was -- when we got married, I

25   was losing my house.  This is connected to your

1    question, so be patient.

2    **Q.**   I understand.

3    **A.**   I was losing my house because I had a failed

4    septic system.  Well, in Marshfield, the keyword being

5    "marsh," it's a very low water table.  So my septic

6    system failed, and it was $50,000.  All of a sudden,

7    you know, septic systems go like that.  I had no place

8    to go to the bathroom.  I had asbestos siding on the

9    house.  I had lead paint.  The house was a mess.

10         And so having been an auctioneer in my past, I

11   had a lot of contacts who were real estate investors

12   and loan hard money and so forth.  So these guys said,

13   Well, here.  Here's the deal.  And, again, this is 15,

14   16 years ago.  But it was something like, We'll take

15   over the house, we'll let you stay there, and you

16   manage the tenants.

17         And what I did to survive was I rented out

18   rooms, and the money went to this company called

19   NE Realty.

20         So what must have happened is, the IRS agent got

21   confused and thought that NE Realty Holdings was the

22   same company as NERH, LLC.  As far as I know, they're

23   two different entities.

24   **Q.**   Okay.

25   **A.**   By the way, I didn't set -- there's no -- I didn't

1    set those up.  I'm not an officer.

2    **Q.**   That was going to be my question.

3    **A.**   That's all a bunch of junk.

4    **Q.**   You didn't create either of those?

5    **A.**   No.  That's easy to figure out.  You just go to

6    the public registry, pull the documents.  I'm not on

7    any of them except for Revenue Management Services,

8    but that was a real estate company as well and they

9    require -- in real estate, you have what's called

10   office managers.  Okay.  That's a common term.  It's a

11   limited administration.  You know, you're like a

12   secretary.

13        So the way it works in real estate is, you have

14   a money partner who puts up the money, and then there's

15   a poor soul who doesn't have money, that's me, who goes

16   out and does all the work, and then they collect half

17   the profits.

18        So that was the situation there.  I was not in

19   control.  I was there to open an office and go out and

20   do real estate, which is what I did.

21   **Q.**   Let me backtrack for a second.  You just said you

22   didn't create NERH or NE Realty Holdings.  Managed

23   Skills, did you create Managed Skills?

24   **A.**   No.

25   **Q.**   Okay.

1    **A.**   I didn't form any of those companies.  If you just

2    check the registries or wherever you go to check that

3    stuff, you won't see my name on any of those things

4    with the exception of that company.  I was appointed an

5    office manager.  Again, in real estate that's a common

6    term.

7    **Q.**   Mr. Fall, let me ask you about the tax -- your tax

8    filings for 1998 and 1999 and 2000.

9    **A.**   Yes.

10   **Q.**   The Government's alleged that you evaded taxes by

11   not filing in those years.

12   **A.**   Yeah.  They've very conveniently left out a lot of

13   details to that story.

14   **Q.**   Well, let's just start, did you file in those

15   years?

16   **A.**   Did I file in those years?

17   **Q.**   Yes.

18   **A.**   What do you mean?  I filed for '98 and '99.

19   **Q.**   Did you file for those years?

20   **A.**   Well, yeah.

21   **Q.**   When did you file for those years?

22   **A.**   I filed twice.

23   **Q.**   Okay.

24   **A.**   First I -- this is another one of those things.

25   If I give you the answer you're asking for, it's going

1    to be misleading without having all the pieces of the

2    puzzle.  So if you want my answer, I require to give

3    all the pieces of the puzzle that I can remember.

4    **Q.**   Yes, please.  Give us all the pieces.

5    **A.**   Here we go.  Twenty-two-some-odd years I worked,

6    filed tax returns, paid taxes just like everybody else.

7    No problem.  I've got five kids.  I need the roads just

8    like everybody else does.  I have nothing against

9    taxes.

10        Then I meet my beautiful wife, and she and her

11   family were investing money with this guy in the

12   Dominican Republic.  And they said, Well, we're a loan.

13   We're making two percent interest a month.  I said,

14   Wow, that's a pretty good interest rate.

15        So I took my life savings, based on her

16   testimony that this guy was a good guy, and I invested

17   it with him.  His name was William Henao.  He was later

18   arrested by the FBI, a guy named Robert down in

19   New York, FBI agent; and he absconded everybody's

20   money, including my wife's.

21        So I lost 100,000, my wife lost 105,000, her

22   father lost 300,000, her aunt lost a couple hundred

23   thousand.  This guy just took everyone's money.

24        So then I went to -- you know, before that I

25   hadn't used accountants very often because my situation

1    was pretty simple.  Sometimes I did, but a lot of times

2    I didn't.

3         So I went to this guy.  His name was Alan

4    Bailey.  He's what's called an MST, Master of Science

5    in Taxation.  I thought that would solve all the

6    problems.  And he said to me, I have no idea how to

7    handle this.  You've loaned money to a citizen of

8    another country, and you've lost it.  He said, You're

9    going to have to call the IRS and then come back to me

10   and tell me what they said.  He just never dealt with

11   that.

12   **Q.**   When was -- do you remember when that conversation

13   was?

14   **A.**    Ninety-eight.  That's when I lost the money, so it

15   probably would have been that year.

16   **Q.**    Okay.  So what did you do next?

17   **A.**    Okay.  So I called the IRS.  Well, that was the

18   beginning of the nightmare.  Apparently I got on some

19   kind of radar screen.  I got a letter.  I think it was

20   called -- I have all the letters, I've saved them all,

21   letter 112-C, if I remember right, I was looking at it

22   the other night; and it said to me make sure you pay

23   the correct kind of tax three times in the letter.

24        Well, probably like everybody in this room, I

25   didn't know there were different kinds of taxes.  I

1    thought everybody paid one kind of tax.

2        So now I'm scared to death.  I've lost $100,000.

3    This guy who was a Master of Science in Taxation tells

4    me, If you don't handle this right, not only did you

5    lose your $100,000, you're going to lose the deduction

6    and you're going to owe taxes on the money for '97.  So

7    it's like a double hit.

8    **Q.**   Okay.

9    **A.**   I'm not going to get the deduction on the 100,000,

10   and I'm going to owe income taxes on all the earnings

11   that I had.  It was a legitimate loss.

12       So I get that letter.  I'm completely, totally

13   naïve to tax issues at that time.  Now I know more than

14   I did then by force of circumstances.  And so the next

15   thing was I go on the internet, look for help.  I

16   talked to, you know, different firms.  They all were

17   outrageously expensive.

18       Now, keep in mind in this year I had just lost

19   my job.  I was working for Country Marketplace.  I lost

20   that job.  Carmen moved out of the house, no warning.

21   She just took my newborn son and left.

22       So I'm sitting in this house, no income.  I

23   could not afford to hire these people.  So now I'm

24   starting to look for somebody I can afford; and I came

25   on the internet, I searched and I found the

1    Save-A-Patriot organization.  And they don't give tax

2    advice, but they give educational material.

3          So I contacted them; and they said, Well, it's

4    real simple.  You just give us a Power of Attorney, and

5    we'll write letters for you.  They only charged like, I

6    think it was, $15 or $20 for a letter.  That was in my

7    budget.  Barely, but it was.

8          So looking back in retrospect, at the time I

9    didn't know this, Save-A-Patriot Fellowship was a

10   pro-Constitution group that was on some kind of a

11   targeted list for being pro-Constitution.  So I got on

12   the list for hiring them.

13         So the man who worked there wrote a letter to

14   the top guy, his name was Tom Quinn, area director if I

15   understood right, that's how he signed the letter

16   anyway, and said, Hey, you sent this letter for

17   different kinds of tax to --

18         MR. BENDER:  Objection.  Hearsay.

19         THE WITNESS:  What's hearsay?

20         THE COURT:  Overruled.  You can continue,

21   Mr. Fall.

22         THE WITNESS:  Okay, because I want to tell the

23   truth here, and I was there.  I don't think you were.

24   **Q.**   Go ahead, Mr. Fall.

25   **A.**   Yeah.  So -- I lost my train of thought.

1   **Q.**   You were talking about --

2   **A.**   Because I get distracted when these people talk.

3   **Q.**   You were talking about the man sent a letter to --

4         THE COURT:   Mr. Fitzgerald, we're off

5   timing-wise a little bit, but I want to make sure that

6   Karen and Vickie and folks get at least a short break.

7   Why don't we take a 10-minute afternoon break, and

8   we'll come back shortly.

9         (Recess.)

10         THE COURT:   You can proceed, Mr. Fitzgerald.

11         MR. FITZGERALD:   Your Honor, if I can have 16-A

12   brought up on the screen there.

13   **Q.**   Mr. Fall, when we took a break, you had talked a

14   little bit about a letter that you had received telling

15   you to make sure that you paid the right type of tax.

16   Do you remember that testimony?

17   **A.**   Yes.

18   **Q.**   Okay.  I'm going to direct you down to the -- this

19   area of the letter.

20   **A.**   I should have brought my glasses; but I've looked

21   at this letter so often, I can see okay.  I can guess

22   what you're doing.

23   **Q.**   Okay.  And right there it says, "Please let us

24   know if you want your payment applied to a different

25   type of tax."

1    **A.**    Correct.

2    **Q.**    You read this letter; right?

3    **A.**    Many times.  Many times.

4    **Q.**    And when you first got it and you read it, what

5    did that mean to you?

6    **A.**    It meant to me that all my beliefs about how taxes

7    worked were wrong.  I thought there was just one tax,

8    and now I find out there's all these different types of

9    tax.

10         You know, it's like the day you find out there's

11   no Santa Claus and no Easter Bunny.  You're just at a

12   loss, and it made me nervous.  So here I wanted to take

13   that loss -- okay, I have to back up and remind you

14   again the situation I was in at the time.  I had no

15   income coming in.  My wife had moved out.  I'm

16   destitute, broke.  The last thing I needed was for a

17   huge tax bill to come in.

18         And so I called the IRS.  Wouldn't help me.  I

19   get this letter.  It says not only do you have to pay

20   the tax, there's different kinds of tax.  Okay.  So

21   which one am I supposed to pay?  What do you mean?  I

22   don't know what you mean.  And so I was really nervous

23   at the time.

24   **Q.**    Okay.  This was the letter that started you on

25   your search?

1    **A.**    Yes, it is.

2    **Q.**    To find out and pay the tax?

3    **A.**    That's the one, and I've written many letters.

4    **Q.**    And you testified right before we broke that you

5    reached out to an individual who was going to charge

6    you a small amount or a nominal amount to write letters

7    for you?

8    **A.**    Yes.

9    **Q.**    That's where we left off.

10   **A.**    Yes.

11   **Q.**    So what happened with that?

12       MR. FITZGERALD:  You can take that down, please.

13   **A.**    So he wrote a letter to this man, Tom Quinn, who

14   very amazingly became my wife's attorney during the

15   divorce 10 years later.  I don't think that was any

16   coincidence how he wiggled into her life.  And of

17   course he didn't answer, like all of them.

18       I've never gotten a responsive letter, not even

19   one, to all 23 letters that I've written.  Not even

20   one.  Admittedly, a few years into it, some of my

21   letters were angry, you know, because of what they were

22   doing to us; but I always stayed on point, which is

23   which kind of tax are you coming at me for.  Never got

24   an answer.

25       I even provided them a menu.  Just check the

1    box.  Is it estate, income, coca leaves, alcohol,

2    tobacco, firearms, machine guns?  I gave them a

3    check-box style.  I made it kindergarten-proof, and

4    they still wouldn't answer.

5    **Q.**  And if you remember, what I was asking you before

6    was about filing the 1998 taxes.  You said you filed

7    them twice.

8    **A.**  Yes.

9    **Q.**  Can you explain that to the jury.

10   **A.**  Yeah, because in that letter that Kotmair wrote,

11   he showed how -- I think it was this letter.  I'm

12   pretty sure it was this letter talked about a 1040

13   form, which is what I had always filed.

14        But now I had this question mark over my head

15   that is this the right form because they're talking

16   about a different kind of tax.  Come to find out,

17   there's over 400 types of tax forms.  And I lost count

18   now, but there's about 12 totally different types of

19   taxes on income as well.

20   **Q.**  Okay.

21   **A.**  So I'm lost.  I've got a Master of Science in

22   Taxation who doesn't know the answer.  The IRS won't

23   answer me over the phone.  They won't respond to my

24   letter.  Thus the journey, the long, painful journey.

25   **Q.**  And you filed -- when did you file the first --

1  when did you file for 1998?

2  **A.**   Okay.  That's a good question.  I did file it

3  late, but there's a very good explanation for that.

4  **Q.**   Okay.

5  **A.**   When I -- and this is going so far back.  When I

6  wrote the letter to Quinn, he didn't answer me; and so

7  I just kept believing, you know, the federal government

8  takes a long time, they're going to get back to me.

9        They timed the answer.  Now, I can't say it was

10  their intent, I would never falsely accuse somebody,

11  but it's very interesting to me that by the time I got

12  any kind of letter from them, it went right over the

13  little threshold where you lose your deduction.  So had

14  he answered me on time --

15  **Q.**   What deduction are you talking about?

16  **A.**   The loss, the $100,000 loss.

17  **Q.**   This was the loss that you suffered from the

18  investment in the Dominican Republic?

19  **A.**   Right.

20  **Q.**   The money that was stolen?

21  **A.**   Right.  This is a very critical juncture in this

22  whole story, so I want to be articulate here.

23  **Q.**   Yes.

24  **A.**   So he doesn't answer me.  Now, this is a top area

25  director for the IRS.  From what I understand, that's a

1    felony for them not to answer your question.

2         MR. BENDER:  Objection, your Honor.

3         THE COURT:  I've instructed the jury a number of

4    times on this issue.  The objection is sustained.  You

5    can proceed.  Put a question to Mr. Fall,

6    Mr. Fitzgerald.

7    Q.   So he didn't answer you.  They told you to file.

8    It was just past the time to --

9    A.   Right.  Meanwhile I'm getting feedback from -- not

10   directly now, sir.  I want to tell the truth here.  My

11   wife's family had all lost money.  And so one of her

12   family members that lost money with this guy, William

13   Henao, lived in New York; and they had contact with the

14   FBI agent who had arrested the man, and they said he

15   was in prison --

16        MR. BENDER:  Objection.  Hearsay.

17        THE COURT:  Overruled.

18        MR. FITZGERALD:  Go ahead.

19        THE WITNESS:  I don't know how that would be

20   hearsay.  You don't believe me?  Okay.

21   Q.   Go ahead.  Don't worry about the hearsay.

22   A.   I'm just trying to be careful and tell the truth

23   here.  So the idea was, they're going to let him out of

24   prison because they found out it was his underling that

25   stole the money and they couldn't prove that he knew

1   about it.

2          And now that I remember it, I did meet the two

3   guys; and the other guy seemed sleazy, and this guy,

4   the boss, seemed okay.  So I said, all right, so I'll

5   just wait until he gets out of jail and then ask him

6   for the letters that I got from him, which I have here,

7   the originals, with his original signature, saying yes,

8   John Fall did put money in this company, he did lose

9   it, here's the certificate of it.

10         And, by the way, Carmen knows all this because

11  she lost $105,000.  That didn't come up in the

12  testimony, of course.

13         So yes, I did wait, but I was waiting for two

14  reasons.  I was waiting for Tom Quinn to get back to me

15  on my letter; and there was a follow-up letter, but I

16  don't have that.  It was 16, 15 years ago.

17         And I was waiting for this guy to get out of

18  jail so he could give me some kind of documentation of

19  what happened so I could show the IRS that.

20  **Q.**   Okay.

21  **A.**   With me so far?

22  **Q.**   Yup.

23  **A.**   Okay.  I mean, there's a lot more fun stories to

24  talk about.

25  **Q.**   Okay.

1     **A.**    So yeah.  Time went by, and it went just over this

2     so-called three-year rule.  Okay.  And then I get this

3     letter that says, Hey, sorry, you're out of luck.  It's

4     over three years.  You can't deduct that.

5     **Q.**    Okay.  So you filed the -- you filed your taxes

6     claiming that deduction; right?

7     **A.**    Right.

8     **Q.**    And then you got a response back from the IRS

9     saying too late?

10    **A.**    Right.

11    **Q.**    Okay.

12    **A.**    Wait.  There's a little more to it that's very

13    important.

14    **Q.**    What else?

15    **A.**    The money that I sent down there were postal money

16    orders.  There was one or two bank checks.  You're

17    going to think I'm stupid, but what I did was, I had a

18    certain amount of money that was my life savings, I

19    don't remember what it was, somewhere in the

20    neighborhood of 60,000, and I had a credit card, lines

21    of credit, and I borrowed money off that, which is --

22    if you're the richest man in Babylon, you don't do

23    that, but I did it.

24           So I borrow money from credit cards.  I take the

25    money I've saved.  I go buy postal money orders.  I

1    give them to my father-in-law, who was a very good man.

2    He used to come and visit us all the time.  He would

3    take them down and give them to William Henao.

4         I had all the receipts.  I gave those

5    receipts -- we're skipping a step; but while I'm saying

6    it, I'll finish it.  I gave those receipts, the letters

7    to William Henao, from William Henao, to Diane Riley

8    before this so-called assessment.  But in between

9    that --

10   **Q.**   Who's Diane Riley?

11   **A.**   She was the assessment officer that came into our

12   lives uninvited.

13   **Q.**   She was an IRS agent?

14   **A.**   Yeah, she was an IRS agent.

15   **Q.**   Sorry.  Continue, please.

16   **A.**   I'm messing this up because I'm skipping a step,

17   but that's an important step there.  So coming back to

18   another step.

19        So he's in prison.  He gets out of prison.  I'm

20   waiting to get the letters from him.  And I get this

21   letter from a guy named Wesley Gillis, I'll never

22   forget it, from the same office and the same address as

23   Tom Quinn, who didn't answer my other letter.

24        I interpreted it as a threatening letter because

25   -- for a bunch of reasons, and I'm going to tell you

1    why; but bottom line is, it said you must file

2    Form 1040.  Okay?

3    **Q.**    Okay.

4    **A.**    Now, I have this other IRS letter that says, you

5    know, different kind of tax three times, make sure you

6    file the right one, and the usual threats, penalties,

7    interest.  So I'm having a problem here.

8          By now I'm angry, I'm going to admit it, and I

9    started studying and really studying hard.  I was going

10   to the law library in Plymouth.  I was reading online.

11   I was trying to figure out, you know, how to deal with

12   these people.

13         So I heard about doing a Freedom of Information

14   Act.  So Freedom of Information Act is where you ask

15   the government to tell you the truth about something;

16   and under the law, they're supposed to, with certain

17   exceptions.

18         So I did a Freedom of Information Act to the

19   other side of the IRS.  I said, Who's this Wesley

20   Gillis guy?  I get back a response, which I have, that

21   says there's no such person.

22         So I'm getting this threatening letter to tell

23   me to file 1040 when Quinn never answered my first

24   letter about which form I'm supposed to file.  So it's

25   like they're trying to push me in this direction, and I

1    caved.  I was nervous.  I didn't have my proof.  I

2    filed it, and the rest is history.

3         They disallowed the deduction, if I remember the

4    assessment right, which the assessment that I got, if

5    it's even a legal assessment, was not signed.  There

6    was no Treasury seal on it.  It looked like -- to me it

7    looked like it was printed from a home computer.

8    Q.   Okay.  And, I'm sorry, you said you filed it

9    twice?

10   A.   Yes.  The second time was when these guys came at

11   me and, you know, accusing me of all this stuff.  I

12   said, Oh, I'll file again.  So I did.  I filed -- this

13   time I filed a tax statement, and I covered all 12

14   years.  It's a legitimate filing.  I swore under

15   penalty of perjury.

16   Q.   That was sometime recently as opposed to -- when

17   was the other tax filing?  When did you file that?

18   A.   Gosh, I don't know.  These guys know.  They know

19   my shoe size.

20   Q.   2002, 2003?

21   A.   Honestly, if I was going to guess, I'd say 2003.

22   It wouldn't be far off.  Let's put it that way.

23   Q.   Now, the 1999 tax year, did you file for taxes?

24   Did you file in 1999?

25   A.   Oh, that's another thing.  You just reminded me.

1    There's so much to this.  The returns were filed

2    through a guy named -- what was his name?  This is

3    really important.  You've all heard of Ron Paul, the

4    presidential candidate?  His brother filed my tax

5    return.

6    **Q.**    Okay.

7    **A.**    He was on a list, too, because he's a

8    pro-Constitution guy, like Ron Paul.  So now I'm

9    dealing with the Save-a-Patriot Fellowship.  And I'm

10   not accusing anybody of anything, but the appearances

11   here are not good.

12        His name was Wayne Paul.  I remember because he

13   had Parkinson's disease.  When he signed my return, it

14   was all jittery.  And he said, You know, what they're

15   doing to you is wrong, but you have to file and then

16   fight it later.

17   **Q.**    He was a CPA?

18   **A.**    Yes.

19   **Q.**    And you had him file the --

20   **A.**    File the 1040.

21   **Q.**    Both for 1998 and '99?

22   **A.**    Right.  And he, as a CPA with a very large firm,

23   from what I understand, I've never been there

24   personally, said, Yeah, you can deduct that.

25        So we did.  We put it on there.  He saw what I

1    had.  I sent him copies of the postal money orders; and

2    he said, This is a slam-dunk, there's no way they can

3    deny this.

4         So they denied -- you know the rest of the

5    story; right?  They denied the 100,000, and that was

6    the beginning of world war 1700.

7    Q.   All right.  The 1999 return that you filed, okay,

8    it said zero tax due and owing.  Do you remember that?

9    A.   Ninety-eight?

10   Q.   Ninety-nine.

11   A.   I don't remember.  You're asking me a question

12   about that.  I know that was the year I was really

13   broke.

14   Q.   Okay.  Well, let me ask you this.  You said

15   Mr. Paul did your taxes for you.

16   A.   Right.

17   Q.   Okay.  Did you provide Mr. Paul with all the

18   information for your tax return?

19   A.   Everything.

20   Q.   Did you give him any false documents or tell him

21   any lies about your income?

22   A.   The same thing as I did the 22 years before that.

23   I just gave him what I -- I was usually pretty good

24   about record keeping.

25        I was an electronics guy.  I went to school for

1    electronics for two years.  And in electronics I used

2    to work in a hospital, and you'd have to satisfy what's

3    called JCAH records.  They're the overseers of

4    hospitals.  Very meticulous records.  So I was fairly

5    decent at keeping good records.  I'm not saying I was

6    perfect, but I was pretty good.

7    Q.    Let me ask you this, completely different from

8    those tax returns.  There was Cielito Deayala?

9    A.    Yup.

10   Q.    You know Cielito?

11   A.    Yes.

12   Q.    Okay.  She used to be an office manager for

13   Comfort Dental or she used to work at Comfort Dental?

14   A.    Yeah.  I mean, I considered myself the answer guy

15   because nobody had any business experience.  I had book

16   knowledge.  I didn't have any experience, but that was

17   a lot more than they had.  I was always fascinated with

18   business.  I always read books about business.

19   Q.    I want to ask you about a specific instance that

20   Ms. Deayala had to deal with.  She said that there was

21   one occasion where a package came to the office and it

22   was either DHL or Fed-Ex or one of these that came to

23   the office and there was cash sticking out of the

24   envelope.  Okay.

25   A.    I heard her say that, yeah.

1    **Q.**   You heard her testify to that?

2    **A.**   I heard her say that.

3    **Q.**   And I think she testified that she brought the

4    package to Dr. Sanchez because it was either addressed

5    to Comfort Dental or to Dr. Sanchez; but eventually it

6    came up -- it was brought upstairs to a second-floor

7    office that she said was your office.

8    **A.**   I heard her say that, yeah.

9    **Q.**   Do you remember that envelope?

10   **A.**   I do remember envelopes, but they weren't for me,

11   and she never handed them to me.

12   **Q.**   Okay.  Do you remember --

13   **A.**   I think what was going on was --

14   **Q.**   We'll get to that in a second.  Do you remember

15   specifically one of these envelopes coming with cash

16   sticking out of it?

17   **A.**   No.

18   **Q.**   Okay.  Do you remember a number of packages coming

19   to the office like that, not with the cash sticking out

20   but just sealed?

21   **A.**   No, I don't.  I remember them coming on occasion

22   but not anything like these guys described.

23   **Q.**   Okay.  Why don't you describe them.

24   **A.**   I wouldn't be wearing a suit with moth holes in it

25   in front of the jury who's going to decide my fate.

1    **Q.**    Tell me what you remember of these packages.

2    **A.**    What I remember of them was, I don't remember

3    them.  I remember packages, but I can't say who they

4    were from, what they were addressed to.  I do remember

5    getting DHL packages that had documents in them.

6    **Q.**    Okay.  Did you ever get, either on one occasion or

7    a number of occasions, packages filled with cash?

8    **A.**    To me?

9    **Q.**    To you.

10   **A.**    No.

11   **Q.**    Do you remember such packages coming into the

12   office not to you but to anyone?

13   **A.**    Yes.

14   **Q.**    Okay.  Can you tell the jury about those.

15   **A.**    Well, I didn't put a lot of attention on it, but

16   they were coming to Comfort Dental.  I'm not Comfort

17   Dental.

18   **Q.**    Okay.

19   **A.**    And they made this -- painted this picture --

20   **Q.**    Tell me what you remember.

21   **A.**    What I remember.

22   **Q.**    Because you were there, not them.

23   **A.**    Right.  Okay.

24   **Q.**    So tell me what happened with the packages.  Did

25   you see a package filled with cash?

1    **A.**   I did, yes.  Well, filled, that makes it sound

2    like a lot of money.  I don't remember there being a

3    lot of money in them.  Very trivial, as I recall.

4    **Q.**   Okay.  And do you remember --

5    **A.**   So trivial I didn't think anything of it.

6    **Q.**   And who did -- where did that package go to?  Who

7    did it go to?

8    **A.**   My wife.

9    **Q.**   I'm sorry?

10   **A.**   My wife.  Everything goes to my wife.  I got

11   nothing.  All I got was the kids, and that's what I

12   wanted.

13   **Q.**   Do you remember how many times you remember --

14   strike that.  How many times do you remember an

15   envelope with cash in it coming to your wife?

16   **A.**   I don't know, four times a year, twice a year.  It

17   was insignificant to me.  It was meaningless.

18   **Q.**   And do you know what that cash was from?

19   **A.**   I have a guess, but it would be a guess.

20   **Q.**   Okay.  You didn't cause that cash to go to your

21   wife?

22   **A.**   No.

23   **Q.**   Okay.  George Jacquez or Jorge Jacquez used to

24   work in the building at Broad Street; right?

25   **A.**   Yeah.

1    **Q.**   He'd be -- he was a handyman around the building;

2    right?

3    **A.**   Occasionally.  More than occasionally, yeah.  He

4    was pretty -- he had a lot of things going on all over

5    the place.  He's a highly desired person.

6    **Q.**   He used to collect rent from the tenants?

7    **A.**   From the residential tenants and sometimes the

8    commercial.  I handled mostly the commercial because of

9    my real estate background.  I handled some of the

10   residential.  It was kind of on an as-needed basis.

11   Jorge had no experience at all in that stuff.

12   **Q.**   But he just did things around the building?

13   **A.**   Yeah.

14   **Q.**   Do you remember him testifying last week?

15   **A.**   Yeah.  I sure do.  I was --

16   **Q.**   He testified that he found a box in a closet on

17   the second floor.

18   **A.**   Yeah.

19   **Q.**   Do you remember him testifying to that?

20   **A.**   Yes, I do.

21   **Q.**   Do you remember him testifying to the contents of

22   that box?

23   **A.**   Yes.

24   **Q.**   A number of stamps and a folder and some papers?

25   **A.**   Uh-huh.

1    **Q.**   Okay.  Do you know how that box got there?

2    **A.**   Yes, I do.

3    **Q.**   How did that box get in that closet?

4    **A.**   Well, when -- again, this is one of those things.

5    If I can't give the complete answer, it's going to be

6    misleading.

7    **Q.**   Okay.  Please do your best.

8    **A.**   Okay.  The complete answer is, when Carmen first

9    came to me and said she thought she might have to

10   divorce me, I was -- you know, I was very sad, and then

11   that went to anger.

12        And so I called the business broker that we

13   interacted with for these business entities, Steve

14   Reynolds; and I said, Look, I need to show my wife that

15   I've not been doing anything wrong, and I need you to

16   send me everything that you have to show that these

17   companies that you've brokered to us were legitimate

18   companies.

19        I know that they gave us valuable services

20   because I saw the growth of Comfort Dental.  I saw the

21   contracts.  I'm not the one who needs to be sold.  I

22   need some really tangible stuff here.

23        And so I didn't talk to him.  I talked to his

24   office.  And so they mailed -- they started mailing me

25   things out, and that was some of the stuff that was in

1    there.

2         By the way, I heard the false accusation of the

3    signatures, and I know that she was put up to that.

4    **Q.**   I'm not going to --

5    **A.**   I want to talk about that.  I'm willing to submit

6    to a forensic signature analysis and spend the rest of

7    my life in jail if I'm lying because those are not my

8    signatures.  So let's do that.

9    **Q.**   Well, before we get to that --

10   **A.**   I don't mean to debate with you, and I'm being

11   respectful here.  That seemed to be something they're

12   hinging their little game on, so I would like to submit

13   to that.

14   **Q.**   Well, let's start with this.  Do you have 60-A up

15   there?

16        THE WITNESS:  By the way, while you're doing

17   that, I want to remind the Court --

18        MR. BENDER:  Objection, your Honor.

19        THE COURT:  Wait for there to be a question,

20   Mr. Fall.

21        MR. FITZGERALD:  Can I have the ELMO, please.

22   **Q.**   Okay.  Mr. Fall, this is a piece of paper that was

23   included in Exhibit 60-A that's in evidence, and I

24   believe this is the -- this was found in the box or

25   came from the box that Jorge Jacquez gave to the IRS,

1    and I believe this is the piece of paper you were

2    referring to with the signatures on it; is that

3    correct?

4    **A.**    Yes.  I noticed he also didn't mention the

5    envelope that that came in, which would have shown the

6    return address, who it was from, and the letters from

7    them saying this is what we're also going to be sending

8    you in the future.

9         I have boxes of stuff they sent me.  I'm

10   exaggerating.  It's probably a box that size with all

11   the contracts, receipts, miscellaneous notes.

12   **Q.**    Just come a little closer to the mike.

13   **A.**    Because by then we weren't interacting with them.

14   Do you understand that?

15   **Q.**    Yes, I do.  Let's get to the documents on the

16   screen.

17   **A.**    Yup.

18   **Q.**    Okay.  Are those your signatures?

19   **A.**    No, they're not.

20   **Q.**    All right.

21   **A.**    And, like I said, I'll be happy to submit to a

22   forensic signature analysis.  I did a little research

23   on the internet.  They're not that expensive.  They use

24   20 points to compare your signature.  I'm all for it.

25   **Q.**    Do you know where that page came from with the

1    signatures on it?

2    **A.**    Yeah.  It came in the mail from the business

3    broker.

4    **Q.**    This is Mr. Reynolds?

5    **A.**    Yeah.  Well, I can't say Mr. Reynolds put it in

6    the envelope, but it came from his office.

7    **Q.**    You made an inquiry to Mr. Reynolds' office, and

8    this came back?

9    **A.**    Right.

10   **Q.**    And what was Mr. Reynolds -- what was his

11   business?  What was the name of his business?

12   **A.**    It would be on the envelope.  It must be on

13   something that they took.  I can't remember.  That

14   was --

15   **Q.**    And you said he was a business broker?

16   **A.**    You realize -- I've got to interrupt you here.

17   You realize what I've been through since this has

18   happened; right?  I've been in and out of the hospital,

19   and I've almost died three times.

20        MR. BENDER:  Objection, your Honor.

21   **A.**    I'm on heavy medication.

22        THE COURT:  Just answer the question, Mr. Fall.

23        THE WITNESS:  I'm trying to give a complete

24   answer.  No disrespect intended.

25        THE COURT:  Mr. Fitzgerald, go ahead.

1    **Q.**   All the questions I'm asking you are --

2    **A.**   It will come to me.

3    **Q.**   -- to the best of your memory.

4    **A.**   I will remember.  I just don't remember right now.

5    Because I always thought of him as Steve.  I

6    didn't think of him -- people think of my wife as

7    Dr. Sanchez.  They don't think of her as --

8    **Q.**   Carmen?

9    **A.**   Yeah.

10   **Q.**   So the business broker, Mr. Reynolds, you said he

11   was the one that set up these businesses, these

12   entities?

13   **A.**   I have no idea who set them up.  My understanding

14   of his role was he was a business broker.  He's the guy

15   you went to if you couldn't get things conventionally,

16   like the marketing, great example.  If you didn't have

17   money to fund marketing, you'd go to these guys and

18   they would fund it for you on the understanding they're

19   going to get a higher rate of return, kind of like a

20   hard money lender.

21        They're out there.  I put stuff in my April 4th

22   filing that really discusses that and explains that

23   better.

24   **Q.**   Okay.

25   **A.**   But, I mean, just look at the growth of Comfort

1    Dental.  That didn't happen by accident.  From zero to
2    two million a year.  I mean, that says it all.  You
3    wouldn't get that by bleeding money into fake
4    companies.  You'd go out of business.
5          MR. FITZGERALD:  Can I have one moment, please,
6    your Honor?
7          THE COURT:  Sure.  Of course.
8          THE WITNESS:  Mr. Fitzgerald?
9          MR. FITZGERALD:  Yes.
10         THE WITNESS:  This man's probably going to shut
11   me down, but -- no, it's time for me to say this.  I'm
12   not here to argue.
13         MR. BENDER:  Objection, your Honor.
14         THE COURT:  Mr. Fall, wait for a question to be
15   asked, please.
16         THE WITNESS:  I mean no disrespect, sir, but --
17         THE COURT:  None taken, but you have to wait for
18   a question, sir.
19         THE WITNESS:  I do not wish to argue this case.
20   I'm not -- they're entitled to their opinion.
21         THE COURT:  Mr. Fall, you've got to wait for
22   Mr. Fitzgerald.  He asked for a few minutes.
23         THE WITNESS:  Well, then, I don't want you to
24   have to throw me out again, but I guess that's what
25   you're going to have to do.

1       MR. FITZGERALD:  Let me ask you one more

2  question.

3       THE WITNESS:  I'm being deprived of seeing the

4  sworn accusation against me.  All these questions are

5  creating the presumption --

6       MR. BENDER:  Objection, your Honor.

7       THE WITNESS:  -- that there's a sworn accusation

8  somewhere, and there isn't.

9       THE COURT:  Mr. Fall, I'm going to warn you

10 again.  Just wait for Mr. Fitzgerald to put a question

11 to you.

12      THE WITNESS:  I'll do one more question, and

13 then I'm going to hold out for you to produce that

14 sworn accusation.

15 Q.   John, do you see that document that's on the

16 screen?  Not behind you but on the screen.  Do you see

17 that?

18 A.   Yes.

19 Q.   Do you remember testimony earlier today,

20 Agent Pleshaw testified about a bunch of different

21 accounts?

22 A.   Honestly --

23 Q.   I'm not asking if you understood it, but do you

24 remember hearing it?

25 A.   Pretty good imagination.  Yeah, I did.  I did

1    remember it.  It was very confusing to me.

2    **Q.**   All right.  Well, this is a -- this was a summary

3    of just what it says, items -- identified deposit items

4    associated with Fall from all bank accounts.

5    **A.**   Okay.  So --

6    **Q.**   Hang on.  And do you see the total down there at

7    the bottom, $2.1 million?

8    **A.**   Yeah.

9    **Q.**   Okay.  Did you take a whole bunch of cash from

10   Comfort Dental and put it in accounts and hide it

11   somewhere?

12   **A.**   No.  And how could -- all right.

13   **Q.**   I'm just asking if you did that.

14   **A.**   Yeah.  Okay.  You take cash and you put it in a

15   bank; right?  Isn't there a deposit slip that goes with

16   that?  Isn't that traceable?

17   **Q.**   I'm asking if you did it.

18   **A.**   No.  That's ridiculous.  I have deposited cash in

19   my own bank account.

20   **Q.**   Two million dollars?

21   **A.**   Yeah, I wish.  No, I'm talking about I have a

22   Citizens Bank account right now.  I'm sure these guys

23   are dying to seize that.  I don't think I've had a

24   balance over $500 in four years.

25   **Q.**   Right.  It doesn't have $2 million in it?

1      **A.**   No.  I never had a bank account with anything

2      anywhere close to that.  Maybe my Dodge Caravan that's

3      the year 1999 explains it all.

4            THE COURT:  Mr. Fall, wait for a question to be

5      asked, please.

6            MR. FITZGERALD:  I have no further questions,

7      Judge.

8            THE COURT:  Thank you, Mr. Fitzgerald.

9            MR. FITZGERALD:  Thank you.

10           THE COURT:  Mr. Bender.

11                      <u>CROSS-EXAMINATION</u>

12     <u>BY MR. BENDER</u>:

13     **Q.**   Good afternoon.

14     **A.**   Go ahead.

15     **Q.**   Are you John Fall?

16     **A.**   Which one?  There's a whole bunch of them.

17     **Q.**   Are you the John Fall charged in this case?

18     **A.**   I haven't seen anything that charges me with

19     anything.  Weren't you listening?  I have not received

20     a sworn statement of accusation against myself as a

21     man, John Joseph Fall.  Do you have that?

22     **Q.**   So you are John Joseph Fall?

23     **A.**   Sir, do you have a sworn accusation against the

24     man, John Joseph Fall, or not?  That's a simple

25     question.  I'm sure the jury would love to know.  Do

1    you have it?

2    **Q.**   Mr. Fall, I'm asking the questions.

3    **A.**   Do you have a sworn accusation against the man,

4    John Joseph Fall?  Don't try to go around it with your

5    tricks.  Either you have it or you don't.  Do you have

6    a sworn accusation that says the man, John Joseph Fall,

7    did wrong?

8         THE COURT:  Mr. Fall, Mr. Bender will put a

9    question to you.

10        Go ahead, Mr. Bender.

11        THE WITNESS:  He's going to get the same

12   response, sir, with all due respect.  This is how they

13   work.  They want to go around the main issue.

14        THE COURT:  Mr. Fall, wait until the question's

15   put to you, please.

16        THE WITNESS:  I'm sorry.  I don't mean to make

17   your job harder, but these people have been doing this

18   to me for 15 years.

19        THE COURT:  Mr. Bender, put a question to the

20   witness.

21   **Q.**   Mr. Fall, were you in this courthouse prior to

22   today given the charges against you?

23   **A.**   I appreciate if you didn't call me Mr. Fall.

24   **Q.**   What would you like me to call you?

25   **A.**   You can call me the claimant because I have a

1    claim against your prosecutor and the --

2              MR. BENDER:  Objection, your Honor.

3    **A.**   I'm saying it under oath.  Do you want to come up

4    here and say that I don't have a claim?

5              THE COURT:  Mr. Bender, put a question, please.

6    **Q.**   Have you ever gone by names other than John Fall?

7    **A.**   Please show me the sworn accusation that I did

8    wrong that your question relates to so that I can give

9    you a relevant, accurate answer.

10             THE COURT:  Mr. Fall, you have to answer

11   Mr. Bender's question.

12             THE WITNESS:  That's my answer, sir.

13   **Q.**   So just to recap, have you ever gone by names

14   other than John Fall?

15   **A.**   Please show me the sworn accusation that says I

16   did wrong.  Is there any words I'm using that you don't

17   understand?  And then I will give you a relevant answer

18   that's accurate under oath.

19             THE COURT:  Mr. Fall -- hold on for a minute,

20   Mr. Bender.  I feel compelled to warn you that if you

21   continue to refuse to answer --

22             THE WITNESS:  I'm not refusing.

23             THE COURT:  Excuse me.  If you continue to

24   refuse to answer Mr. Bender's question, you could -- it

25   is quite possible that the Government will move to

1    strike your entire direct testimony because you're

2    required to answer questions under cross-examination.

3         That could seriously and detrimentally hurt your

4    case here.  So I'm going to tell you one more time,

5    Mr. Fall, Mr. Bender's going to put a question to you.

6    You need to answer his question.

7         If you don't know the answer to his question,

8    you can say "I don't know the answer to the question";

9    but you've got to answer the question he poses.

10        Mr. Bender, put a question to Mr. Fall, please.

11        THE WITNESS:  Ladies and gentlemen --

12   **Q.**   Are you familiar with Revenue Management Services?

13   **A.**   I'm happy to answer his questions, but I want to

14   know the claim that it ties to.

15        THE COURT:  Mr. Fall.

16   **A.**   Because they're trying to skip that.  There's no

17   sworn claim in this case.

18        THE COURT:  We'll take a break now.  Gary, take

19   the jury out, please.

20        THE WITNESS:  I'm sorry, sir, but I've got to

21   speak the truth.  I'm the one who's under oath right

22   now.

23        (The jury is not present for the following.)

24        THE COURT:  Mr. Fall, you're required to answer

25   the questions that the Government asks of you, and

1    you're required to follow my orders.  We've had this

2    discussion a few times before.

3        When Mr. Bender puts a question to you, you have

4    to answer the question that he asks.  If you don't know

5    the answer to the question, you can say "I don't know";

6    but you need to answer the question he asks you, not to

7    speak directly to the jury in anything other than an

8    answer to the question.  Do you understand that?

9        THE WITNESS:  Sir, I think you know that I'm not

10   the Defendant in this matter.  I've yet to face my

11   accuser.  I require to face my accuser.  That's my

12   right.  I believe you took an oath, and you know the

13   Ninth Amendment secures that right.  It's a God-given

14   right.  I want to face my accuser, have them make

15   accusations to me, and I will respond to the accuser.

16       THE COURT:  Mr. Fall, you're coming very close

17   to seriously hurting the rights that you currently have

18   in this case in defending yourself.  Do you understand

19   that?

20       THE WITNESS:  I don't see how.

21       THE COURT:  Your failure to abide by this

22   Court's orders to answer the Government's questions

23   could have serious and will have serious detrimental

24   effects.

25       In fact, it could be subjected to such that your

1    entire direct testimony would be stricken.  Do you

2    understand that?

3        THE WITNESS:  No, that's not clear to me because

4    I have not received any orders made out to the man,

5    John Joseph Fall.

6        THE COURT:  Mr. Fall --

7        THE WITNESS:  Would you please provide that.

8        THE COURT:  -- are you prepared to answer the

9    questions that Mr. Bender poses to you?

10       THE WITNESS:  If they relate to a sworn

11   accusation that I did wrong, I will absolutely answer.

12       THE COURT:  Are you prepared to answer the

13   questions that Mr. Bender poses to you that this Court

14   instructs you to answer?

15       THE WITNESS:  That's my answer.  The answer that

16   I gave you is my answer.

17       THE COURT:  Mr. Fall, are you prepared to obey

18   the orders of this Court?

19       THE WITNESS:  I have not received any orders to

20   the man, John Joseph Fall.

21       THE COURT:  Mr. Fall, I've instructed you to

22   answer the questions of the Government, Mr. Bender

23   representing the Government.  Are you prepared to

24   answer his questions and follow the orders of this

25   Court?

1          THE WITNESS:  I stand by my answer, sir.

2          THE COURT:  I'm going to assume, Mr. Fall, that,

3     therefore, your answer is no, that you will not answer

4     the --

5          THE WITNESS:  That's not my answer.

6          THE COURT:  Well, then tell me one more time,

7     are you prepared to answer the questions that the Court

8     has directed you to answer posed by the Government in

9     this case?

10         THE WITNESS:  My answer is, it's not possible

11    for me to answer a question that does not relate to a

12    sworn accusation that I did wrong.  That's not

13    possible.  I'll be -- I would be telling a lie giving

14    an answer that doesn't relate to a sworn accusation.

15         THE COURT:  I'm going to ask the marshals to

16    remove the Defendant from the courtroom at this time.

17         THE WITNESS:  Can I pack my papers up?  Let the

18    record show that I was deprived of my right to redress

19    the grievances and due process of law.  Can I take my

20    checkbook?  I wanted to offer to pay an unpaid debt.

21    Let the record show that I'm leaving against my will,

22    over my objection.

23         (Defendant removed from courtroom.)

24         THE COURT:  We're going to have to wait until he

25    gets access.  Foolish me.  I told them to shut it down.

1    We're going to have to reboot it.

2              Could I see counsel at side bar.

3              (Bench conference held on the record.)

4              THE COURT:  My intention was to call it a night,

5    perhaps give Mr. Fall the chance to cool off and see if

6    -- we'd come in again in the morning and see if he

7    would follow the Court orders.

8              He has pretty well consistently said he wouldn't

9    follow the Court orders a number of times.  I think I

10   gave him a number of chances to do that.  I'd like to

11   give him another chance.  I think by letting him sleep

12   on it, maybe a little cooling-off period will.

13             We'll come back in the morning, without the jury

14   first, and see if he'll respond.  If he doesn't

15   respond, then I'll have to entertain a motion and we'll

16   have to figure out where we go from here.

17             Kevin, any opinion on this one way or the other?

18             MR. FITZGERALD:  No.  I think giving him another

19   chance is the appropriate thing to do, your Honor.

20             THE COURT:  I do, too.  Mr. Bender?

21             MR. BENDER:  That's fine with the Government.

22             THE COURT:  What would you like me to tell the

23   jury?

24             MR. FITZGERALD:  "Have a nice evening."  I'm not

25   sure, Judge.

1          THE COURT:  I'm inclined to just say we're going

2     to break for the evening and offer no further

3     explanation.  I think attempting to say something would

4     probably do more harm than good.

5          MR. BENDER:  That works.

6          THE COURT:  Why don't we do that, and then we'll

7     come back in because we did not think through the

8     logistics of what we're going to do from here.

9          MR. FITZGERALD:  Yes, your Honor.

10          (End of bench conference.)

11          THE COURT:  Lori, could you help again?  Could

12     you ask Gary to bring the jury back in, or if you don't

13     feel comfortable, you can ask him to come in and I'll

14     tell him, but I just want the jury in.

15          (Pause.)

16          THE COURT:  Should I have them back at 10?  Do

17     you think we have the time in the morning?  I hate to

18     have them sit.

19          (The jury is present for the following.)

20          THE COURT:  You can remain standing, ladies and

21     gentlemen.  We're going to break for the evening.  I

22     have a sentencing at 10 in another case.  I'm sorry, at

23     9:00 tomorrow morning.  And they tend to take close to

24     an hour.

25          So rather than have you sit and wait, I'd ask

1    you to report back at 10:00 tomorrow morning.  I'll
2    give you a little break in the morning.
3        So continue to follow my directives.  Please,
4    we're almost at the end, please don't do any
5    independent research on this case.  Please don't
6    discuss this case amongst yourselves or with anyone
7    else.  It's only a little bit longer.
8        So please hold on and continue to do that and
9    don't say anything about your jury service or anything
10   that's occurred in the case on any social media.
11       And with that, ladies and gentlemen, have a good
12   evening, and I will see you at 10 a.m.  Thank you.
13       Can I see counsel in chambers.
14       (Adjourned.)
15
16
17
18
19
20
21
22
23
24
25

```
1                    C E R T I F I C A T I O N
2

3

4              I, Karen M. Wischnowsky, RPR-RMR-CRR, do
5    hereby certify that the foregoing pages are a true and
6    accurate transcription of my stenographic notes in the
7    above-entitled case.
8

9              February 16, 2016
10                  Date
11

12

13             /s/ Karen M. Wischnowsky
14             Karen M. Wischnowsky, RPR-RMR-CRR
               Federal Official Court Reporter
15

16

17

18

19

20

21

22

23

24

25
```