IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND


```
* * * * * * * * * * * * * *    C.R. NO. 13-135M
UNITED STATES OF AMERICA  *
                          *
VS.                       *  JANUARY 23, 2015
                          *  10:00 A.M.
JOHN J. FALL              *
* * * * * * * * * * * * * *   PROVIDENCE, RI
```


BEFORE THE HONORABLE JOHN J. McCONNELL, JR.,
DISTRICT JUDGE
(Jury Trial -- Volume VII)
<u>REDACTED</u>


**<u>APPEARANCES</u>**:

FOR THE GOVERNMENT:         JOHN N. KANE, ESQ.
                            JEFFREY BRIAN Bender, ESQ.
                            U.S. Department of Justice
                            Tax Division
                            601 D Street, N.W., 7th Floor
                            Washington, D.C.  20530

FOR THE DEFENDANT:          JOHN J. FALL, PRO SE
                            108 Princess Avenue
                            Cranston, RI  02920

                            KEVIN J. FITZGERALD, ESQ.
                            Federal Defender's Office
                            10 Weybosset Street, Suite 300
                            Providence, RI  02903


Court Reporter:             Anne M. Clayton, RPR
                            One Exchange Terrace
                            Providence, RI  02903


Proceeding reported and produced by computer-aided
stenography

1    23 JANUARY 2015-- 10:00 A.M.

2              (The jury is not present for the

3    following:)

4              THE COURT:  Good morning, everyone.

5              Let me just begin by handing Ms. McGuire what

6    will be marked as Court's Exhibit 14, which is a note

7    the CSOs received from Mr. Fall this morning upon

8    entering the courthouse.

9              He also, I understand, filed something this

10   morning that will be placed on ECF directly dealing

11   with yesterday's proceedings.

12             My intention this morning is to bring Mr. Fall

13   in without the jury to see if he is willing to abide by

14   the Court order and answer the Government's questions

15   on cross-examination and then see where we go from

16   there.

17             Any objection to that procedure from the

18   Government?

19             MR. BENDER:  No, your Honor.

20             THE COURT:  Mr. Fitzgerald, any objection to

21   that procedure?

22             MR. FITZGERALD:  No, your Honor.

23             THE COURT:  Any other thoughts about how we

24   should proceed?

25             MR. FITZGERALD:  I don't have any other

1      thoughts.  I'm sorry, your Honor.

2            THE COURT:  Great.  Would it make most sense,

3      Mr. Fitzgerald, for you to go and get Mr. Fall and

4      bring him in and have him come to the stand, or do you

5      want me to ask the marshals to do that?

6            MR. FITZGERALD:  I think it might be easier to

7      call on the radio down the hall.  I did talk to

8      Mr. Fall and I told him that before the jury was

9      brought in that you were going to ask him similar

10     questions from yesterday afternoon again.  So he's

11     expecting to be called in.

12           THE COURT:  Okay.  Officer Palumbo, would you

13     instruct the marshals to have Mr. Fall come and take

14     the stand.

15           (Pause.)

16     **JOHN J. FALL**, Resumes Stand.

17           THE COURT:  Good morning, Mr. Fall.  Do you want

18     to remain standing?  Is that still the best --

19           THE DEFENDANT:  Yes, please.

20           THE COURT:  Okay.  Mr. Fall, you're still under

21     your obligation to tell the truth.  You understand

22     that, correct?

23           THE DEFENDANT:  Yes.

24           THE COURT:  Okay.  Mr. Fall, yesterday you

25     protested and objected about your ability to answer

1    certain questions that were posed to you by the

2    Government during cross-examination, and the Court

3    instructed you to answer the questions after you placed

4    your objection and protestation on the record; and I'm

5    again instructing you that you have to obey the orders

6    of this Court and to answer the substantive questions

7    that the Government poses to you.

8         So I ask you this morning, are you prepared to

9    follow the orders of this Court and to substantively

10   answer the questions as posed to you by the

11   Government's attorney?

12        THE DEFENDANT:  It's my belief, sir, that I'm

13   here to challenge jurisdiction of this matter because I

14   was appointed counsel that I did not consent to.  The

15   counsel that was appointed to me spent no time with me

16   before the trial, has admitted to me he has no

17   experience winning a criminal trial in taxes, has

18   admitted to me he has no experience assisting a man in

19   common law; and as you know, I'm here as a man, only as

20   a man only in common law at all times.

21        I'm also challenging jurisdiction because there

22   is no accuser in this case.  There is no sworn

23   statement of accusation.  None.  Everybody knows that

24   now.  So it's their case that needs to be discharged,

25   and I require their case be discharged immediately.

1        There's seven more reasons I'm challenging

2   jurisdiction that I'd like to get on the record.

3        THE COURT:  Mr. Fall, I have --

4        THE DEFENDANT:  By the way, sir, I don't mean to

5   interrupt you, but you asked me a question.

6        THE COURT:  I did and --

7        THE DEFENDANT:  I have not received any orders

8   directed to the man, John Joseph Fall.  I've not been

9   presented any orders.

10        THE COURT:  Mr. Fall, I have many times in the

11   past and I am now again ordering that you,

12   notwithstanding your claimed inability to answer the

13   questions as posed, to in fact answer the questions

14   that the Government has posed to you on

15   cross-examination.  And I'll ask you now, will you

16   assure me that you will -- now that your objection is

17   placed on the record to answering the question, will

18   you follow the Court's order and answer the questions

19   substantively as posed to you by the Government?

20        THE DEFENDANT:  It's my belief that I did answer

21   the question.

22        THE COURT:  It's this Court's ruling that you

23   didn't and has ordered you to answer the questions

24   substantively.  Will you assure me now that you've

25   placed your objection on the record that you will

1    answer the Government's questions substantively as

2    ordered by this Court?

3         THE DEFENDANT:  I have not received an order to

4    the man, John Joseph Fall.  That's part of my answer.

5    The other part of my answer is I believe that I would

6    be committing fraud to answer a question that does not

7    relate to a sworn statement of accusation against me

8    saying I did wrong.  And I'm not going to participate

9    in fraud.

10        THE COURT:  Mr. Fall, do you further understand,

11   as I told you yesterday, that your continued refusal to

12   obey the orders of this Court and to answer the

13   questions substantively as posed to you by the

14   Government after the Court's ruling and instruction to

15   you could and will result in your direct testimony

16   before this jury being stricken, which means that they

17   will have no right or ability to consider anything that

18   you testified to yesterday.  Do you understand that?

19        THE DEFENDANT:  I do not consent to that.  I do

20   not consent to the jurisdiction of your administrative

21   court, nor your statutes.  I'm in common law.  I'm a

22   man.  I have a right to my jury.  I have the right to

23   tell my sworn testimony to the jury unobstructed

24   without condition.  And I know my rights, and I'm

25   asserting my rights.  And by the way, counsel cannot

1    assert my rights.  I'm here to assert my rights as a

2    man.

3         THE COURT:  Thank you, Mr. Fall.

4         This Court rules as follows:  Mr. Fall has

5    answered many questions on direct examination before

6    the jury, including when his attorney addressed him as

7    Mr. Fall.  When the Government addressed him as

8    Mr. Fall at the beginning of its cross-examination of

9    Mr. Fall, he would not answer the questions and

10   protested that form of address, denying that he was, in

11   fact, Mr. Fall.

12        Moreover, on direct examination, Mr. Fall gave

13   straight-forward answers to questions about whether he

14   had used any other names by denying that he had.  When

15   asked on cross-examination whether he had used any

16   aliases, Mr. Fall protested the question and said he

17   would not answer the question even after being

18   instructed by this Court to answer the questions

19   substantively.

20        This Court finds that Mr. Fall's evasiveness on

21   cross-examination and his continued refusal to answer

22   questions responsibly constitutes deliberate

23   manipulation on his part in an effort to make his

24   testimony as favorable as possible.

25        I also find his evasiveness deprives the

1    Government of an opportunity to meaningfully

2    cross-examine him.  I've warned Mr. Fall repeatedly

3    that his failure to answer questions put to him after

4    being ordered by this Court to do so could result in

5    his direct testimony being stricken from the record;

6    and if that happened, the jury would not be allowed to

7    consider it.  In spite of that warning, Mr. Fall has

8    persisted.

9         Does the Government have a motion?

10        MR. BENDER:  Yes, your Honor.  The Government

11   moves to strike the testimony of Mr. Fall.

12        MR. FITZGERALD:  Mr. Fitzgerald?

13        THE DEFENDANT:  I do not consent and

14   Mr. Fitzgerald is not my counsel.

15        THE COURT:  Mr. Fall, I'm going to hear from

16   your counsel now.

17        Mr. Fitzgerald?

18        THE DEFENDANT:  He's not my counsel.  I'm saying

19   it under affirmation here.  He's not my counsel.

20        THE COURT:  Mr. Fall --

21        THE DEFENDANT:  I've never consented to him

22   being my counsel.  Ever.

23        THE COURT:  Mr. Fall, please stop talking now.

24   I'm going to hear from your counsel.

25        THE DEFENDANT:  I require my choice of counsel,

1   my choice of assistance of counsel.

2        THE COURT:  Marshals, please remove Mr. Fall

3   from the courtroom.

4        THE DEFENDANT:  Let the record show that I'm

5   being forcibly removed from the Court against my will

6   over my objection, that my right to redress grievances

7   have been deprived and my right to due process of law

8   has been deprived.

9        THE COURT:  Mr. Fitzgerald?

10        MR. FITZGERALD:  Your Honor, I've got --

11        THE COURT:  Why don't you hold on until I'm sure

12   that Mr. Fall is in Courtroom 4 with live video and

13   audio feed.

14        (Pause.)

15        THE COURT:  Officer Palumbo, can you report to

16   me that Mr. Fall is in Courtroom Number 4 and that the

17   live video and audio feed are working?

18        COURT SECURITY OFFICER:  Yes, your Honor.

19        THE COURT:  Thank you, Officer Palumbo.

20        Mr. Fitzgerald?

21        MR. FITZGERALD:  Your Honor, I'm going to object

22   to his testimony being stricken.  I'm objecting to him

23   not being allowed to further -- or to continue his

24   testimony -- to further continue his testimony, your

25   Honor.  Both of those rulings would impact his

1    constitutional rights, his right to defend himself, his

2    right to testify, and I'm objecting to the Court and

3    the Government essentially taking those rights away

4    from him in this situation.

5           THE COURT:  Thank you, Mr. Fitzgerald.

6           The Court is going to grant the Government's

7    motion to strike.  I'm striking his testimony from the

8    record.  I find, specifically, this Court makes a

9    finding that his conduct was knowing and intelligent

10   and voluntary and that his knowing, intelligent,

11   voluntary waiver of his constitutional right to testify

12   was pursuant to those actions.

13          MR. FITZGERALD:  Your Honor, I have a motion.  I

14   move for a mistrial at this point.

15          THE COURT:  Motion is denied.

16          Do either side -- I'll deal with the -- my

17   plan -- what would the Government like me to say to the

18   jury other than that I've stricken the testimony?

19          MR. BENDER:  Thank you, your Honor.  The

20   Government looked at some cases about striking

21   testimony, **United States versus Bartello**, 129 F.3d 663,

22   a First Circuit case.

23          THE COURT:  Are you going to hand anything to

24   me?

25          MR. BENDER:  Yes, your Honor.  There's copies

1    for everybody.

2            THE COURT:  Thank you.

3            MR. BENDER:  I'm at page six of the document I

4    just handed, which is page 673 of the case.  And the

5    case basically just explains the right of Government's

6    cross-examination of a Defendant in this case, and it

7    just says that the right is subject -- the Defendant's

8    right to testify is subject to the Government's

9    legitimate interest in testing the truth of the

10   testimony offered by the defense through

11   cross-examination.

12           And simply, the Government would ask that the

13   Court instruct the jury that the Government was

14   deprived of its interests in testing the truth of the

15   direct testimony through cross-examination; and as a

16   result, the Court struck the testimony and the jury

17   cannot consider that testimony in their deliberations.

18           THE COURT:  That's a reasonable instruction.

19           Mr. Fitzgerald, any comment on the instruction?

20           MR. FITZGERALD:  Yes, that the Government has

21   been deprived of some right.  I don't want it put that

22   way to the jury.  They did see his testimony yesterday.

23   I think it's safe to essentially just say his testimony

24   is being stricken.  If we say he's being deprived now,

25   you know, it's his fault and I think that makes the

1     situation even worse.

2          THE COURT:  Okay.  My intention is to call the

3     jury in now, give them an instruction on striking of

4     the testimony.  I'll then ask Mr. Fitzgerald if he has

5     anything further.  I'm assuming that you will then rest

6     at that point.  I'll ask the Government if there's any

7     rebuttal, though actually there wouldn't be any

8     rebuttal because I struck the Defendant's case so there

9     wouldn't be any rebuttal.  I'm thinking a little out

10    loud here, if that's not obvious.

11         And then I am intending to release the jury

12    for -- until one o'clock?

13         MR. FITZGERALD:  That's what you said yesterday,

14    your Honor.

15         THE COURT:  Does that make sense?

16         MR. FITZGERALD:  Yes, that makes sense.  That's

17    kind of what I planned on.

18         THE COURT:  That would allow us a little period

19    of time to finalize the instructions.  I'll have them

20    come back at 1:00, and we'll go right into closing

21    arguments.

22         Mr. Kane?

23         MR. KANE:  Very well, your Honor.

24         Just on the instruction to the jury, does the

25    Court intend to say something about cross-examination

1    in addition to striking the testimony?

2         THE COURT:  What do you mean?

3         MR. KANE:  Mr. Bender mentioned that in addition

4    to saying the Court strikes the Defendant's testimony,

5    is the Court going to say in a sense very briefly, as

6    Mr. Bender pointed out, why, that the Government has

7    been deprived of the right of cross-examination

8    essentially?

9         THE COURT:  I'm going to take a short break and

10   think about it.  I'm going to actually write out what

11   I'm going to say so I can give it some thought, so I

12   don't know the answer to your question yet.

13        MR. KANE:  Because otherwise, the jury -- they

14   obviously don't understand fully obviously the

15   important rights that we understand through

16   cross-examination, potentially the most important due

17   process right we have.  And if you just strike it, the

18   jury might be left with the impression that some sort

19   of unfairness is befalling the Defendant.

20        MR. FITZGERALD:  The Government doesn't have a

21   due process right.  This is the second time that the

22   Government said that.  They don't have due process

23   rights.

24        MR. KANE:  To cross-examination?

25        MR. FITZGERALD:  Do they have a right to

1   fairness to cross-examine?  Yes, I get that.  They

2   don't have a due process right.

3          THE COURT:  Right.  So perhaps what I'm thinking

4   about is saying that in light of the fact that the

5   Government did not conduct a full and complete

6   cross-examination of Mr. Fall that his direct testimony

7   is stricken, something to that effect, which attempts

8   not to highlight blame but rather explain to them the

9   reason for it, but they need some context for

10  understanding that it's stricken.

11         Warning to counsel for both sides, as I said

12  informally in chambers, implied informally in chambers

13  when we discussed this, I don't want any mention or any

14  inference by either side of anything that Mr. Fall said

15  because I've now stricken his testimony.  That includes

16  the Government attempting in a way to address it.

17  Because as we know, I can instruct the jury to

18  disregard testimony but they've heard it, and I assume

19  and will order them to follow my instructions to put it

20  out of their minds.  But I don't want anything seeping

21  in from the Government concerned that they actually

22  heard it and attempting to address anything that

23  Mr. Fall might have said.  So I want you to be

24  particularly careful of that.  It's easier for the

25  Defendant because they can't argue it at all.  But if

1     the Government is going to attempt subtly to rebut

2     things that Mr. Fall said even though I've stricken his

3     testimony, I'm not going to allow it.

4          We'll be back in just a couple of minutes.

5          (Recess.)

6          (The jury is present for the following:)

7          THE COURT:  Good morning, ladies and gentlemen.

8     How is everyone doing?

9          Let me ask you the usual questions.  I gave you

10    certain instructions yesterday.  Can I be assured that

11    all of you followed those instructions, that is you

12    didn't discuss this case amongst yourselves or with

13    anyone else; you didn't do any independent research,

14    and you stayed off social media about your jury service

15    or this case?

16         THE COURT:  Great.  All jurors have answered in

17    the affirmative.

18         Ladies and gentlemen, when we recessed

19    yesterday, Mr. Fall was on the stand and being

20    questioned by the Government.  The Court has determined

21    that Mr. Fall's answers on cross-examination were

22    unresponsive; therefore, the Court halted the

23    examination, and I have now stricken from the record

24    the entirety of his testimony, both direct and cross.

25         I therefore instruct you that you are not to

1    consider his testimony at all.  None of his testimony

2    given in this courtroom is evidence that is before you

3    appropriate for use during your deliberations.

4         Ladies and gentlemen, in light of that, and

5    where we are, let me talk schedule with you a little

6    bit.

7         We weren't anticipating, as you can imagine,

8    that we would be where we are right now.  I need an

9    hour or two with the attorneys to finalize the legal

10   instructions or whatnot.  It's part of the procedure we

11   go through to prepare for closing and the instructions.

12   So what I'd like to do and tell you is I'm going to

13   release you until one o'clock.  You're welcome to stay

14   here and hang out with us.  Not us, us, but in the

15   courthouse.  You're welcome to go through downtown.  I

16   would like you to take care of your lunch obligations

17   before then.  What the plan is at one o'clock the

18   Government will close -- before we do that, I

19   apologize.

20        Mr. Fitzgerald, anything further for the

21   Defendant?

22        MR. FITZGERALD:  No, your Honor.  The defense

23   rests.  Thank you.

24        THE COURT:  Great.  Thank you.

25        I needed to do that officially.  The evidence

1    that you will have to deliberate is now complete before

2    you.  The only thing remaining are the closing

3    arguments of counsel and then the instructions of law

4    that this Court will give you.

5         My intention is at one o'clock the Government

6    will present its closing argument to you.  The defense

7    will then present its argument to you; and because as

8    I've told you all along that the burden of proof is on

9    the Government, they begin closing arguments and then

10   they have a right to rebut after the Defendant.

11        So the Government will close, argument, the

12   Defendant will close and then the Government has a

13   right to -- sort of the last word so to speak because

14   it's their burden.  I will then instruct you on the law

15   and then you'll begin your deliberations this

16   afternoon.

17        So I apologize for the inconvenience and the

18   couple of hours that I'm giving you off.  Continue not

19   to discuss this case.  You have now heard all the

20   evidence.  What you have not heard yet is the closing

21   arguments, and I'll tell you this a few times, closing

22   arguments are not evidence.  They are argument.  They

23   are the parties' attempt to persuade you toward their

24   understanding of the facts and how those facts apply to

25   the law and to argue to you what your verdict should

1    be.  But it's not evidence.  Anything that the

2    Government says, as was their opening statements, not

3    evidence.  And then I will instruct you on the law that

4    you have to follow in applying it and then you'll begin

5    your deliberations.

6          So we will see you back here, and we will start

7    promptly with the Government's closing at 1:00 p.m.

8          (Recess at 10:30 a.m.)

9          (The jury is not present for the following:)

10   THE COURT:  We have met, I've met with counsel

11   on a couple of occasions and we've exchanged back and

12   forth over jury instructions, and I've now distributed

13   what the Court intends to be the final instructions.

14         I'll offer this opportunity to the Government

15   and to Mr. Fitzgerald on Mr. Fall's behalf to state any

16   objections to the instructions that wish to be made.

17         Mr. Bender?

18         MR. BENDER:  The Government doesn't have any

19   objections to the instructions but we spoke with

20   defense counsel and earlier defense counsel requested

21   an instruction for Count I about the jury must agree on

22   a specific obstructive act.  And the Government and I

23   believe defense counsel would be agreeable to a similar

24   instruction for Count II, the jury must agree,

25   unanimously agree on a specific affirmative act.  So

1    we're looking at page 10.

2              THE COURT:  Of what was once the final version?

3              MR. BENDER:  Correct.  Yes, your Honor.  The

4    paragraph that ends on the top of page 10 discusses

5    affirmative acts of evasion, and perhaps adding a

6    sentence that "the jury must unanimously agree on a

7    specific affirmative act" to the end of that paragraph

8    might be appropriate.

9              THE COURT:  You want it to read that the jury

10   must agree, unanimously agree?

11             MR. BENDER:  Correct.

12             THE COURT:  Agree on what?

13             MR. BENDER:  On a specific affirmative act.

14             THE COURT:  Okay.

15             MR. BENDER:  But no objections to the

16   instructions from the Government, your Honor.

17             THE COURT:  Okay.  Mr. Fitzgerald?

18             MR. FITZGERALD:  That would be the end of that

19   paragraph that ends at the top of page 10?

20             THE COURT:  Correct.  Where it says, "Revenue

21   service or conceal income period," and then the

22   sentence is added.

23             MR. FITZGERALD:  Correct.  Other than that, I

24   have no objections.

25             THE COURT:  Great.  Well, I'm going to make that

1    change and I will -- don't go anywhere because as soon

2    as I come back we'll call the jury in.

3           (Pause.)

4           THE COURT:  Just before the jury comes in

5    there's another note from Mr. Fall that he gave the

6    Court security officers that will be marked as Court's

7    Exhibit 15.

8           With that, let's get the jury in.

9           MR. BENDER:  Your Honor, could we just note that

10   the Defendant is -- whether he's present in Courtroom 4

11   for this?

12          THE COURT:  We'll have to wait for Officer

13   Palumbo, but we'll certainly do that when he gets in.

14          MR. BENDER:  Thank you.

15          (Pause.)

16          THE COURT:  Officer Palumbo, can you verify for

17   me that Courtroom 4 is available with a live video and

18   audio feed and that Mr. Fall is present in Courtroom

19   Number 4?

20          COURT SECURITY OFFICER:  Yes.

21          THE COURT:  Great.  Thank you.

22          Would you bring the jury in, please.

23          COURT SECURITY OFFICER:  Yes.

24          THE COURT:  We're off the record.

25          (Discussion off the record.)

1          (The jury is present for the following:)

2          THE COURT:  Welcome back, ladies and gentlemen.

3          Can you again assure me that you have followed

4     the Court's instructions?

5          Great.  All the jurors have affirmed that that

6     was the case.

7          Ladies and gentlemen, as I told you before, we

8     are entering the argument stage on the case.  The

9     Government will get up shortly and present its closing

10    argument to you.  We'll probably take a break after

11    that and then the Defendant will come and argue to you,

12    and then the Court will instruct you on the law.

13         Again, I instruct you arguments of counsel are

14    not evidence.  You have now heard all the evidence.  I

15    don't mean to downplay the arguments.  They are

16    oftentimes very helpful in attempting to help you with

17    what the facts are that you are to determine, so just

18    remember they are not evidence.  The evidence you have

19    heard or seen or will see when you deliberate.

20         With that, Mr. Kane on behalf of the Government.

21         MR. KANE:  Thank you, your Honor.

22         Your Honor, may it please the Court, counsel,

23    members of the jury:  John Fall filed taxes before.  He

24    filed taxes for the better part of his adult life, up

25    until 1998.  He knew what the law was.  He knows what

1    the law is.  He knows what you know.  He knows what we

2    all know.  When it comes to April of every year, the

3    tax laws of the United States requires the filing of

4    tax returns and the payment of taxes.

5         But John Fall didn't want to pay taxes anymore

6    come 1998.  As he stated in Exhibit 71-F, and if I can

7    have that up, please.

8         As he stated in Exhibit 71-F, "Haven't filed

9    since 1998 and never will."

10        And so this Defendant embarked on a decade-long

11   campaign to defy the law, to defy the IRS at every

12   turn.  He did this with respect to his own taxes.  He

13   did this with respect to his wife's taxes.  He did this

14   through numerous layers of concealment, through

15   numerous deceptions and deceits and falsehoods

16   including the use of fake names and aliases.  And when

17   the IRS caught up to him, when the IRS got leads on his

18   income and determined that his wife's returns were

19   false, what did he do?  Did he come clean?  Did he

20   cooperate with the IRS?  No.  He employed what he

21   called his technology.  He papered the IRS with

22   frivolous nonsense, what he knew was frivolous nonsense

23   all in an effort to delay and impede the audits and the

24   examinations.  All in an effort to harass the agents

25   who were simply doing their jobs.

1        The IRS warned him against all of this multiple

2   times going back as early as 2002.  Notice after

3   notice, warning after warning telling him what he

4   already knew, that the tax laws of the United States

5   required the filing of tax returns and the payment of

6   taxes; telling him that if he continued down the path

7   he had chosen, he could be prosecuted.  And the IRS

8   told him that multiple times.  But the Defendant

9   continued to defy the law.

10        So deep and profound was this Defendant's

11   philosophical disagreements with the IRS and the tax

12   laws that he proclaimed himself in filings with the

13   Providence City Hall a sovereign citizen, a sovereign

14   living soul, in effect suggesting he's beyond the rule

15   of law, that he's not a United States citizen.

16        But as this Court will instruct you, a

17   disagreement with the law, however deep and sincere, is

18   not a defense to the charges.  It is everyone's duty to

19   obey the law.

20        In pursuing his decade-long campaign against the

21   IRS and against the tax laws in his corrupt endeavors

22   to hide and conceal, the Defendant broke the law

23   multiple times, and he did so willfully.  For that, he

24   must be held accountable.

25        Members of the jury, there are four charges for

1    your consideration, four counts in the Indictment.

2          Count I alleges that the Defendant between 1999

3    and 2010 corruptly endeavored to obstruct and impede

4    the IRS.  The count alleges essentially everything you

5    heard about during trial, all of his conduct with

6    respect to his taxes and with respect to his wife's

7    taxes.  This count also charges that he obstructed the

8    audit after the filing of his wife's taxes by

9    submitting false paperwork through an accountant and to

10   the IRS; by telling his wife not to comply with an IRS

11   summons, as well as other obstructive acts.  That's

12   Count I.

13         Count II is tax evasion.  It charges the

14   Defendant with evading the payment of his taxes for

15   1998, '99 and 2000.  If you recall the evidence, the

16   Defendant willfully failed to file his returns for

17   those years.  The IRS caught a lead on his income

18   through those W-2s and 1099s hitting the system.  They

19   proposed an assessment.  He filed frivolous paperwork.

20   The IRS kept coming.  He decided to file returns.  He

21   filed false returns.  They audited those returns.  They

22   worked up their assessment.  They told him what the

23   assessment would be.  They gave him an opportunity to

24   challenge it, to appeal it, to even take it to tax

25   court.  He didn't do so.  Those assessments became

1    final in 2005 and 2006.

2         Count II charges that after that point, between

3    2005 and 2010, he evaded the payment of those taxes by

4    engaging in numerous acts of concealment, the same

5    obstructive acts as charged in Count I, multiple

6    entities, multiple fake names, multiple bank accounts

7    and additional obstructive acts, additional affirmative

8    acts.  That's Count II.

9         Count III and IV essentially charge the same

10   violation, that the Defendant aided and assisted in the

11   false returns of Comfort Dental for 2006 and 2007, and

12   specifically with respect to advertising expenses.

13        Let's take a look at those last counts first,

14   the aiding and assisting counts.  And these counts boil

15   down to essentially two questions for you to answer.

16   First, were those returns false in terms of

17   advertising; and second, did the Defendant willfully

18   cause or participate or provide information that led to

19   those false items, those false advertising deductions.

20        As the Court will instruct you, it's not

21   necessary that the Defendant actually physically

22   prepared those returns or that he actually signed those

23   returns.  All that is necessary is proof that the

24   Defendant provided false information or directions with

25   the expectation that the information he provided would

1    be used to file a tax return.

2            So let's take a look at the first question, were

3    those returns false?  There can be no serious question

4    that they were.  To begin, there was an audit of those

5    returns.  And everybody agreed in that audit that those

6    returns were false.  You heard from two accountants,

7    Larry Rosen and Brian Tortolano, who came in into the

8    audit; and as Brian Tortolano testified, it's their job

9    to represent the taxpayer.  They had an interest, as he

10   said, to prove the IRS wrong.  And as he testified,

11   these expenses didn't exist.  The advertising expenses

12   were not true, and so they agreed with the IRS

13   examination and proposed changes.

14           Carmen Sanchez testified that these advertising

15   expenses were not true.  She testified that no services

16   were provided by Washington Allocation or JV Services,

17   and she ran the dentistry but she also testified that

18   she handled the communications and the advertising in

19   her community, that she provided the script, that she

20   worked with SuperMax and Cumbre Communications, the

21   actual advertisers that provided services to Comfort

22   Dental.

23           Ken Cournoyer, obviously the IRS agent who did

24   the audit.  He tried to find information on these

25   companies.  He tried to find contact information,

1    telephone numbers.  They didn't exist.

2         How else do you know these returns were false in

3    terms of advertising?  Those invoices that were used to

4    substantiate the deductions.

5         Let's have 301-H.

6         These are examples of both the JV Services and

7    the Washington Allocation invoices, very similar PO

8    boxes in Texas.  As one witness I think testified,

9    these were basically pro forma printouts, appear to be

10   printouts from QuickBooks.  Repeatedly everybody asked

11   John Fall, as well as others, where is the contact

12   information for these companies, where are these

13   companies, where is additional proof that they even

14   exist?  And none was forthcoming.

15        As Ken Cournoyer with the IRS testified, on

16   their face these invoices are suspicious.  The lack of

17   contact information and the fact that the amounts are

18   tied to the revenues of the business, which is unlike

19   all the other advertising expenses which charge for a

20   finite or a definite amount of time that is on the air.

21   But these are tied to the revenues because John Fall

22   set up those payments on an automatic basis, as I think

23   he said in one document, that would continue every

24   month.

25        How else do you know that the returns were

1    false?  In addition to the fake invoices and in

2    addition to everybody agreeing at the audit that these

3    expenses were fake, you saw the true disposition of

4    these funds, and most of them did not go to

5    advertising.

6         Let's take a look at Exhibit 421-E.  And I think

7    I have a blowup for this.

8         This is a demonstrative that Agent Pleshaw

9    testified to.  And you also saw the long form summaries

10   entered into evidence for the JV Services account down

11   in Texas.

12        First of all, why is there advertising going on

13   down in Texas, using a company down in Texas when the

14   advertising was local with local radio stations?  But

15   in any event, the money didn't go to advertising, or at

16   least most of it didn't.  It goes into an account in

17   Texas in the name of JV Services; and then from there,

18   as the testimony came out, John Fall had sent on to the

19   actual advertisers about $48,000 over those years.  The

20   remainder of those funds go up to his warehouse

21   accounts, including warehouse accounts in Iowa.  Did

22   not go to advertising.  And the amounts that did go to

23   advertising were accounted for in the adjustments at

24   the audit.

25        The fact that JV Services just turned around and

1    sent the money right back to Cumbre Communications and

2    SuperMax shows they didn't provide any service at all.

3    Basically, John Fall sent this money into an account he

4    controlled and then took a cut and sent it up to his

5    warehouse accounts in Iowa.

6            So at the end of the day -- if I can have 423,

7    please.

8            This is a summary of the adjustments that Agent

9    Pleshaw testified to.  For 2006, 58,000 and change; and

10   for 2007, 20,000 and change, basically over-statements

11   of the advertising.

12           The evidence at trial also showed that there

13   were false advertising expenses for 2005, but the

14   counts in the indictment relate to 2006 and 2007, at

15   least as to Counts III and IV.

16           All right.  The second question:  Did John Fall

17   participate in causing these false expenses?

18           To begin, the testimony was did he have an

19   office at Broad Street upstairs, that he participated

20   in the financial affairs of his wife.  Now, when it

21   came time to learning about these expenses, everybody

22   turned to John Fall.

23           You heard testimony from Cielito Deayala, and

24   you saw documents sent to Cielito Deayala.

25           Let's have 287-C, please.

1          This relates to equipment leasing, which was

2     another false item on these returns that relates to the

3     obstruction count, but this document shows, and you can

4     see the fax header at the top right of the page, that

5     John Fall had direct contact with the bookkeepers of

6     the business.  He was directing these expenses.  He was

7     causing these expenses and not only causing these

8     payments, but he was directing the characterization of

9     these payments as leasing expenses, which ended up on

10    the returns as false items.

11         Let's have Exhibit 110-A, please.

12         You heard Cielito Deayala talk about this

13    document.  This is an envelope containing tax

14    information.  If you look at the next pages after this

15    document or after the first page, they're QuickBook

16    reports on some of these expenses.  And Cielito Deayala

17    testified this envelope was given to John Fall and

18    that's her handwriting.

19         Let's have 287-B.

20         Carmen Sanchez testified to this document.  This

21    was an instruction sheet for payments that John

22    prepared.  Many exclamation points throughout this one,

23    which was a characteristic of his text and writings,

24    especially in all those documents that came from the

25    George Jaquez disks.

1       Additional evidence showing that he caused or

2   participated in causing these false items, you heard

3   testimony from Viva Johnson.  She said that he

4   participated in Broad Street.  She had interactions

5   with him on Broad Street and that when there were

6   questions about these particular advertising expenses

7   and the expenses with Washington Allocation, she spoke

8   to John.

9       And let's take a look at Exhibit 299-A.  In this

10  particular case, John told her not to make the payment.

11  "Per John, do not pay."  Showing you that he was

12  directly involved in these expenses and causing them to

13  be sent and to be recorded as false expenses.

14      You heard testimony from Ken Cournoyer, the

15  agent.  He testified that when Carmen Sanchez was

16  ordered to appear for a summons after her husband told

17  her not to appear, John Fall came with her and he

18  started asking questions about these expenses, and she

19  didn't know anything about the expenses and she turned

20  to John Fall for answers, "Tell them, John."

21  Additional evidence he caused these expenses.

22      All the evidence showing John Fall's anti-tax

23  rhetoric and research, all of his efforts to try to

24  hide and conceal, and you'll find that evidence from

25  George Jaquez disks, the documents taken off those

1    disks that Agent Dickerman testified to, and they can

2    be found between 62 and 98, and I'm going to show you a

3    few here today.

4         Extensive research on how to hide assets,

5    extensive research on using aliases, extensive research

6    on how to go about disappearing showing you that he, of

7    course, was the one behind these expenses.

8         In addition, JV Services itself was his company.

9    He's the one that set it up in Nevada, the super-secret

10   state that he researched.

11        Let's have 141-B and 141-D.  These are the

12   formation papers in Nevada for both Washington

13   Allocation and JV Services.

14        The names and the nominees and the officers used

15   are names and nominees tied to him, Consignment

16   Partners, Thomas Brown.  Those are him.

17        Let's have his cheat sheet up, if we can.  60-A.

18        Found in a room at Broad Street that he left

19   behind, a room that George Jaquez testified in no

20   uncertain terms that John Fall is the only one who had

21   access to.  Creating a list of names, companies and

22   even in the left-hand side his warehouse banks.  He had

23   so many he had to keep it straight on his cheat sheet.

24   And obviously, one of those names is Thomas Brown.

25        71-I, please.

1           And here's a document from the George Jaquez

2     disks, some of the research, just one example.  Nevada,

3     the super-secret state, no disclosure with the IRS.

4     Establishing companies in Nevada can help you keep a

5     low profile.  Additional evidence that he caused these

6     expenses.  Not only did he control and set up these

7     companies, he controlled the bank accounts.

8           Again, not only do the bank accounts show the

9     expenses didn't go to advertising, but he set up the

10    company; he set up the bank account in Texas, a bank

11    where he had three other accounts, and he had an

12    additional account at another bank in Texas.  And if

13    you look at the summaries of those bank records, you

14    see funds of his and Comfort Dental's going into his

15    accounts showing that he controlled the company and he

16    controlled the money.

17          In addition, of course you heard from Carmen.

18    Carmen said it was John's idea to have these payments,

19    that these entities didn't provide any services, that

20    it was him.  She testified credibly.  And the

21    Government is not asking you to rely on her testimony

22    alone.  There is all sorts of evidence in the documents

23    and in the other testimony of witnesses that

24    corroborate what she says.

25          In addition, his involvement in the audit.

1    After the returns were filed, the returns were audited.

2    And when it came time to represent Comfort Dental,

3    remember Bill Harrigan's testimony.  Usually he goes to

4    the bookkeeper in the business and he tried to with

5    Veva Johnson in this case.  But very shortly after the

6    audit started, the point person became John Fall, which

7    shows you he knew what these expense were about.  When

8    there were questions about these expense, the point

9    person was John Fall.

10        Let's have 301-E up.

11        Just one example of the correspondence between

12    Bill Harrigan and John Fall, a letter or e-mail for

13    Bill Harrigan and John Joseph Fall.  The IRS was asking

14    questions on what these expenses were all about.

15    Where's the support?  Where's the proof?  And he sets

16    forth his false justifications for JV Services and

17    Washington Allocation, and he explains that these were

18    on an automatic pilot.  They were on an automatic pilot

19    set up either months or years ago.  Years ago.  Three

20    years ago.  Automatic pilot.

21        When there were questions about these expenses,

22    people went to John Fall.  And not only did he provide

23    information or answer questions, he also provided false

24    documentation.

25        Exhibit 304.

1      This is the false script or justification of a

2  script sent to a John, John Fall, from a Paul Swanson.

3  Paul Swanson being one of his fake names and aliases.

4  A document that was supposed to allegedly substantiate

5  the advertising expense explaining that JV Services

6  provided the script, but Carmen Sanchez testified that

7  one of the things she did in the business was to handle

8  the advertising.  She handled the script.  She dealt

9  with SuperMax and Cumbre Communications.  This document

10  was utterly and completely false.  And we know it was

11  false in addition because the name, Paul Swanson,

12  appears on one of those stamps.  There was a signature

13  stamp for Paul Swanson found in that room where only

14  John Fall had access.

15      In addition, Paul Swanson appears on the cheat

16  sheet, 60-A, the cheat sheet found in a room where only

17  John Fall had access.

18      And you know this cheat sheet is his not only

19  because he had access, the only access to that room,

20  but with that cheat sheet were the stamps as well as

21  those George Jaquez disks.  And if you look at the

22  documents, he's identified all over the documents as

23  being the author.  Those disks were his, the cheat

24  sheet was his.

25      And finally, final information and evidence

1    showing that he was behind these expenses is the fact

2    that not only did he falsify the advertising expenses,

3    but he falsified other expenses as well.  The leasing

4    expenses as well as false deductions on the personal

5    returns of Carmen Sanchez showing you that the false

6    advertising expenses were not a mistake and that he was

7    behind the falsification of these returns.

8            Let's have 424, please.

9            This is a summary of the leasing adjustments by

10   Agent Pleshaw.  And if you recall the testimony, before

11   the advertising expenses there were false deductions

12   for leasing expenses related to an asset allegedly

13   purchased or leased from Managed Skills.  The evidence

14   is that that company did not exist, did not provide

15   services.  Everybody testified to that.  The

16   accountants, Carmen, there was no such asset.

17   Substantiation was requested.  It was never provided.

18   First, allegedly it was being leased and that was the

19   justification for the expense, and then there was this

20   alleged buyout agreement and John Fall provided false

21   documentation in the audit on that, and then there was

22   a depreciation expense.  The evidence is overwhelming

23   that this company provided nothing and these expenses

24   were false.

25           And we know John Fall was behind these leasing

1    expenses as well.  If we look at 87-B, this is his

2    internal accounting record of these expenses found on

3    the George Jaquez disks.  Income and outgo for Comfort

4    Dental.  He's tracking the payments out of Comfort

5    Dental to his various companies, including Managed

6    Skills, Professional Equipment and Profit Management.

7    And how does he list these expenses?  As expenses that

8    ended up on the return.

9           You heard testimony about the false return for

10   2005, the personal return of Carmen Sanchez.

11          If we can have that up, 8-A at page 1 and 7.

12          Washington Allocation expenses appear not only

13   on the corporate returns but on the personal return as

14   well for 2005.

15          You also heard testimony that Carmen Sanchez

16   essentially had head-of-household filing status through

17   three or four years when David Seidman was the

18   preparer, even though they lived together all for about

19   a year when she moved to Providence.  That was false.

20          So members of the jury, that's Counts III and

21   IV.  The returns were false, and John Fall was behind

22   the falsities and he willfully caused the falsities.

23          Let's now go back to Count I, the obstruction

24   charge.  Again, this charge basically alleges -- it's

25   an all-encompassing charge alleging that he obstructed

1    the IRS with respect to his taxes and with respect to

2    her taxes.  In addition, it alleges that he obstructed

3    the audit.

4         Now, if you find the Defendant guilty on Counts

5    III and IV, you may also find him guilty on Count I

6    because as part of Count I we charge the falsification

7    of those corporate returns.

8         In addition, he obstructed the audit.  We've

9    already talked about the false documentation that he

10   provided during that audit.

11        Let's have 307-B.

12        This is another piece of -- this is another

13   document he provided that was false supposedly

14   substantiating the Managed Skill deduction and that was

15   false according to the witnesses and the documents.

16        So if you find that he falsified the returns of

17   Comfort Dental or obstructed the audit, you may find

18   him guilty on Count I.  And as the Court will instruct

19   you, the Government need only prove one obstructive act

20   with respect to Count I.

21        In addition, he obstructed the audit by telling

22   Carmen Sanchez not to show up at a summons, encouraged

23   her not to comply with the tax laws and the IRS.  And

24   the testimony from her was very clear, "He told me not

25   to go."  And that forced an enforcement action before

1    the United States District Court for the District of

2    Rhode Island, and she was ordered to appear.  That was

3    an obstruction.

4         So now let's talk about the broader conduct

5    alleged in Count I, which is the fact that he tried to

6    obstruct the IRS with respect to his income and his

7    wife's proper deductions and income.

8         To sum up his scheme, it was hide and harass.

9    Two words, hide and harass.  He hid by creating

10   multiple layers of concealment to distance himself from

11   his assets and income.  He harassed when the IRS caught

12   up to him.  He filed mountains of frivolous paper in an

13   effort to stop and impede and intimidate agents hoping

14   the audit would either be delayed or would go away.

15        Let's talk about the hiding first and what was

16   he hiding.  The evidence is he was in income-producing

17   activities.  He was in real estate, he owned property,

18   he earned rent, he was a real estate broker.  You saw

19   that in the license that was offered into evidence.  He

20   also told people that he made money.

21        Let's have 71-F, please.

22        This is actually an internal memo he had, found

23   on the George Jaquez disks, in which he states he made

24   $150,000, 90,000 of it which was profit.

25        Let's go to 248-A.

1          A life insurance policy that he applied for.

2    Annual income, $104,000 he represents.  And he takes

3    the policy out in the name of Profit Management, one of

4    his entities.

5          387-A.  This is the financing for the Lexus, an

6    application.  The scanned copy is not the best.  The

7    hard copy you'll be able to read better, but down at

8    the bottom he represents he makes $8,000 a month, which

9    is about $96,000 a year.

10         You saw evidence that he owned Ohio Street and

11   tried to transfer it into different nominees before he

12   sold it to the McGraths and then had the payoff sent to

13   Eleganza Leasing, which was one of his entities, having

14   that payoff sent across the country to the State of

15   Washington.

16         You saw bank accounts with multiple deposits and

17   payments tied to him.  The Defendant made money.

18         But the Court will instruct you we don't have to

19   prove how much, and we don't have to prove a tax loss

20   with respect to Count I.  The point of Count I is that

21   the Defendant tried to obstruct the IRS from even

22   finding out what his income and taxes would be.

23         So let's talk about the layers of concealment.

24   Multiple, multiple layers.  Step one, his multiple

25   entities and shell companies.

1          And if we could have that chart up, please.

2          By our count, at least 16 different entities

3    tied to this Defendant, entities set up to create

4    distance between himself and any assets and income.

5    Multiple entities to disguise his income and assets.

6    Revenue Management Services, that was him.

7          Let's have 68-A.

8          A document found on the George Jaquez disks, one

9    of the many, showing that he lists himself as a general

10   partner.  We know what that means.  He owned and

11   controlled this entity.  And all of these entities

12   didn't file tax returns.  With respect to except for

13   one, NERH the record shows that he filed one in 2005

14   and reported no taxes and no income.  Other than that,

15   these entities did not file.  Managed Skills, Profit

16   Management, Stratford Management, some of these other

17   entities, those were him.

18         Let's take a look at Exhibit 41.

19         This is the intake sheet found at Melissa

20   Sugar's business when there was an execution of a

21   search warrant when she was investigated.  This sheet

22   shows that he was a client of Melissa Sugar.  And

23   Melissa Sugar helped him set up an account in Colorado

24   in the name of Stratford Management where he used not

25   only Stratford Management but all of these entities.

1    And as you can see from the document, these were John

2    Fall's entities.

3          Eleganza Leasing, Venture Lending, those were

4    him.

5          Let's have the cheat sheet again, 60-A.

6          Listing Eleganza Leasing and Venture Lending.

7    And you saw the check, payoff check for the Ohio Street

8    sale go to Olympic Business Systems in Washington.

9          Washington Allocation, JV Services, we've

10   already talked about them.  Those were him.  NERH, that

11   was his company.

12         141-A, please.

13         The Secretary of State filing for NERH, again,

14   using Thomas Brown and Consignment Partners as officers

15   and representatives, those names being found in his

16   room or in the room that he had access to at Broad

17   Street.

18         Exhibit 251-A, a bank account he opened up at

19   Fidelity, a retirement account in the name of NERH

20   under his name, John Fall.

21         And of course, you saw the bank account evidence

22   of NERH where his funds are going into accounts in the

23   name of NERH.  Not only did he use multiple entities,

24   but he changed the entities over time.

25         If we can have that chart up.

1            In the early years, he used Revenue Management

2     Services, and then he used multiple entities for a

3     period of time, and then he switched to JV Services and

4     Washington Allocation and NERH to add another layer of

5     concealment, changing companies, putting them on the

6     shelf, making them less visible.

7            So that's one layer.  Multiple entities, 16 by

8     our count where the Defendant set up these entities to

9     conceal assets and income.  And if you look again at

10    Exhibit 62 through 98 if you need to, we went through a

11    lot of them with Agent Dickerman's testimony, you'll

12    see the efforts he went to create all these entities

13    confirming that they were all his.

14           Step two, multiple bank accounts.  Not only

15    multiple bank accounts, but bank accounts throughout

16    the entire country.

17           Let's have that chart, please.

18           Numerous bank accounts he had funds sent to

19    throughout the country.  Bank accounts that don't have

20    his name on them.  Bank accounts in Washington, in

21    Iowa, in Colorado, in Texas, in Maryland.  You heard

22    Ken Cournoyer say he found an account in Georgia.  He's

23    having funds sent out from Providence through these

24    various bank accounts all in order to reduce his paper

25    trail.  None of the accounts bear his name, all in the

1    name of nominees and some of these accounts were what

2    you heard were co-mingled or warehouse bank accounts

3    where they weren't just his funds, but they were other

4    people's funds making it difficult to trace the source

5    of funds.  Not only that, but he also moved money

6    between these accounts making it even more difficult to

7    trace.

8           Members of the jury, who banks this way?  Who

9    banks this way?  Nobody banks this way.  He had no

10   legitimate purpose to do this.  He had no property in

11   these states.  He had no business in these states.  You

12   heard Carmen testify that he may have traveled to

13   Panama once, but he didn't go to these states.  No

14   reason for this other than to conceal and to hide

15   assets and income.  And it was an elaborate way to do

16   it.  An elaborate way to do it.  Multiple bank

17   accounts.

18          The next step, the next layer, multiple fake

19   names and aliases to create more distance.

20          If we could have that chart, please.

21          The Defendant used multiple names and aliases to

22   create further distance between his assets and income.

23   You'll find again on the George Jaquez disks research

24   on how to use aliases, admissions by him that he was

25   using aliases, and those were in a number of the

1        documents.  John Johnson, that's him.

2                You can put that down.

3                John Jonathan, that's John Fall.

4                If I can have 301-L, please.

5                An e-mail between John Fall and Bill Harrigan.

6        And you saw multiple e-mails between Bill Harrigan and

7        John Fall where he's using John Jonathan.  And there's

8        only one reason he's doing that, to use aliases to

9        conceal his identity and to minimize papers trails.

10               Thomas Brown and Robert Johnson, we talked a

11       little bit about that already.  Those were him.  Again,

12       the cheat sheet had those names on it, the cheat sheet

13       found in a room where only John Fall had access.

14               The signature stamp in the name of Robert

15       Johnson, that's at 60-D.

16               And then there's 70-B again from the George

17       Jaquez disks, an e-mail that John Fall sent to somebody

18       who apparently was helping him create fake IDs

19       basically asking to create fake IDs for Robert Johnson

20       and the name Thomas Brown suggesting that he would use

21       stock photos of a younger man and an older guy and also

22       using addresses for the ID possibly out in Arizona.

23       E-mail from John Fall.  And of course, that fake ID he

24       had created was found in the room where only he had

25       access on the George Jaquez disks, 70-D.

1        John Cusick, the name John Cusick, that's him.

2    That's John Fall.  280 at page 5.

3        E-mails, you heard testimony from Lou Caccavaro

4    and Veva Johnson who testified that John Cusick was on

5    the e-mails that they had in communications with John

6    Fall.  Why is he using John Cusick in e-mails?  Why is

7    he using John Jonathan in e-mails?  Why is he not using

8    his own name?  Because he's trying to stay under the

9    radar.

10       Bob MacNeil, that's him.  104-D at page 2.

11   Smart Buyer letterhead, tied to his address at Ohio

12   Street, a solicitation for real estate, Bob MacNeil.

13   That's John Fall.

14       We've talked about Paul Swanson.  That's on the

15   cheat sheet.  Also the signature stamp found in the

16   room where only he had access.  John Paul, the name

17   John Paul, he had another fake ID with his picture this

18   time.  That's 104-A at page 7.

19       So multiple companies, multiple bank accounts,

20   including co-mingled and warehouse bank accounts

21   throughout the country, fake names and aliases.

22   Multiple layers of concealment.

23       But there was a fourth step.  The extensive use

24   of cash.  John Fall used cash.  He had lots and lots of

25   cash sent back to Broad Street.  You heard some

1    testimony from Cielito Deayala, I believe.  A package

2    came in the mail with cash in it and John Fall got that

3    package.  But you also saw documents entered into

4    evidence.

5            Let's have 79-C, again from the George Jaquez

6    disks, his disks.

7            If you look at the documents entered into

8    evidence from George Jaquez, you'll see all the

9    warehouse bank account correspondence that he had with

10   these promoters of these various bank accounts.  He

11   would ask that they write checks or send him money back

12   including in the form of cash.  And this is one

13   example.  In this case, asking to have sent back

14   $26,000 in cash mailed to John Fall, attention John

15   Fall, urgent, at Comfort Dental on Broad Street.

16           81-A at page 5.

17           Another mailing of cash, $5,500 to John Fall at

18   Comfort Dental.  And note the special instructions by

19   John Fall.  Please do not put your return address.  Use

20   my, my Managed Skills instead, exclamation point.

21           81-B at 5.  More cash being mailed back to him

22   at Comfort Dental, $1,500, attention John Fall.

23           81-C at page 7.  More cash back to John Fall,

24   $2,000.

25           81-C at page 9.  $5,500 in cash back to John

1     Fall at Comfort Dental.  And 81-D -- and these are just

2     some of the examples, members of the jury, 81-D, $3,000

3     in cash.  That's another layer of concealment, the

4     extensive use of cash to minimize the paper trail.

5          Another layer of concealment is that with

6     respect to all these identities he used multiple

7     mailing addresses not tied to Wheeler Ave. or tied to

8     Broad Street but addresses in Arizona and elsewhere

9     trying to create more distance between these entities

10    and where he resided.

11         He also used multiple e-mail addresses, multiple

12    e-mail addresses.

13         Another form of concealment is that when the

14    issue of NERH came up, when the IRS issued a summons

15    and a request for the funds that Lou Caccavaro held in

16    his escrow account, the Defendant provided false

17    statements to a Federal Court denying his interest in

18    NERH, even though you saw evidence that he is NERH.  He

19    set it up, he ran it, he controlled it, he owned the

20    funds.  He denied all of this in a filing in Federal

21    Court.  And then he had a Peter Fettig write a letter

22    to Lou Caccavaro telling Lou Caccavaro not to turn over

23    the funds to the IRS and not to turn over information

24    to the IRS.  And that's at 282-C at page 1.

25         Lou Caccavaro when he got this contact from the

1    IRS, he said that one of the first people he called was

2    John Fall because he knew that John Fall was a

3    representative of NERH.  He also testified that John

4    Fall was the common contact he had with all of the

5    entities that he brought a suit against to determine

6    whose funds they were because it was John Fall behind

7    all of those entities.

8          So members of the jury, we're talking about

9    Count I.  We're talking about his scheme to hide and

10   harass.

11         Let's turn to the harassment.  Despite his best

12   efforts to create these multiple layers of concealment,

13   the IRS got leads.  They got leads on his income.

14   There's those W-2s as well as some other information,

15   and they got leads on his wife's false returns.  But

16   rather than come clean, rather than cooperate, the

17   Defendant tried to stall the audits and the

18   examinations, tried to impede and delay the

19   examinations.  And the way he did that is he filed

20   frivolous paper, paper after paper both making

21   allegations as well as asking frivolous, frivolous

22   questions that he knew were frivolous, that he was told

23   were frivolous.  Questions and statements that he's

24   sovereign, statement that he's not a United States

25   citizen, statements that the IRS only has jurisdiction

1    in Puerto Rico, questions asking what type of tax do I

2    owe when it's perfectly obvious from the paperwork that

3    it's the Federal income tax that's at issue.

4           He wasn't looking for answers.  He was looking

5    to delay.  He filed an $8 million claim against the

6    agent who was trying to just do their job.

7           You heard from our first witness, Shauna

8    Henline, the senior technical coordinator at the

9    Frivolous Filer Unit in Ogden, Utah.  The IRS set up a

10   whole unit to deal with this kind of paperwork.  And

11   she testified that they send out what they call a soft

12   letter informing the Defendant and any taxpayer who

13   files such frivolous correspondence that what they're

14   doing is wrong; that their filings are frivolous; that

15   the tax laws of the United States require the filing of

16   returns and the payment of taxes; that the Federal

17   courts, the courts of law in this country have ruled

18   against your arguments over and over, but if you

19   continued on the path you have chosen you can be

20   prosecuted.  Providing citations to statutes, providing

21   advice to seek counsel or attorneys or accountants.

22   And she testified the policy is usually to send one

23   notice but in the record are multiple, multiple letters

24   from the IRS telling him that all of this was nonsense,

25   all of this was wrong, all of this was not an accurate

1   statement of the law.

2          You know the Defendant's intent was not a

3   good-faith request for information by the

4   correspondence he had with Bill Harrigan during the

5   audit.  There were multiple e-mails in which he states

6   really the purposes of its technology is to stop the

7   audit.  This was his technology.

8          Let's just take a look at 302-B as one example.

9          Promising Bill that if he would only agree to do

10  it his way, all of this will go away.  Having nothing

11  to do with the merits, having nothing to do with the

12  actual substance of the audit, but using his technology

13  maybe it will all go away as sure as the sun will rise

14  in the East.  That's not good faith.  That's not a good

15  faith, genuine, honest search for the truth.  That's

16  not somebody who is genuinely looking for answers.

17  That's somebody who is looking to obstruct and impede.

18          You can put that down.

19          So that's Count I.  One final count.  Count II,

20  the tax evasion count, charges the Defendant with

21  evading payment of taxes between 2005 or '06 and 2010,

22  for the 1998, '99 and 2000 tax returns.  The IRS worked

23  up their assessments and between 2005 and 2010 he

24  engaged in multiple acts of evasion.

25          The Court will instruct you that to prove this

1    charge the Government must prove three elements:  That

2    the Defendant engaged in an affirmative act of evasion,

3    which is really any act the likely effect of which will

4    mislead or conceal; second, that he actually had a tax

5    due and owing; and third, that his conduct was willful,

6    that is, he intentionally violated a known legal duty.

7        As to the first element, did the Defendant

8    engage in affirmative acts of evasion?  We've already

9    gone through that.  All of the obstructive acts with

10   respect to multiple entities and shell companies, the

11   use of fake names and aliases, the use of multiple bank

12   accounts, the use of cash are all charged as

13   affirmative acts for Count II.  So that's the first

14   element of tax evasion.

15       The second element is the tax due and owing.

16       And if we could have 425-A, please.

17       This is the summary by Agent Pleshaw, which is

18   largely based on the assessments rendered by the IRS

19   auditors.  And for each of those years, there was a

20   substantial tax due and owing.  The actual tax due and

21   owing is at these lines.  Ten thousand and change for

22   1999; 4,700 for 2000; and about 27,000 for 1998.

23       Collectively and separately, each of these

24   amounts are a substantial tax.  But when the IRS does

25   an examination, as you heard, when somebody doesn't

1    file, they file their substitute for return, which is a

2    zero return, and then they have W-2s and 1099s that

3    they work with.  But that doesn't capture all of their

4    income necessarily.  And in this case, John Fall had

5    additional payments going to him, and we saw that in

6    the warehouse accounts for '99 and 2000, the payments

7    going to Revenue Management Services.

8         So if we take a look at 425-C, this is a summary

9    by Agent Pleshaw in which those payments are added or

10   the taxes based on those payments are added.  So that

11   for those years, he actually had a bigger tax due and

12   owing than was actually assessed.  And if the 1998 year

13   is taken away, he still had a substantial tax due and

14   owing.  So there is a substantial tax due and owing.

15        That brings us to the third element,

16   willfulness, the intentional violation of a known legal

17   duty.

18        One other point on the tax due and owing.  Now,

19   you heard some questions and some testimony about the

20   payment, the collection suit, the payment of those

21   taxes for '98, '99 and 2000.  There was a forced

22   collection action in 2011 and that appears on the

23   transcripts, but that's not relevant to the charge.  As

24   the Judge will instruct you, so long as there was a tax

25   due and owing at the time the Defendant committed an

1    affirmative act, the tax due and owing element is

2    satisfied.  He committed affirmative acts in 2006, '07,

3    '08 and '09, all at a time when he still had a tax due

4    and owing, and when he committed those affirmative acts

5    at a time he had a tax due and owing, the crime was

6    complete.

7         Now to willfulness.  Was the Defendant's conduct

8    willful?  Did he know of his legal duty and did he

9    intentionally violate it?  The evidence is overwhelming

10   that he did.  He knew what his duty was under the tax

11   laws.  He filed taxes before.  He was told by the IRS

12   what his duty was, which he already knew.  This was not

13   a mistake.  This was not a misunderstanding.  He

14   willfully broke the law.  And you further know that his

15   conduct was willful and not in good faith because of

16   all the hiding he engaged in.

17        The Court will instruct you that if you find

18   that the Defendant acted in good faith or had a

19   good-faith belief that he didn't have to file or that

20   he was in compliance with the law, then that's a

21   negation of willfulness.  But looking at his conduct in

22   filing the frivolous paper that he knew was frivolous

23   and all those acts of concealment, that's not good

24   faith.  Why would you go through such extraordinary

25   steps to hide your income, to go literally across the

1    country using bank accounts to hide and conceal if you

2    thought you were on the right side of the law?  Why

3    would you engage in all that concealment and all that

4    hiding?  You wouldn't if you thought you were on the

5    right side of the law.  But he knew what the law was

6    and he was trying to hide from the law, and the

7    extraordinary lengths he went to to hide shows you that

8    his paper and all of his statements to the IRS were not

9    genuine, honest searches for the truth, which is what

10   the definition of "good faith" is as the Court will

11   instruct you, but rather a demonstration that he knew

12   exactly what he was doing, he knew what the law was and

13   he intentionally violated it.

14        More evidence that his conduct was willful and

15   not in good faith is the fact that he helped file false

16   tax returns for his wife.  That's a fraud.  That's not

17   good faith.

18        There's no evidence that he actually sought

19   advice from attorneys or accountants.  If he really

20   thought he was on the right side of the law concerning

21   taxes, you'd think he would go and consult somebody

22   about this, but he didn't because he knew what the

23   answer would be.  How many times did the IRS tell him

24   he could take appeals on any assessment, he can even go

25   to Federal Court and argue his case, but he refused to

1    do so because he knew what the answer would be.  He

2    knew what the law was.  And we've talked about the IRS

3    notices and warnings.  Multiple notices and warnings.

4              Let's have that chart.

5              This is just a demonstrative, a summary of all

6    the notices that went into evidence, responses to his

7    claims, notices and warnings from the IRS telling him

8    what he already knew, that he had an obligation under

9    the tax laws, an obligation to follow the law.  Notice

10   after notice, warning after warning telling him over

11   and over and over that he needed to comply; telling him

12   that he could be criminally prosecuted if he didn't;

13   citing to him the statutes in some of these letters on

14   where the legal duty to file can be found.  Notice

15   after notice, warning after warning.  He ignored all

16   these notices and continued to defy the law.

17             An example can be found at 60-D, an IRS response

18   to him early on in 2002 telling him that the tax laws

19   were passed by Congress, signed by the President,

20   telling him and informing him of what he already knew.

21   Telling him the role of the Internal Revenue Service,

22   which is not to debate the tax laws but to enforce

23   them.  Telling him that he could be prosecuted.

24   Telling him that they cannot go on and on and engage in

25   frivolous correspondence with him responding to all of

1    his frivolous requests, which he knew.  But the

2    Defendant ignored this notice and all the warnings.

3         On the issue of good faith and willfulness, the

4    Court will also instruct you that good faith is a

5    subjective standard, whether he actually held the

6    belief.  But in determining whether he actually held

7    any good faith beliefs, you may consider whether those

8    beliefs are reasonable in determining whether he

9    actually held them.  Were his claims reasonable?  His

10   frivolous claims that the IRS only had jurisdiction in

11   Puerto Rico, that he wasn't a United States citizen,

12   his request of what type of tax do I owe when the forms

13   and the notices that were sent to him told him what tax

14   was at issue?  That wasn't reasonable, and it shows you

15   that his true belief wasn't what he said in papers

16   filed with the IRS.

17        And the Court will also instruct you that

18   disagreement with the law is no justification, no

19   defense.  It is the duty of everybody to obey the law

20   no matter how strong that disagreement might be.  Isn't

21   that what this case is about?  A Defendant who over the

22   course of a decade continually papered the IRS, refused

23   to pay his taxes, said in papers that he was done

24   paying taxes and he would never file again, simply

25   disagreed with the law.  He knew what the law was.  He

1       simply disagreed with it.

2              One final issue on willfulness with respect to

3       Count II.  The Court will instruct you on willful

4       blindness, and basically this instruction tells you

5       that if the Defendant -- you may infer that the

6       Defendant had knowledge of a duty if you find that the

7       Defendant deliberately closed his eyes to a fact that

8       otherwise would be obvious to him.

9              Now, the Defendant wasn't blind to anything.  He

10      knew exactly what he was doing.  But if he was blind at

11      all, he was willfully blind.  The IRS sends him notices

12      after notices, warnings after warnings telling him that

13      he could be prosecuted, among other things.  He was

14      deliberately blind to the truth.  He was told his

15      avenues for appeal and to take his claims to Federal

16      Court, but he refused to do so because he knew what the

17      answer would be.  He was deliberately blind to the

18      truth.

19             He refused to seek counsel and instead the

20      accountants that you heard from at trial, Mr. Seidman

21      and Mr. Harrigan, told him that what he was doing was

22      wrong and warned him against his conduct.  He was

23      deliberately blind to the truth.

24             So members of the jury, that's our case.  As he

25      said in that document, 71-F, he hasn't filed since 1998

1    and he was never going to file again.  In his

2    decade-long campaign to obstruct the IRS and to make

3    good on that promise, the Defendant defied the law over

4    many years; and for that, he must be held accountable.

5         So after you consider the evidence, after you

6    deliberate, we respectfully request that you return a

7    guilty verdict on all counts.  Thank you.

8         THE COURT:  Thank you, Mr. Kane.

9         Ladies and gentlemen, we'll take a brief recess

10   between the two closing arguments.  We'll have you back

11   shortly.  Continue not to discuss this case amongst

12   yourselves.  You'll get this case very shortly when

13   you'll be allowed to discuss it.  So continue with my

14   order not to discuss this case amongst yourselves until

15   such time as I instruct you.

16        Could I see counsel at sidebar.

17        (The jury is not present for the following:)

18        (Sidebar conference off the record.)

19        (Recess.)

20        (The jury is present for the following:)

21        THE COURT:  Welcome back, ladies and gentlemen.

22        Mr. Fitzgerald.

23        MR. FITZGERALD:  Thank you, your Honor.

24        Okay.  Folks, I've got the -- we're going to try

25   something new.  So I've got this on, and we'll make

1    sure it works.

2         It's going to not surprise you that I have a

3    little bit of a different take on what we've all

4    listened to for the past two weeks.  I don't think that

5    should surprise you any.

6         During the eight days we've been here together

7    with Judge McConnell, we've had a few light moments and

8    some chuckles in between, but now it's more important

9    than ever for you to focus.  I think you've done a good

10   job during the whole trial, it seems that way anyways,

11   but it's really important to focus now because what's

12   going to happen next is you're going to get to do your

13   hard work of deciding guilt or innocence in this case;

14   and you're going to have to take all of the information

15   that we've given to you into the jury room and make

16   that decision.  And that's not a light decision.  I

17   don't think you think it's a light decision, but I want

18   to make sure you understand that it's a very, very

19   important decision for Mr. Fall.  Okay?

20        We can't forget that this case is about

21   Mr. Fall.  It's personal to him.  He's the man that's

22   being tried.  He's the man that's charged with these

23   crimes, and what we're doing here and the decisions

24   that you make are going to affect him personally and I

25   want to make sure that that's not lost in everything.

1    Okay?

2         Ladies and gentlemen, the Government has

3    presented you with a number of presumptions.  Okay?

4    They have presumed there's income in this case for

5    different people.  They have presumed that there was

6    interference by different people with different

7    objectives.  They have presumed Mr. Fall's

8    understanding of things.  They have presumed frivolity.

9    They keep saying that there were frivolous filings.

10        They have a whole unit of the IRS, the frivolous

11   tax unit.  Okay?  Do you remember Shauna Henline told

12   you that the IRS decides what is frivolous.  Okay?  So

13   the Government decides what's frivolous and what's not

14   frivolous.  Okay?  They presume what is frivolous,

15   what's beneath them, what they -- they don't need to

16   address.  What's frivolous, what's unwise, what's

17   foolish.  It's the IRS that makes the decision of what

18   they think is foolish or unwise.

19        They presumed the origin of all these documents

20   that you see, most of them.  Okay?  The documents that

21   have been presented, we've seen on the screens.  They

22   presumed where those things have come from.

23        They presumed associations, all of these

24   entities they say are associated with Mr. Fall.  That's

25   what the testimony was or what they had labeled it as

1    during the trial.  Today you heard these entities are

2    tied to Mr. Fall.  So we've moved from just the

3    presumption of association to he's tied to these, he

4    created these.  It's a presumption.

5         They presumed that information that's been

6    provided you is solid evidence that you need to -- I'm

7    sorry, solid evidence that will lead you to a

8    particular factual determination beyond any doubt.

9         But none of those presumptions that the

10   Government is relying on, that the Government has put

11   forward in front of you, none of those is more

12   important than the presumption of innocence Mr. Fall

13   has right now.  Okay?  And that carries with him all

14   the way into the jury room until you make a decision.

15   He's presumed innocent even if the Government -- I'm

16   sorry.  The Government has made all these other

17   presumptions.  They're not as important as that one.

18        The Government's case is only based on these

19   presumptions, and they want to convict him on these

20   presumptions.  Okay?  Now, they hope that you believe

21   them and you believe their take on the evidence to push

22   them over the line of reasonable doubt; but a

23   presumption is like an assumption, it's not quite

24   there.  They're presuming things.  They want you to

25   presume what they have failed to prove.

1            Folks, the documents, they presume where those

2     documents came from.  You heard from George Jaquez.

3     George Jaquez finds this box on the second floor of

4     Broad Street.  Okay?  George Jaquez found that box.

5     George Jaquez files, the George Jaquez disk, the Jaquez

6     disk, the Jaquez box.  That's what the Government keeps

7     telling you.  It's the Jaquez box, it's the Jaquez

8     folder.  And then they said the only person that had

9     access to the room was Mr. Fall.  Well, that's not true

10    because Mr. Jaquez had access to that room.  Okay?

11           Now, what were the items that were in the box

12    and how they did they get there?  You don't know.

13    George Jaquez didn't know.  They want you to presume

14    because of the contents of the box that it's Mr. Fall's

15    stuff and it came from Mr. Fall and he put it there.

16    That's a presumption.

17           Agent Dickerman.  Agent Dickerman was the one

18    who picked up the boxes from the garage at Wheeler

19    Street.  He came in and said that he got all this

20    stuff, this was all documents that Carmen Sanchez

21    provided.  Okay?  And then when he testified, he

22    testified to he didn't get them from Dr. Sanchez.  They

23    were in Dr. Sanchez's garage.  Dr. Sanchez wasn't

24    there.  Never testified that he talked to Dr. Sanchez

25    about those documents.  He got them from somebody else

1      that works for Dr. Sanchez, but they're in the garage.

2      So he's presuming that these are the documents that

3      trace back to Mr. Fall because he's presuming that they

4      came from Dr. Sanchez when they did not.  You don't

5      know where those documents came from.

6             Ms. Henline, Shauna Henline testified to all the

7      tax assessments, all these IRS documents.  You may not

8      remember because they went over and over and over and

9      all of us were -- I was nodding.  Okay?  They went all

10     through and she said, Yes, these are all IRS documents.

11     She said they were IRS documents because they look like

12     IRS documents, and she knows what IRS documents look

13     like.  Okay?  But hopefully, you were awake for the

14     very end of her testimony when she told us that those

15     documents didn't come from the IRS.  Those documents

16     went to her to check, and they came from the

17     Government.  I know the IRS and the Government is the

18     same thing but two separate places.  She didn't go back

19     to the computer and print those out.  She didn't go

20     back to the IRS computer and read them or double check

21     them.  She got those documents from someplace else, and

22     the Government wants you to presume that those are the

23     actual documents from the IRS.

24            Those presumptions, the Government is asking you

25     to just presume this last link in how those documents

1    got from A to B should not be enough for you.  It

2    should not be enough.  Fill the links.  Fill the line.

3    The documents went from A to B to C.  Okay?  Why didn't

4    the Government do that?  There's no excuse for them not

5    to complete that line.  Okay?  Because there's no

6    excuse and they certainly had lots of opportunity to do

7    it, you shouldn't be satisfied with a presumption that

8    they came from a particular place.

9         Okay.  Ms. Henline also testified that Mr. Fall

10   was adequately put on notice of his responsibilities to

11   file taxes, to pay taxes based on the letters that were

12   sent to him.  Okay?  Remember those letters a little

13   bit.  I think you saw one during the closing.

14        Now, you saw this during the evidence.  Okay?

15   The screens are all up?  Thank you.

16        This was a letter from Mr. Fall in 2002 to the

17   IRS.  I'm not going to go and underline it for you, but

18   this is the one where he asked about his tax liability.

19   This is back in 2002, back to the very beginning of all

20   of this.  Okay?  He asked about his tax liability.

21   Right in Section 1 -- I will point it out for you.

22   "Tell me what the tax liability is, please."  Okay?

23        Now, the response to this letter is this one in

24   January of 2003.  I believe that's four months later.

25   So four months later he gets a response.  What does it

1    say?  Tax laws are constitutional.  The question he

2    asked at the beginning was, What's my tax liability?

3    The answer he got is tax laws are constitutional.  Now

4    we know why he got this letter that says tax laws are

5    constitutional, because this letter came from a

6    computer.  Somebody decided that this letter was

7    frivolous, stuck it in a "frivolous" folder, hit a

8    button, print, and that's what we get, a letter back,

9    non-responsive, tax laws are constitutional.  But

10   Ms. Henline says that he was properly on notice and

11   adequately informed of his responsibilities.  She said

12   that he was adequately informed of his responsibilities

13   because on the -- I believe it was the notice of

14   deficiency -- the deficiency notice came later.

15        And the deficiency notice would have told him

16   what his tax liability was.  This is the Government's

17   chart, the big chart that was over here a little while

18   ago.  Notice of tax deficiency came two-and-a-half

19   years later.  So he was adequately on notice

20   essentially three years after he asked the question,

21   but a whole lot of stuff happened in between.

22        Now, the Government describes Mr. Fall as hiding

23   and harassing.  Okay?  But when you ask a simple

24   question and not only do you not get responses you get

25   notices of tax deficiency, harassment can be a two-way

1    street.  Okay?  If you were receiving those kind of

2    letters, you might feel harassed, too.

3         Now, they also said that he was on notice or

4    should have been on notice because he didn't seek out

5    any legal advice or he didn't seek out any accounting

6    advice.  All right?  You don't have any evidence that

7    he sought out advice from lawyers and accountants or

8    that he did not.  That's not in evidence.  Okay?  You

9    don't know what he did.  We don't know what he did.

10   Okay?  For them to hang their hat on saying, well, he

11   had the opportunity or he should have or he could have

12   or he did, you don't know if he did or he didn't.  All

13   we have are these letters going back and forth.  Okay?

14        All right.  The Government presumes that the

15   Defendant created and controlled and managed all of

16   these different entities.  They had the nice chart

17   there with all these different entities.  How many

18   documents have you seen that he created an entity?  I

19   think it's two.  They both lead back to Revenue

20   Management Services.  None of the rest of them has been

21   substantiated based on a document or anything else

22   here.  What they want you to do is presume, based on

23   all of these other documents that they got third hand

24   that he created these things and he controlled these

25   things.

1      Now, you can say that actually there was other

2  evidence that Carmen Sanchez told us he created all

3  these things.  And we'll deal with Dr. Sanchez in a

4  second, but they haven't shown you any other evidence

5  that he created these different entities.

6      Folks, the Government told you in their closing

7  that Dr. Sanchez was credible in her testimony.  She

8  was not credible in her testimony.  I think I told you

9  at the beginning I'm going to have a different take on

10  things than they are.  Well, that's a big one.  That's

11  a huge difference of opinion on her credibility, and

12  I'll start with the part that I think should make it

13  easiest for you all to accept.

14      We had Cielito Deayala testify.  She was the

15  former office manager.  I believe she said that, you

16  know, she started working there with Dr. Sanchez.  When

17  she first started working there, it was her and

18  Dr. Sanchez and one other person.  Just three people in

19  the office.  Nice, cozy little office.  Obviously, you

20  know each other, you get along, talk to each other

21  every day.  Okay?  There's nothing to -- there was no

22  evidence presented that Ms. Deayala had any ax to grind

23  in this case.  She had no ill will towards anybody.

24  There's no evidence that she said anything to you that

25  wasn't accurate or true.  Okay?

1          She told you that she gets the bills, she gives

2     directions, she gets the checks, she brings them back

3     to Carmen, Carmen signs the checks and they get mailed.

4     There's no reason not to believe her that that happened

5     and that's the way it happened.

6          She told you that she didn't have access to the

7     accounts.  She didn't have control over those accounts.

8     It was all Carmen.

9          Now, the next day -- and I'm sorry, because the

10    trial's been so long I can't remember the timing here.

11    Might have been Monday morning when Dr. Sanchez came

12    back and we talked to her about that, about the signing

13    of the checks.  She kept saying that, No, there was a

14    stamp, that sometimes Cielito would stamp the checks

15    and send them out.  Okay?  That's just a lie.  There is

16    no stamp.  We looked at checks.  You looked at checks.

17    You looked at dozens, if not over a hundred of checks

18    with Carmen Sanchez's signature on them.  Not one

19    stamp.  Okay?  It's just plain -- it's just a plain

20    lie.

21         When Carmen talked about Cielito when she was

22    testifying about her and about her place in the office,

23    I don't know if you caught this, but she never referred

24    to her as Cielito.  She never referred to her as

25    Ms. Deayala.  She always said the office manager, the

1    office manager, the office manager.  Okay?  There's

2    something wrong there.  There's a disconnect.  When you

3    work with somebody that closely when you're in that

4    tight-knit little office just the three of you, and

5    then the office expands, yes, but it always goes back

6    to those were the folks who were there at the

7    beginning.  Those were the folks you bonded with.  And

8    she testifies "the office manager" like Cielito doesn't

9    exist anymore.  She's not a person.

10   Well, she is a person, and she testified.  And

11   she testified different from Carmen.  She testified

12   truthfully, and Carmen did not.  That's the best

13   example I can give you of why you shouldn't believe

14   what Carmen said.

15   Now, Carmen was very smart, very educated, very

16   ambitious.  Okay?  She absolutely knew what she wanted

17   to do.  There should be no question.  She went to

18   dental school, got out, became a dentist, started

19   practicing, saw a need in the community.  Those were

20   her words, she saw a need in the community and opened

21   up Comfort Dental and it expanded and blossomed.

22   She bought the building at 1482 Broad Street.

23   Bought the building.  Formed her own corporation or

24   entity that managed that building, Broad Street

25   Investments.  She's a smart business woman.  Okay?

1    She's not a dummy.  All right?  She knows what's going

2    on.  But what did she tell you?  "I don't know

3    anything.  John doesn't have any part in our office.  I

4    would just sign things because he told me to."

5          Those two things don't add up.  As the smart

6    business woman, as the one who is trying to expand her

7    practice and make money and just become successful,

8    she's not also turning a blind eye to what Mr. Fall is

9    doing.  That just doesn't make any sense.  That's not

10   credible, and you shouldn't credit her testimony for

11   that.

12         She is in charge of Comfort Dental.  All right?

13   She hires and fires.  She has that authority.  She told

14   you she's in charge of advertising.  She decides where

15   they get supplies.  She doesn't do the bills.  She

16   delegates that authority to the office manager.  She

17   probably doesn't clean teeth.  I'm sure she delegates

18   that to the dental hygienist.  She delegates lots of

19   different things.  She delegates collecting the rent to

20   her uncle, Mr. Jaquez.  But there shouldn't be any

21   question in your mind she's in charge.  She owns

22   Comfort Dental; she's in charge of Comfort Dental.

23         Folks, she delegated a number of

24   responsibilities to a number of people that worked for

25   her.  She testified to you that she did not delegate

1    any part of that to Mr. Fall.  She told you that she

2    was the one that made sure that the documents got to

3    the CPAs for taxes.  She made sure that all that

4    information was done.  She signed the checks.

5         Let me take a step back because there's

6    something else you need to know about Carmen.  After

7    this is all over, you know, Carmen came in here on an

8    immunity agreement.  She wasn't going to testify, but

9    they said if you testify and if you testify truthfully,

10   we won't charge you.  That's how she ended up on the

11   stand.

12        At the end of this, she pays off the IRS.  She

13   still owns the two practices now.  She owns the house

14   on Wheeler Street.  She owns or has a part of the

15   property in the Dominican Republic.  She has Broad

16   Street Investments.  Okay?  She owns a lot of stuff.

17   And if you want to go through all the papers, you can

18   see that Comfort Dental is doing more than 2 million a

19   year I think if you look at their taxes that have been

20   filed recently that are in there.  She's very

21   successful.  She's very well-to-do.

22        And on top of that, she's divorced from Mr. Fall

23   and she has the kids.  So she's got everything.  She's

24   got everything here.

25        So she has all that.  She comes in here to

1    testify because of the immunity order and she gets on

2    the stand.  What does she do?  She doesn't take any

3    responsibility for any of this.  Zero.  She delegates

4    the responsibility of this.  Cielito stamped checks.  I

5    think the last thing she said was, It's all John's

6    fault.  All of it.  Not hers.  All John's fault.

7          Now, folks, her testimony, her version is the

8    main support for the Government saying that John Fall

9    created all these entities, that he was associated with

10   all these entities, that he is tied to all these

11   entities.  Okay?  She is not credible.  You shouldn't

12   believe her; and if you can't believe her, then we're

13   left with their presumptions.

14         Now, Agent Pleshaw testified and same thing.  He

15   presumed these assumptions.  He presumed these

16   associations.  If you remember, on all of the different

17   summaries he had with him, associated with Fall,

18   associated with Fall.  And I asked, What does that

19   mean?  And he said, Well, the evidence is that he's

20   associated with all these different entities.

21         What he thinks the evidence is, what I think the

22   evidence is, the prosecution thinks the evidence is, is

23   not what the evidence is.  It's what you think the

24   evidence is.  Okay?  So they want you to presume the

25   evidence is that he's associated with all these people

1    and today tied with all these entities.  Okay?  What

2    you have is presumptions.  You don't have enough to

3    show that he's tied to these entities, he created them,

4    that he managed them.

5         Folks, the other -- and I think this is almost

6    more important.  The other presumption I haven't talked

7    about yet is the presumption that the Government seems

8    to think that the rest of us are a little dim.  Okay?

9    That we're not so up on top of, or watching what's

10   going on here.  And I think that we start with this

11   slide here.  Okay?  It's on the ELMO.  This is the --

12   if you remember, this is the slide that shows nothing.

13   It shows nothing.  I tried to make it go away, but it's

14   still here.  And it still shows nothing.

15        I asked Agent Pleshaw and eventually he agreed

16   with me that it doesn't show anything.  Okay?  The $2.1

17   million, that is, as they said, the total amount of all

18   the money that went through all these different

19   accounts.  And finally he did tell you, he admitted

20   that it includes money that was transferred between the

21   accounts.  Okay?  So if that's the case, what's the

22   reason for the $2.1 million?  It's not relevant to

23   anything here.  Mr. Fall didn't put $2.1 million in his

24   pocket.  Carmen Sanchez didn't put $2.1 million in his

25   pocket.  Didn't show up on a tax return anywhere.  It

1      is -- it's a slide that shows nothing, folks.

2             So what's the purpose of putting that total on

3      there?  I'd suggest it's to mislead you.  Okay?  It's

4      deceptive.  It's misleading.  It's misleading.  I can't

5      put it any nicer than that.  Okay?  Why put it on there

6      unless you want to pump up your case, the Government

7      does, and show you, the jury, wow, there's a lot of

8      money here, you better pay attention.  This guy is a

9      bad guy.  There's a lot of money here.

10            And just so you understand the whole transfer of

11     money back and forth, Stratford Management, I know you

12     may not be able to remember one account from the next

13     account, Stratford Management was one of these accounts

14     that Broad Street Investments was -- I'm sorry, that

15     Comfort Dental was sending money to for rent and then

16     Stratford Management was sending it back to Broad

17     Street Investments.  Okay?  Now, the rent for Comfort

18     Dental was $4,500 a month.  That $4,500 went from

19     Comfort Dental to Stratford, and then from Stratford

20     back to Broad Street.  So that single $4,500 became

21     $9,000 here.  It doubles because it was transferred

22     twice.  Okay?

23            Stratford Management, the identified

24     withdrawals, the figure 139,500, that's my handwriting,

25     by the way.  That's the total of all the money that

1    went back to Broad Street Investments.  Okay?  If

2    that's the money that went to Broad Street Investments,

3    that means that it went to Stratford first.  So that

4    means there's $280,000, okay, in that slide that shows

5    nothing.  Okay?  That should give you an idea of the

6    level of double counting in this case.  Okay?  It's

7    deceptive.  It's misleading.

8         More evidence that the Government thinks we're

9    not so quick, the fact sheets.  They're fact sheets.

10   They show facts.  Okay?  That's true.  They do show

11   facts.  They show facts about these particular

12   accounts.  All right?  The question is are they facts

13   that matter in this case?  Are they facts that are

14   relevant to this case?  Are they facts that are going

15   to help you decide what's going on?  All right.

16        So for Avigon, this particular Avigon account,

17   it says $4.1 million went through there.  That's great.

18   This is a warehouse account.  More than one agent told

19   you a warehouse account is where a whole bunch of

20   people put money into.  Okay?  The $4.1 million that's

21   on here, on this fact sheet has nothing to do with this

22   case.  You can't look at the $4.1 million and say, Oh,

23   that has to do with Mr. Fall because of X.  It doesn't.

24   It's another big number.  It's another big number the

25   Government stuck under your nose to say, Hey, look,

1    this guy is really bad.  Look at all this money.  Okay?

2    It's misleading.

3         But they didn't do it once.  Here's the fact

4    sheet of Accurate Bookkeeping, $2.5 million.  There's

5    the fact sheet of Olympic Business Systems, $6.7

6    million.  Not the money from this case.

7         You can go through all these documents all you

8    want, and Agent Pleshaw already did, and I don't think

9    he could tell you how much of that was involved in this

10   case.  Okay?  So what's the purpose of showing you this

11   to begin with?  Why did the Government put it into

12   evidence?  It's ugly.  It makes Mr. Fall look bad.  He

13   didn't have anything to do with $6.7 million.  All

14   right?  But they want you to take that on, attribute

15   that big number to him so that they can support their

16   presumption.  They're fact sheets, but they're not so

17   relevant fact sheets.

18        Now, it's interesting the Government had said,

19   you know, Who banks this way?  Okay.  They said nobody

20   banks this way.  We know that's not true because things

21   that they put in evidence was there's a whole bunch of

22   people in these warehouse banks.  There's lots of

23   people that bank this way.  Whether you think it's

24   legitimate or not legitimate, it's not nobody.  There's

25   a whole bunch of people that bank this way.  It's a

1   warehouse bank.  It's not Mr. Fall's bank.  It's a

2   warehouse bank.

3        Okay.  Bear with me here while I, unfortunately,

4   try to just pound this point, please.  The title of

5   this slide, and this was presented to you during the

6   Government's closing is "The Disposition of Funds Paid

7   by Comfort Dental to JV Services."  Okay?  That sounds

8   like it's pretty straightforward.  But when Agent

9   Pleshaw testified, you remember that there's no

10   relationship between the 149 -- I'm sorry, the 142,000

11   on the left and the money going out on the right other

12   than one happened before the other.

13        So when the Government says this is the

14   disposition -- this right here is the absolute

15   disposition of those funds, to me that means I took the

16   paper from here and I put it here and then I moved it

17   over here.  That's not what happened.  In the middle of

18   all this, JV Services has money.  Okay?  I don't know

19   how much money.  It had whatever money they had plus

20   $142,000.  So to say that the money on the right is the

21   disposition of those funds is not accurate.  It's not

22   correct.  It's misleading.

23        Transfers of money for the sale of 35 Forbes

24   Street.  The money on the right is not the same as the

25   money on the left.  Okay?  The proceeds from the sale

1   of Forbes Street according to this is $162,000.

2   There's no link that goes from Point A to Point B to

3   Point C.  The money that goes to Avigon in these three

4   different accounts is not the same money that went in

5   to Washington Allocation originally.  They're saying

6   this is to transfer money.  It's not.  It's different

7   money.  Maybe some of it is the same money, but it's

8   not what they're saying it is.  It's misleading.

9          Transfer of money from 37 Sagamore Street.  I

10  don't think anybody remembers 37 Sagamore Street coming

11  into evidence.  Okay?  I don't.  It's in there.  It's

12  in the papers.  Okay?  It's in the papers that have

13  been generated in this case, this mountain of papers.

14  Okay?  The papers in these boxes that are over here in

15  the back, the papers that are in the binders up next to

16  the Judge, it's in there, 37 Sagamore Street.  Okay?

17  But for them to say that this money is this money is

18  just misleading.  They can't say that.  It's not true.

19          Last one, folks, on these.  Okay?  At some point

20  in 2002, $437,000 went into Stratford Management and

21  then some point later $155,000 went from there to

22  Office Services.  The two dollar figures have nothing

23  to do with each other.  Nothing to do with each other.

24  You can't say that that money is the money that's down

25  the line.  It's not.  It's different.

1          Folks, during the closing today, the Government

2     talked about, you know, who banks this way.  We talked

3     about that a little bit already.  They continued to say

4     that Mr. Fall is tied to these entities, that he

5     created these entities.  They don't have proof of that.

6     It's their presumption.  There's innuendo.  There's

7     these e-mails.  Okay?  There's these letters that they

8     say came from him, but they don't -- they can't even

9     tell you where the documents came from, for sure.  The

10    documents they came up with, the documents they came

11    across during the investigation but they can't tell you

12    whether the actual origin of them was Mr. Fall.

13         Folks, what the Government really wants to do

14    here, at least in part, is -- I'll try not to be too

15    presumptuous.  Okay?  But I'll tell you this.  The

16    Government has not given you proof beyond a reasonable

17    doubt.  What they've given you is a series of

18    presumptions and that they hope that you take those

19    presumptions and push it over the line.  What did we

20    say?  There's a mountain of paper, a ton of paper in

21    all this.  It's not a ton of evidence.  It's not a

22    mountain of evidence.  It's a ton of paper.  Okay?  And

23    there's a difference.

24         One of the things that you should be wondering

25    about in all of this is, you know, where did all this

1    money go?  Okay?  Where did all this money go?  I like

2    the Government saying that Mr. Fall made extensive use

3    of cash, made extensive use of cash.  If you think not

4    so hard because it's pretty obvious there was one

5    incident with an envelope that had cash sticking out of

6    it.  That was the evidence.  There were other envelopes

7    that we don't know what was in them.  So the extensive

8    use of cash?  The evidence isn't there.  The

9    insinuation is there.  The innuendo is there.  The

10   presumption is there, but not the evidence.  Not the

11   facts and that's, frankly, another thing that Carmen

12   Sanchez wasn't so forthcoming about.

13        So where is all the money?  Where is all the

14   cash, if you will?  I don't know.  It's not my job to

15   tell you, but you should wonder.  It should be a

16   question.  It should be a question that leads you to

17   some doubt.  What happened to all this money?  Okay?

18        Ultimately, folks, the determination you have to

19   go make now is a difficult one, but it's not a

20   determination of maybe or possibly or probably.  It's

21   not I think so.  The standard is beyond a reasonable

22   doubt.  The Judge is going to tell you what that means,

23   but I'd suggest that if you're speculating or you're

24   not sure or all you have is the Government's

25   presumptions, you're not there.  Okay?  You're not

1    there.  And the Government hasn't met its burden.  They

2    haven't.  They've made a lot of presumptions.  They've

3    given you a lot of show and a lot of documents, a lot

4    of paper, but they haven't given you a lot of evidence.

5           I want to leave you with two thoughts.  Two

6    thoughts.  The first is relatively short.  When I sit

7    down, the Government is going to be able to come back

8    up and talk to you for a few minutes giving their

9    commentary on my presentation which I took advantage of

10   for the Government.  I just ask that when the

11   Government addresses some of the points that I've made

12   that you also consider in your mind the context in

13   which I made them and the point that I was making.

14   That's the first thing.

15          The second thing is last night I went to a

16   concert.  I went to a band concert.  Okay?  And it was

17   my daughter's school band.  Okay?  And it was just

18   wonderful.  Just wonderful.  They were great.  They

19   were very, very impressive and it was just great to

20   listen to and everything else.  Well, you know, I can

21   tell you that because I'm a proud parent, okay, and I

22   like my daughter.  It was the 5th grade band concert,

23   their first concert.  And I'm sure if any of you were

24   there, what you would have heard was a lot of squeaks,

25   a lot of missed notes, a lot of flat, a lot of sharp

1    when there shouldn't have been.  Okay?  Your perception

2    of it would have been a little bit different from mine.

3    Okay?  But I'm going to tell everybody it's wonderful,

4    because it's my daughter and I love my daughter.  And

5    she tries hard on the clarinet, which is not a joy to

6    listen to practice, I will tell you, but she's my

7    daughter.  That's why I latched on to that concert.

8    That's why I tell you it was great.

9           I tell you that the Government has asked you to

10   latch on to all of these presumptions, okay, and why.

11   Well, just like my daughter's concert, okay, they are

12   attached to this case.  All right?  It's their case.  I

13   don't know if they love this case, but it's their case.

14   They own it.  Okay?  If there's any question in your

15   mind on that, look at all the agents here.  Okay?  Look

16   at all the agents here, all the people that have come

17   and testified, all the Government agents.  There should

18   be no question in your mind that this is their case,

19   they own it, they love it, and they're invested in it.

20   They're invested in it.

21          So what you have is presumptions.  Okay?

22   Presumptions are not enough for reasonable doubt.

23   That's what you should find.  But that they're invested

24   in it; they love it.  They want you to help kick it

25   over the line to beyond a reasonable doubt.

1          Folks, just having a mountain of papers isn't

2     enough to do that.  I'd ask you to consider what I've

3     said and come back with a not guilty finding.  Thank

4     you.

5          THE COURT:  Thank you, Mr. Fitzgerald.

6          Mr. Kane.

7          Mr. Fitzgerald, make sure you shut the mike off.

8          MR. FITZGERALD:  Thank you.  I forgot.

9          MR. KANE:  Thank you, your Honor.

10         To begin, counsel talks about the Government's

11    case built on presumptions.  Two weeks of trial,

12    multiple witnesses, a lot of proof, yes, a lot of

13    documents but from multiple sources, multiple proof,

14    multiple corroborating evidence proving this

15    Defendant's guilt beyond a reasonable doubt.  The

16    Government's case was hardly built on presumptions.

17         Let me work backward on a couple of points.

18    Counsel had mentioned toward the end of his

19    presentation that where's the money, where did all the

20    money get?  Members of the jury, that's the point

21    especially with respect to Count I.  The Defendant

22    obstructed the IRS's ability to even determine where

23    all this money went.  We may never know.  His success

24    in hiding his money through multiple layers of

25    concealment is not a defense.  It's proof of the

1    charge.

2          Let's have some of these fact sheets that he

3    highlighted.  And if I can have 408-A.

4          Counsel tried to attack the credibility of

5    several of the Government's summary exhibits.  And this

6    was one of them, 408-A, a fact sheet with respect to

7    one warehouse account, suggesting that the Government

8    was somehow suggesting that the $4 million was John

9    Fall's or associated or John Fall's income.  Just the

10   opposite.  During the examination of Michael Pleshaw,

11   the Government made the point that these are warehouse

12   bank accounts.  It's not all of the Defendant's money.

13   His money was thrown in with everybody else's money in

14   an effort to conceal.  That's the point.  It most

15   definitely isn't all his money.  But by putting his

16   money in with a lot of other people's money, it made

17   his money much more difficult to trace.

18         If you look at the exhibits right after this

19   summary, you will see that with respect to each of

20   these accounts Michael Pleshaw identified those of

21   Mr. Fall's, showing you exactly what he was able to

22   find in terms of his particular payments.

23         426-B, another summary that counsel has come

24   back to.  During the direct examination of Michael

25   Pleshaw, it was elicited that these are not his income.

1    There's no way to determine whether all these transfers

2    are his income because they're co-mingled in different

3    people's accounts and different warehouse accounts.

4    This demonstrative is to show the level of concealment.

5    Every transfer, every deposit that the Defendant

6    engaged in is a measure of his obstruction because all

7    of these accounts were nominee accounts strewn all over

8    the country.  As Michael Pleshaw testified on direct

9    and cross and redirect, it may be impossible to ever

10   find out how much this Defendant actually earned.  But

11   we know in statements in insurance applications in his

12   internal documents on those George Jaquez disks that he

13   made money and by his own admission at least for a few

14   years over $100,000.

15          Let's talk about Carmen Sanchez, and let's pull

16   up 287-C.

17          First, going to the Count III and IV, the aiding

18   and assisting counts, Defendant Fall has been charged

19   with aiding and assisting in the false corporate

20   returns.  The Court will instruct you it does not

21   matter, and you should not consider, whether somebody

22   else, and in particular Carmen Sanchez, knew or did not

23   know of the falsity on the return.  You shouldn't

24   consider whether anybody else other than Mr. Fall knew

25   about the falsity.  Did she know?  She may have known.

1    Her testimony was fairly credible.  But did she turn a

2    blind eye?  She might have.  But to suggest that she

3    was the mastermind behind all of this?  The evidence

4    was that she had office managers.  She was a dentist.

5    She ran the dentistry.  She did her advertising.  And

6    the way it worked as demonstrated in this exhibit,

7    which is just an example, John Fall injected himself

8    with respect to these false payments.  He had direct

9    contact with Cielito Deayala.  He directed the payments

10   out of these accounts, out of the corporate accounts

11   for Comfort Dental, the checks were given from Cielito

12   to Carmen to sign.

13        Now, did Carmen know what was going on?  Maybe

14   she did.  You can think about that, but the Court is

15   going to instruct you it's not relevant to the charges.

16   It is relevant to her credibility, but the Government

17   hasn't presented this case based on Carmen Sanchez's

18   testimony alone.  We presented evidence from bank

19   accounts and multiple witnesses.  Her testimony was

20   corroborated by those other sources.

21        Counsel suggests that the Government's case is

22   essentially built on Carmen Sanchez's testimony, and

23   that's just not true and I think, members of the jury,

24   you know that.

25        Counsel talks about the presumption of income,

1    that there must be income in this case.  Well, he

2    hasn't addressed Count II, tax due and owing by

3    Mr. Fall for the 1998, 1999 and 2000 tax years.  He did

4    have income those years, and he did have a tax due and

5    owing which he evaded from 2005 to 2010.

6        The obstruction count doesn't require the proof

7    of income.  In fact, the point of Count I is he made it

8    difficult to determine.  That was his whole goal, and

9    he was successful in doing that through his multiple

10   layers of concealment.  There's no presumption of

11   income with respect to the corporate returns.  That has

12   nothing to do with unreported income.  It's the false

13   expenses that appeared on those returns.  And he didn't

14   dispute that they were, in fact, false because they

15   were false.

16       He said that there was a presumption that

17   Mr. Fall is connected to these entities.  There's no

18   presumption that he's connected to these entities.

19   It's not just the George Jaquez disks, which we'll talk

20   about in a moment, but it's the bank accounts, for

21   example, the NERH bank account that he opened up at

22   Fidelity using his own name showing his direct tie to

23   that particular entity.  It's the seized evidence from

24   Melissa Sugar out in Colorado where John Fall listing

25   his Ohio address is tied to almost all of these

1    entities, or a good chunk of them, at least eight, I

2    think.  And then, of course, there is those documents,

3    the cheat sheet, the stamps and the George Jaquez disks

4    found in that room.  George Jaquez testified in no

5    uncertain terms that only he and John Fall had access

6    to that room.  George Jaquez obviously was not behind

7    all of this.  The only person who had access that is

8    relevant is John Fall, and he was clear it was John

9    Fall's stuff because only he had access to it.  And you

10   know that it was his stuff because if you look at the

11   documents taken off the disks, they're

12   self-identifying.  It's John Fall's correspondence.

13   It's his authorship.  It's his research on how to hide

14   and create entities and aliases.  It's his research on

15   the super-secret state, Nevada, where he can have a low

16   profile.

17          So there's no question that the cheat sheet and

18   the paper coming off those disks was John Fall's not

19   only based on that evidence but the corroborating

20   evidence.  The corroborating evidence of his anti-tax

21   views and papers that he filed with the IRS, his

22   refusal to pay over the better part of a decade.

23          Counsel made a point that the IRS should have

24   responded sooner to some of his paper, and they didn't

25   tell him what his tax liability was and he just wanted

1    to know what his tax liability was.  Take a look at

2    some of the papers.  He was claiming he didn't know the

3    type of tax.  He was just creating frivolous paper.

4    And if you look at Exhibit 16 and its subparts, as well

5    as 17, you'll see the chronology of correspondence back

6    and forth between the IRS and the Defendant, and you

7    will see that the IRS told him repeatedly 1040 income

8    tax, that's what we're talking about.  In addition,

9    they gave him a notice of proposed assessment telling

10   him this is how much you owe.  Do you have any changes?

11   Should it be different?  Then there was a notice of

12   deficiency.  If he disagreed with that, he can go to

13   tax court; he can go to appeal to the IRS.  He was told

14   what his tax liability was repeatedly.  And you'll find

15   that if you need to in Exhibits 16-A through K, I

16   believe, and the subparts to Exhibit 17.

17        That the source of documents is presumed, we had

18   multiple sources of documents, as you know, bank

19   records, documents from banks, seized records not only

20   from Colorado but from the State of Washington where

21   the Defendant was using various nominees including

22   Wainright Associates, which also appears on his cheat

23   sheet.

24        Counsel talked about Shauna Henline.  Is the

25   Defendant seriously suggesting that the tax records are

1    not authentic records?  Shauna Henline testified she's

2    got 27 years in at the IRS.  We took her through the

3    computer records from the IRS that printed out his

4    transcripts.  There's no dispute as to the authenticity

5    of those records.  If you look at the records, they

6    have a blue sheet on the front of them with a seal.

7    They're authentic certified records of the Treasury.

8    She testified that she recognized those records, that

9    the records are authentic, that they're kept in the

10   normal course of business, that they're the regular

11   practice of the IRS to make those records.  And those

12   records, of course, are corroborated by all the other

13   evidence in the case including the correspondence

14   between the IRS and the Defendant.

15        It's corroborated by the Defendant's own

16   research on the George Jaquez disks in which he says,

17   "I'll never pay taxes again."

18        So to dispute the authenticity of the IRS

19   records is just without merit.

20        Counsel took issue with the Government's

21   argument that the Defendant never sought legal advice

22   or accountants' advice.  There's no evidence that he

23   did.  Quite the opposite.  He kept pounding away at the

24   IRS no matter how many warnings he got to go seek

25   advice and to stop what he was doing.  But there was

1    evidence that he got advice from accountants, from

2    David Seidman who told him people are -- in Danbury are

3    full of people like him who refuse to follow the law.

4    He was told by Bill Harrigan, he was pressuring Bill

5    Harrigan, CPA Bill Harrigan with at least two decades

6    of experience being an accountant, pressuring Bill

7    Harrigan to do what he was doing, papering the IRS.

8    Bill Harrigan said, "We're not doing that."  You would

9    think that the Defendant would listen to Bill Harrigan

10   on that, but he refused to do so.

11        So members of the jury, at the end of the day,

12   the Government's case is not -- it's not built on

13   presumptions.  It's built on proof that shows you

14   beyond a reasonable doubt that this Defendant committed

15   tax fraud for more than a decade, that he did it in

16   multiple ways.  He not only concealed his own income,

17   but he also falsified the returns of his wife.  He

18   obstructed audits.  He filed frivolous paper with the

19   IRS to try to stop audits.  He told his wife not to

20   show up at a summons.  He filed false documents with

21   the Federal Court in Massachusetts denying his

22   ownership and control over NERH.  The proof came from

23   multiple sources, multiple witnesses over two weeks.

24        So in light of that evidence, we again

25   respectfully request that after you consider all of it

1    and deliberate that you return a verdict of guilty on

2    all counts.  Thank you.

3            THE COURT:  Thanks, Mr. Kane.

4            Ladies and gentlemen, we'll take a mid-afternoon

5    break.  We'll see you back in 15 minutes.

6            Could I see counsel.

7            (The jury is not present for the following:)

8            (Sidebar off the record.)

9            (Recess.)

10           (The jury is present for the following:)

11           THE COURT:  Ladies and gentlemen, you have now

12   heard all the evidence.  You've now heard the arguments

13   of all counsel.  Now it is my obligation and I,

14   therefore, do instruct you on what law it is for you to

15   apply.

16           Ladies and gentlemen, you can put down your

17   notebooks and put down your pens because I'm going to

18   give you a copy of the jury instructions for your use.

19   And not all judges do that, but I tend to find it

20   helpful.  Realize that the instructions as I give you

21   orally now are the instructions that you are to follow.

22   I'll give you a courtesy copy of the instructions for

23   your use in the jury deliberation room.

24           Ladies and gentlemen, you are the triers of the

25   facts.  You alone must determine what the facts are in

1    this particular case.  It's my duty to instruct you on

2    the law applicable to this case.

3         You must consider these instructions as a whole.

4    You should not choose one part and disregard another.

5    You must accept and apply the law as I give it to you

6    in its entirety, and this is true whether you

7    personally agree with the law or not.  It would be a

8    violation of your oath you took as jurors to base a

9    decision on any version of the law other than that

10   contained in my instructions, just as it would be a

11   violation of that oath to return a decision upon

12   anything but the evidence in this case.  It is not up

13   to you to decide what the law is or what it should be.

14   Your duty is to apply the law as I explain it to you.

15        As I have told you at the start of this trial,

16   Mr. Fall is presumed to be innocent of the accusations

17   against him.  It is a fundamental principle of our

18   system of justice that every person accused of a crime

19   is presumed to be innocent unless and until his guilt

20   is established beyond a reasonable doubt.  The

21   presumption is not a mere formality.  It is a matter of

22   the utmost importance.  The presumption of innocence

23   alone may be sufficient to raise a reasonable doubt and

24   to require the acquittal of a defendant.

25        The Defendant before you, Mr. Fall, has the

1    benefit of that presumption throughout the trial, and

2    you are not to convict him of a particular charge

3    unless you are persuaded of his guilt of that charge

4    beyond a reasonable doubt.  Each charge carries its own

5    presumption of innocence; and even if you find the

6    evidence has overcome that presumption on one charge,

7    you must still apply it to the other charges unless and

8    until the evidence persuades you otherwise.

9         The presumption of innocence unless and until

10   proven guilty means the burden of proof is always on

11   the Government to satisfy you that Mr. Fall is guilty

12   beyond a reasonable doubt of the crime with which he is

13   charged.  This burden never shifts to Mr. Fall.  It is

14   always the Government's burden to prove each of the

15   elements of the crimes charged beyond a reasonable

16   doubt by the evidence and the reasonable inferences to

17   be drawn from that evidence.

18        Mr. Fall has the right to rely upon the failure

19   or the inability of the Government to establish beyond

20   a reasonable doubt any essential element of a crime

21   charged against him.  If after fair and impartial

22   consideration of all the evidence you have a reasonable

23   doubt as to Mr. Fall's guilt of a particular crime, it

24   is your duty to acquit him of that crime.  On the other

25   hand, if after a fair and impartial consideration of

1    all of the evidence you are satisfied beyond a

2    reasonable doubt of Mr. Fall's guilt of a particular

3    crime, you should vote to convict him.

4          In light of the fact that the Court struck

5    Mr. Fall's testimony, I remind you that a defendant has

6    an absolute right not to testify.  Since the entire

7    burden of proof in this case is on the Government to

8    prove that Mr. Fall is guilty, no inference of guilt or

9    anything else may be drawn from the absence of

10   testimony from Mr. Fall.

11         It is not up to Mr. Fall to prove that he is

12   innocent.  Under our system of law, any defendant has a

13   perfect right to say to the Government:  You have the

14   burden of proving your case against me beyond a

15   reasonable doubt; I do not have to say a word.

16         You must determine whether the Government has

17   proved its case against Mr. Fall based solely on the

18   testimony of the witnesses who did testify and the

19   exhibits that were introduced.

20         Now, the mere fact that this case is brought in

21   the name of the United States of America does not

22   entitle the prosecution to any greater consideration

23   than that accorded to Mr. Fall.  By the same token, it

24   does not mean that the prosecution is entitled to any

25   less consideration.  All parties, whether the

1    Government or individuals, stand equal at the Bar of

2    justice.

3         Now, I will shortly explain the offenses with

4    which Mr. Fall is charged and the elements the

5    Government must prove in order to establish that

6    Mr. Fall is guilty of any of the four offenses.

7         In order for the Government to prove Mr. Fall's

8    guilt of an offense, it must convince you beyond a

9    reasonable doubt that it has proven each and every

10   element of that offense.  Possibilities or even

11   probabilities are not sufficient.  If the Government

12   fails to prove any one of the elements of an offense

13   beyond a reasonable doubt, then you must find Mr. Fall

14   not guilty of that particular offense.

15        On the other hand, if you are convinced beyond a

16   reasonable doubt that all elements of an offense with

17   which Mr. Fall has been charged have been proven to you

18   beyond a reasonable doubt, then you should find him

19   guilty of that offense.

20        As I've said, the burden is upon the Government

21   to prove beyond a reasonable doubt that Mr. Fall is

22   guilty of the charges made against him.  It is a strict

23   and heavy burden, but it does not mean that Mr. Fall's

24   guilt must be proven beyond all possible doubt.  It

25   does require that the evidence exclude any reasonable

1    doubt concerning Mr. Fall's guilt.

2         A reasonable doubt may arise not only from the

3    evidence produced but also from a lack of evidence.

4    Reasonable doubt exists when after weighing and

5    considering all of the evidence using reason and common

6    sense jurors cannot say that they have a settled

7    conviction of the truth of the charge.

8         Of course, Mr. Fall should not be convicted on

9    suspicion or conjecture.  If for example, you view the

10   evidence in this case as reasonably permitting either

11   of two conclusions, one, that Mr. Fall is guilty as

12   charged, the other that Mr. Fall is not guilty, then

13   you must find Mr. Fall not guilty.  It is not

14   sufficient for the Government to establish a

15   probability, even a strong one, that a fact charged is

16   more likely to be true than not true.  That is not

17   enough to meet the burden of proof beyond a reasonable

18   doubt.

19        On the other hand, there are very few things in

20   this world that we know with absolute certainty.  And

21   in criminal cases, the law does not require proof that

22   overcomes every conceivable doubt, but it requires

23   proof that overcomes every reasonable doubt.

24        Concluding my instructions on the burden then, I

25   instruct you that what the Government must do to meet

1    its heavy burden is to establish the truth of each part

2    of each offense charged by proof that convinces you and

3    leaves you with no reasonable doubt and thus satisfies

4    you that you can, consistently with your oath as

5    jurors, base your verdict upon it.  If you so find as

6    to a particular charge against Mr. Fall, you will

7    return a verdict of guilty of that charge.  If on the

8    other hand you think there's a reasonable doubt about

9    whether Mr. Fall is guilty of a particular offense,

10   then you must give Mr. Fall the benefit of the doubt

11   and find Mr. Fall not guilty of that offense.

12        The indictment in this case charges Mr. Fall

13   with four separate counts.  Counts I, II, III and IV.

14   There are no other charges before you.  You must

15   consider each of the four counts separately.  The fact

16   that you find Mr. Fall guilty or not guilty on one

17   count does not mean that you should find him guilty or

18   not guilty on the other count.

19        Now, when I explain the charges in detail, you

20   will hear that the Government alleges certain offenses

21   were committed on or about or in or about certain

22   dates.

23        The proof need not establish with certainty the

24   exact date of an alleged offense.  It is sufficient if

25   the evidence in the case establishes beyond a

1   reasonable doubt that the offense was committed on a

2   date reasonably near the date alleged.

3          I'm going to describe each charge for you and

4   then tell you the elements of the offense and then

5   define some terms for you.  The four charges against

6   Mr. Fall were charged in an Indictment, which is simply

7   the description of the charges against the Defendant.

8   An Indictment is an appropriate method for the

9   Government to use in order to assert charges against an

10  individual.

11         In Count I, Mr. Fall is accused of corruptly

12  endeavoring to obstruct and impede the Internal Revenue

13  Service concerning his and Carmen Sanchez's individual

14  taxes, as well as Comfort Dental's corporate income

15  taxes in violation of 26 U.S.C. Section 7212(a).

16         In Count II, Mr. Fall is accused of tax evasion.

17  Specifically, that he did willfully attempt to evade or

18  defeat the payment of a substantial part of the taxes

19  due for the tax years 1998 through 2000 in violation of

20  26 U.S.C. Section 7201.

21         Now, Counts III and IV, Mr. Fall is accused of

22  aiding and assisting in the filing of false tax returns

23  for Comfort Dental for the years 2006 and 2007,

24  specifically with respect to business expense

25  deductions for advertising expenses totaling $133,222

1   for 2006; and $95,544 for 2007 while knowing and

2   believing that the expenses had not been incurred in

3   violation of 26 U.S.C. Section 7206(2).

4            You've heard in this trial and you will see in

5   many of the exhibits the name of Carmen Sanchez and the

6   name of other businesses, including Comfort Dental.

7   And although you may wonder what, if anything, happened

8   to these individuals or those entities, you should not

9   concern yourself with that, nor should you speculate

10  about that.

11           Ladies and gentlemen, the legality of the tax

12  laws is not an issue in this case.  Congress

13  unquestionably has the authority to tax and to require

14  the filing of tax returns such as for income taxes.

15  Likewise, the Internal Revenue Service is authorized by

16  law as an agency of the United States to assess and

17  collect taxes.  All citizens of the United States are

18  subject to Federal tax laws.  Compliance with the tax

19  laws is not voluntary in the sense that it is optional.

20           Now, I'm going to turn to the discussion of the

21  law as applicable to each of the four counts.

22           Count I.  Count I charges the Defendant, John J.

23  Fall, with corruptly trying to obstruct or impede the

24  administration of the Internal Revenue laws from in or

25  about February 1999, to in or about November of 2010.

1    It is against Federal law to corruptly endeavor

2  to obstruct or impede the administration of Internal

3  Revenue laws.

4    For you to find Mr. Fall guilty of this crime,

5  the Government must prove each of the following beyond

6  a reasonable doubt:  One, first, that in or about the

7  dates charged, Mr. Fall did something in an effort to

8  obstruct or impede the due administration of the

9  Internal Revenue laws in the manner charged; and two,

10  second, that Mr. Fall did so corruptly.

11    To act corruptly means to act with the intent to

12  secure an unlawful advantage or benefit or financial

13  gain either for oneself or for another.  To obstruct or

14  impede means to hinder, interfere with, create

15  obstacles or make difficult.

16    The Government does not have to prove that the

17  effort succeeded.  The Government does not have to

18  prove that the United States suffered a tax loss.  The

19  crime is complete upon the commission of one corrupt

20  act.  You must unanimously agree on a specific corrupt

21  act.  The act need not be criminal in nature.  An act,

22  even if lawful in and of itself, can serve as a corrupt

23  act if it is done with the requisite intent.

24    Count II.  Count II charges the Defendant, John

25  J. Fall, with attempting to evade and defeat the

1    payment of his Federal income taxes for 1998, 1999 and

2    2000.  It is against Federal law to try to evade or

3    defeat the payment of Federal income taxes.

4         For you to find Mr. Fall guilty of attempting to

5    evade taxes, the Government must prove the following

6    beyond a reasonable doubt:  One, that Mr. Fall owed

7    substantially more Federal income tax than zero for the

8    years 1998 through 2000; second, that Mr. Fall

9    willfully attempted to evade or defeat the assessment

10   of this tax; and third, that Mr. Fall committed an

11   affirmative act in furtherance of this willful attempt.

12        A person acts willfully if the law imposed a

13   duty on him, he knew of the duty, and he voluntarily

14   and intentionally violated that duty.

15        If Mr. Fall acted in good faith, he did not act

16   willfully.  A good faith belief is one that is

17   genuinely and honestly held.  The burden to prove

18   Mr. Fall's state of mind, as with all other elements of

19   the crime, rests with the Government.  This is a

20   subjective standard.  What did Mr. Fall actually

21   believe, not what a reasonable person should have

22   believed.  However, you may consider the reasonableness

23   of Mr. Fall's belief in deciding whether he actually

24   held the belief.  Innocent mistakes caused by the

25   complexity of the Internal Revenue Code or negligence,

1    even gross negligence, are not enough to meet the

2    willfulness requirement, but philosophical disagreement

3    with the law or belief that the tax laws are invalid or

4    unconstitutional does not satisfy good faith and does

5    not prevent a finding of willfulness.  It is the duty

6    of every person to obey the law.

7         A person may not be convicted of Federal tax

8    evasion on the basis of willful omission alone.  He

9    must also have undertaken an affirmative act of

10   evasion.  The affirmative act requirement can be met by

11   the filing of a false or fraudulent tax return that

12   substantially understates taxable income or by making

13   false entries or invoices or documents.  The

14   affirmative act requirement can be met by the filing of

15   a frivolous tax return that substantially understates

16   taxable income, by the filing of a false form W-2, or

17   by other affirmative acts of concealment of taxable

18   income such as keeping a double set of books, making

19   false entries or alterations or false invoices or

20   documents, destroying books or records, concealing

21   assets or covering up sources of income, handling one's

22   affairs so as to avoid keeping customary records and/or

23   other conduct whose likely effect would be to mislead

24   the Internal Revenue Service or conceal income.

25        You must agree on a specific affirmative act.

1    If a motive to evade or defeat the tax assessment or

2    payment plays any part in an affirmative act, you may

3    consider it even if the affirmative act serves other

4    purposes as well, such as privacy or concealment from

5    parties other than the IRS.

6        Willful intent or guilty knowledge may be

7    inferred from the secretive or irregular manner in

8    which a transaction is carried out.

9        In deciding whether Mr. Fall knew of a duty, you

10    may infer that he had knowledge of it if you find that

11    he deliberately closed his eyes to something that

12    otherwise would have been obvious to him.

13        In order to infer knowledge, you must find that

14    two things have been established.  First, that Mr. Fall

15    was aware of a high probability that the duty existed;

16    second, that Mr. Fall consciously and deliberately

17    avoided learning of the duty, that is to say that

18    Mr. Fall willfully made himself blind to the existence

19    of the duty.  Mere recklessness, negligence or mistake

20    in failing to learn the duty is not sufficient.  There

21    must be a deliberate effort to remain ignorant of the

22    duty.

23        You may not find that Mr. Fall acted willfully

24    if you find that he actually believed that he had no

25    duty and that his belief was not based on philosophical

1  disagreement with the tax laws or a belief that the tax

2  laws are invalid or unconstitutional.

3  Mr. Fall's attitude toward the Internal Revenue

4  Service or the reporting and payment of taxes generally

5  may also be considered by you in determining his intent

6  with respect to each of the allegations contained in

7  the Indictment.

8  The Government does not have to prove the exact

9  amount of Federal income tax due and owing.  The

10  Government is required to establish only that Mr. Fall

11  owed a substantial amount during the year or years in

12  question and at the time he committed an affirmative

13  act.  Whether or not the amount owed is substantial is

14  a question for you to decide based on the facts and

15  circumstances in this case.

16  Counts III and IV.  Counts III and IV charges

17  the Defendant, John J. Fall, with aiding and assisting

18  in the preparation and filing of false corporate tax

19  returns by Comfort Dental for the tax years 2006 and

20  2007.  Counts III and IV charge the same offense but

21  for different tax years.  Count III concerns tax year

22  2006.  Count IV concerns tax year 2007.  You must

23  consider each count separately.

24  In order to prove Mr. Fall guilty of Counts III

25  and IV as charged in the Indictment, the Government

1    must prove each of the following beyond a reasonable

2    doubt:  One, that Mr. Fall advised or assisted in the

3    preparation of a tax return, which was subsequently

4    filed; and, two, that the tax return was false or

5    fraudulent as to any material matter; and three, that

6    Mr. Fall acted willfully.

7         The first element that the Government must prove

8    beyond a reasonable doubt is that Mr. Fall advised or

9    assisted in the preparation of a tax return which was

10   subsequently filed with the Internal Revenue Service.

11   It is not required that the Government prove that

12   Mr. Fall actually prepared or signed the return in

13   order to prove that he aided in the preparation.  Proof

14   that Mr. Fall knowingly provided false information or

15   directions with the expectation that the information he

16   provided would be used to file a tax return is

17   sufficient to satisfy this element.

18        The second element that the Government must

19   prove beyond a reasonable doubt is that the return was

20   false as to a material matter.  An income tax return

21   may be false not only by reason of understatement of

22   income, but also because of an overstatement of lawful

23   deductions or because deductible expenses were

24   mischaracterized on the return.

25        The false statement in the return must be

1    material.  This means that it must be essential to an

2    accurate determination of Comfort Dental's tax

3    liability.

4         The third element is that Mr. Fall acted

5    willfully.  I've already defined "willfully" for you.

6    A person acts willfully if the law imposed a duty on

7    him, he knew of the duty, and he voluntarily and

8    intentionally violated that duty.  It does not matter

9    and you should not consider whether anyone other than

10   Mr. Fall knew or did not know of any falsity on the

11   return.

12        The word "knowingly" as that term has been used

13   from time to time in these instructions means that the

14   act was done voluntarily and intentionally and not

15   because of a mistake or an accident.

16        Now that you know what it is that the Government

17   must prove and what the standard of proof is to be

18   applied, the next question is how do you determine

19   whether the Government has proven any or all of the

20   charges beyond a reasonable doubt.  Obviously, you must

21   make a determination solely from the evidence properly

22   before you and from all reasonable and legitimate

23   inferences to be drawn from that evidence.

24        The evidence that is properly before you is the

25   testimony of witnesses and the exhibits that I have

1    admitted into evidence.  From the evidence, you may

2    draw whatever conclusions are reasonable under the

3    circumstances.  The evidence that is properly before

4    you does not include the following.  The evidence does

5    not include the following:  Comments or statements by

6    attorneys; documents, photographs or other items which

7    may have been referred to but have not been admitted

8    into evidence; anything you have heard or seen outside

9    of this courtroom regarding the events in question or

10   the participants in this case; and fourth, anything I

11   have instructed you to disregard, including the

12   Defendant's testimony.

13         As to the testimony of witnesses, your principal

14   task is to determine the credibility of witnesses and

15   the weight you give to the testimony of each.  In

16   making that determination, there are a number of

17   factors that you may consider.  One, the opportunity or

18   lack of opportunity the witness had to acquire

19   knowledge of the facts about which the witness

20   testified.  In other words, was the witness in a

21   position to have accurately perceived the facts that

22   the witness related to you?

23         Two, the reliability or unreliability of the

24   witness's memory.  In other words, did the witness have

25   a clear recollection of what happened, or was the

1    witness's memory uncertain or unclear?

2          Three, the witness's appearance on the stand.

3    Did the witness appear to be a person who was telling

4    the complete and unadulterated truth, or did it appear

5    that the witness was slanting things one way or another

6    either consciously or unconsciously?

7          Four, the probability or improbability of the

8    witness's testimony.  Did what the witness had to say

9    sound reasonable or implausible, or did it appear to be

10   highly unlikely or impossible?

11         Fifth, whether the witness had anything to gain

12   or lose from the outcome of this case.  In other words,

13   was the witness totally impartial, or did the witness

14   have some stake in the outcome or some reason to favor

15   one side or the other?

16         Now, the fact that a witness may be employed by

17   a Government or law enforcement agency does not by

18   itself mean that you should give that witness's

19   testimony any greater or any lesser weight simply

20   because of that fact.  You should assess the

21   credibility of testimony of such a witness by applying

22   the same factors you would with respect to any other

23   witness.

24         In evaluating the testimonial evidence, remember

25   that you are not required to believe something to be a

1        fact simply because a witness has stated it to be a

2        fact and no one has contradicted what the witness said.

3        If in the light of all the evidence you believe that

4        the witness is mistaken or has testified falsely or

5        that he or she is proposing something that is

6        inherently impossible or unworthy of belief, you may

7        disregard that witness's testimony even in the absence

8        of any contradictory evidence.  You must decide which

9        witnesses to believe and which facts are true.  To do

10       this, you must look at all the evidence drawing upon

11       your common sense and personal experience.

12              Just because there may be more witnesses

13       testifying on one side of an issue than on the other

14       does not mean that the weight of the evidence lies in

15       favor of the greater number of witnesses.  Once again,

16       it is the credibility or the quality of the testimony

17       that determines where the weight of the evidence lies.

18              In addition to assessing the credibility of the

19       witnesses and the weight to be given to their

20       testimony, you should also evaluate the exhibits that

21       you will have with you in the jury room.  Examine them

22       and consider them carefully.  However, bear in mind

23       that merely because an exhibit has been admitted into

24       evidence does not mean that you are required to accept

25       it at face value.  Like the testimony of a witness, the

1    significance of an exhibit or the weight you attach to

2    it will depend upon your evaluation of that exhibit in

3    light of all the facts and circumstances of the case.

4         Now, as I mentioned previously, you may consider

5    only the evidence that is properly before you.

6    However, that does not mean that in determining the

7    facts you're limited to the statements of the witnesses

8    or the contents of the exhibits.  In reaching your

9    conclusions, you are permitted to draw from the facts

10   that you find have been proven such reasonable

11   inferences as seem justified in the light of your

12   experience.

13        Inferences are deductions or conclusions which

14   reason and common sense lead you to draw from the facts

15   which have been established by the evidence in this

16   case.  Such evidence is sometimes called circumstantial

17   evidence.

18        To put it another way, a fact may be proved

19   either by direct evidence or by circumstantial

20   evidence.  Direct evidence include such things as the

21   testimony of an eyewitness who personally observed the

22   fact in question, or a photograph or a document showing

23   the actual thing described.  Circumstantial evidence

24   consists of proof of a series of facts or circumstances

25   from which the existence or non-existence of another

1     fact can be reasonably inferred.

2            For example, if you go to bed at night on a

3     clear and dry night and you wake up and you find that

4     the pavement outside is wet, you may infer that it

5     rained during that night, even though you did not see

6     the rain fall.

7            The law makes no distinction between direct and

8     circumstantial evidence concerning the weight to be

9     given each.  It is for you to decide how much weight to

10    give any evidence.  However, the law does require that

11    any fact required to convict Mr. Fall be proven beyond

12    a reasonable doubt.

13           Now, as I have said to you, it's up to you to

14    determine the facts of this case.  You should not

15    determine anything that I have said or done during this

16    trial as expressing an opinion on my part as to what

17    the facts in this case are.  I have not intended to

18    express any such opinion and you should not be

19    concerned about what my opinion might be regarding the

20    facts.  That is solely a matter for you to decide.

21           During this trial, there have been occasions

22    where the attorneys have objected to a question that

23    was asked of a witness.  You should not penalize an

24    attorney or, more importantly, his client for

25    objecting.  It is the attorney's right and duty to

1    protect the client's interests by objecting to what the

2    attorney believes is evidence that does not satisfy the

3    requirement of the Rules of Evidence.

4         If I sustained the objection, it's important

5    that you not speculate about what the answer to the

6    objected to question might have been.  By sustaining

7    the objection, the Court has determined that the

8    evidence should not be considered by you.

9         Now, your verdict must be based solely on the

10   evidence developed at trial or the lack of evidence.

11   Neither bias in favor of any person or cause, prejudice

12   against any person or cause, nor sympathy of any kind

13   should be permitted to influence you in the course of

14   your deliberations.  You may not consider any personal

15   feelings you may have about the race, religion,

16   national origin, sex or age of Mr. Fall or any witness.

17   It would be equally improper for you to allow any

18   feelings you might have about the nature of the crimes

19   charged to interfere with your decision-making process.

20        All that Mr. Fall and the Government are

21   entitled to or for that matter expect is a verdict

22   based upon your fair, scrupulous, conscientious

23   examination of the evidence before you and your

24   application of the law as I have explained it to you.

25        The question of possible punishment of Mr. Fall

1    is of no concern to you and should not in any sense

2    enter or influence your deliberations.  The duty of

3    imposing sentence rests exclusively upon me.  Your

4    function is to weigh the evidence in the case and to

5    determine whether or not Mr. Fall is guilty beyond a

6    reasonable doubt solely upon the basis of the evidence.

7    Under your oath as jurors, you cannot allow a

8    consideration of the punishment, which may be imposed

9    upon Mr. Fall if he is convicted, to influence your

10   verdict in any way or in any sense enter into your

11   deliberations.

12          Now, in order to return a verdict in this case,

13   all 12 of you must agree as to what the verdict will

14   be.  You cannot return a verdict of either guilty or

15   not guilty with respect to any charge against Mr. Fall

16   unless your decision is unanimous.  Therefore there are

17   two things that you should keep in mind during the

18   course of your deliberations.  On the one hand, you

19   should listen carefully to what your fellow jurors have

20   to say and you should be open-minded enough to change

21   your opinion if you become convinced that your opinion

22   had been incorrect.  On the other hand, you must

23   recognize that each of you has an individual

24   responsibility to vote for the verdict that you believe

25   is the correct one based on the evidence that has been

1    presented and the law as I have explained it to you.

2         Accordingly, you should have the courage to

3    stick to your opinion even though some or all of the

4    other jurors may disagree as long as you have listened

5    to their views with an open mind.

6         Now, I'm going to appoint Juror Number 1,

7    Ms. H███, as the jury foreperson.  She will preside

8    over the deliberations and she will speak on behalf of

9    the jury here in court.  You will discuss this case

10   with your fellow jurors to reach agreement if you can

11   do so.  Your verdict must be unanimous, meaning all of

12   you must agree.  Each of you must decide this case for

13   yourself, but you should do so only after you have

14   considered all of the evidence, after you've discussed

15   it fully with the other jurors and listened to the

16   views of your fellow jurors.  Do not be afraid to

17   change your opinion during the course of deliberations

18   if the discussion persuades you that you should.  Do

19   not come to a decision simply because other jurors

20   think it is right.

21        If it becomes necessary during your

22   deliberations to communicate with me, you may send a

23   written note through the Court security officer, Gary

24   Palumbo, and the note must be signed by the foreperson.

25   No member of the jury should every attempt to contact

1     me except by a signed writing, and I will communicate

2     with any member of the jury on anything concerning the

3     case only in writing or here in open court.

4          Now, the Court has prepared a verdict form for

5     you.  It is a rather simple form that I will go over

6     with you.  After you've reached a unanimous agreement

7     on a verdict, your foreperson will fill in the form

8     that has been given to you, sign it and date it, and

9     you're to advise the Court security officer at that

10    time that you are ready to return to the courtroom to

11    return your verdict.

12         So you'll have this with you.  It's rather

13    simple.  It's the question of not guilty or guilty as

14    to the four counts.  As to Count I, the charge of

15    attempting to interfere with the administration of the

16    Internal Revenue laws, we, the jury, unanimously find

17    the Defendant, John J. Fall, not guilty or guilty.

18    Once you've reached a unanimous verdict on that count,

19    the jury foreperson should check the appropriate box.

20         Move on to Count II.  As to Count II, the charge

21    of attempting income tax evasion, we, the jury,

22    unanimously find the Defendant, John J. Fall, once

23    you've reached a unanimous verdict as to that count,

24    the foreperson should check guilty or not guilty.

25         Then the same for Counts III and IV -- well,

1    I'll read them.  As to Count III, the charge aiding and

2    assisting in the filing of false returns for Comfort

3    Dental for the tax year 2006, we, the jury, unanimously

4    find the Defendant, John Fall, check either not guilty

5    or guilty.  Then as to Count IV, the same charge for

6    tax year 2007, we, the jury, unanimously find the

7    Defendant either not guilty or guilty.

8         Once you've reached a unanimous verdict on all

9    four counts, the foreperson signs below, dates the

10   form, informs Officer Palumbo that you've reached a

11   unanimous verdict, and the Court will call you into the

12   courtroom shortly to return your verdict.

13        I've instructed you as to what the law is that

14   governs your deliberations.  I'll send a copy of these

15   instructions back in with you for you to have, and I

16   just want to ask very briefly to see counsel at

17   sidebar.

18        (Side-bar conference.)

19        THE COURT:  Mr. Kane, any objections to the jury

20   instructions?  Mr. Bender?

21        MR. BENDER:  Just on the evasion of payment, I

22   think you said evasion of assessment.  It's not evasion

23   of assessment.

24        MR. FITZGERALD:  I didn't bring it with me.

25        MR. BENDER:  I wrote it down over there.

1          (Pause.)

2          MR. BENDER:  Page 9.

3          THE COURT:  That should be W-2, not W-4, right?

4          MR. KANE:  I think it is correct.

5          THE COURT:  Any other objections for the

6    Government?

7          MR. BENDER:  No.

8          MR. FITZGERALD:  Your Honor, I'm objecting to on

9    page 7 the tax laws are legal instruction.  Your Honor,

10   usually when these instructions are included is when

11   there is evidence presented by the defense that taxes

12   are unconstitutional or are not legal for one reason or

13   another.  The only hint of that in this case is buried

14   in the papers that the Government put into evidence.

15   And I think over my objection, initially anyways, not

16   by the defense, your Honor, so the only basis of this

17   is the Government's own opening the door for it.  I

18   don't think you can put into evidence and then get a

19   jury instruction to support that when it's not part of

20   the defense.

21          THE COURT:  I've had discussions with counsel

22   about that.  The Court ruled that the evidence that's

23   in this case is admitted evidence included statements

24   by Mr. Fall in writing where he challenged the

25   constitutional legality of the tax laws in this

1    country.  Because that issue is before this jury, the

2    Court found it is appropriate and required, actually,

3    to instruct them on the law in that regard.  So your

4    objection is overruled.

5            Any other objections?

6            MR. FITZGERALD:  No, your Honor.

7            THE COURT:  I will then just go back, I'll take

8    the hit and tell them I misspoke and I'm going to read

9    the beginning part of Count II.

10           (End of sidebar conference.)

11           THE COURT:  Ladies and gentlemen, it appears all

12   counsel have pointed out to me, there's so many

13   checking, that I left one phrase out when I read one

14   section to you so just so that we're clear, in Count

15   II, attempting income tax evasion, the charge under

16   Count II, I read to you the three elements.  I'm going

17   to read the three elements to you again in their

18   entirety and I'll say the phrase that I left out the

19   first time.

20           In order for you to find Mr. Fall guilty of

21   attempting to evade taxes, the Government must prove

22   the following beyond a reasonable doubt:  First, that

23   Mr. Fall owed substantially more Federal income taxes

24   than zero from the years 1998 through 2000; second,

25   that Mr. Fall willfully attempted to evade or defeat

1    the assessment or payment of his taxes; and third, that

2    Mr. Fall committed an affirmative act in furtherance of

3    this willful attempt.  Apparently I left the words "or

4    payments" out when I read it.  It's correct on the

5    form.

6             Anything further, counsel?

7             MR. FITZGERALD:  No, your Honor.

8             MR. KANE:  No, your Honor.

9             THE COURT:  Thank you for that.

10            Ladies and gentlemen, it does not make any sense

11   to begin deliberations at this hour.  We're under all

12   sorts of guidelines to close down at the appropriate

13   time and whatnot.  So I'm going to have to have you

14   report back at 9:30 to begin your deliberations.  It's

15   going to be a hard one, because now you have heard all

16   the evidence and now you have heard the arguments and

17   now you have been instructed on the law, so I would

18   imagine it's going to be hard not to want to discuss

19   this case.  Know that the best people to discuss this

20   case with are going to be the 12 of you, and you can't

21   do that until Monday morning.

22            So I need for you to continue to not discuss

23   this case with anyone.  I'm sure family and friends are

24   going to want to discuss it with you, and you really

25   have to, and I instruct you, that you must stay away

1    from discussing this with anyone.

2            In addition, please don't do any independent

3    research.  If you feel confused by anything right now

4    or whatnot, you are not allowed to do any independent

5    research.  It would mess the system up entirely if you

6    were to do anything like that, and I instruct not to do

7    that.  If there are questions that occur during

8    deliberations that the Court can assist you with, write

9    down the question, the foreperson will sign it, and I

10   will attempt to deal with it if I need to, but do not

11   this weekend do any independent research.

12           If there's anything about this case in the

13   media, please look the other way and avoid any

14   attention to it.  Please don't say anything -- don't

15   Instagram or Tweet or Facebook or, I don't know, there

16   are probably other things out there by now.

17           Enjoy the weekend.  And what will happen Monday

18   morning is you'll gather as normal.  I'm required to

19   bring you in here first.  I count you.  I don't know if

20   you notice that when you walk in.  I have to count all

21   of you, assure that you're here, make sure that you

22   followed my orders.  That will take two minutes, and

23   then we will send you on your way and we'll wait to

24   hear from you till then.

25           Mr. P████, I'm going to ask you to stay with

1     us on Monday.  We don't know what could happen over the

2     weekend.  I'm going to tell you now that I'm going to

3     ask you to, as the alternate, when the jury does begin

4     deliberations I'm going to have another room set for

5     you.  There have been times in the past, as unlikely, I

6     hope, as it may be where a juror becomes disabled

7     during deliberations.  If that's the case, we'll deal

8     with it, but it will involve you and you're the only

9     person that can serve that role.  So I ask you to come

10    back.  Gather as usual Monday morning.  After I excuse

11    the jury, we'll have another room set for you.  You

12    might want to bring a book or something.  I'll sort of

13    forewarn you.  And we'll go from there.

14         No questions about the case or the trial, but

15    any administrative questions about timing or what your

16    duties are?

17         Great.  You will have your notebooks in the jury

18    room with you.  Vicky will on Monday prepare all of the

19    exhibits.  The attorneys will spend some time now,

20    which is the other reason it doesn't make sense to

21    begin, going through it, making sure that only the

22    admitted exhibits are on the cart.  They'll all come

23    into you then, along with your notebooks, along with

24    the jury instructions, the jury verdict form.  And

25    generally, there might be some things if you want them,

1    flip charts and things if there's writing or pads or

2    whatever you might need.

3              Yes, Ms. B▮▮▮▮▮?

4              THE JUROR:  Is there to be one copy of the jury

5    instructions?

6              THE COURT:  Well, you know, it's surprising you

7    should ask that.  I've only ever sent one back and then

8    the last jury we had asked for 12 copies; so if you'd

9    like multiple copies, I'll send multiple copies back.

10   I see a few of nods, but, sure, I'll send multiple

11   copies back.  That way you won't have to ask.  If you

12   need them, great.  If not, you can just put them aside,

13   but I will send multiple copies of the jury

14   instructions back.  I'm not copying all of the

15   exhibits.  You get one of those.

16             THE CLERK:  And neither am I.

17             THE COURT:  Ladies and gentlemen, thank you so

18   much for your service.  Enjoy the weekend, and we'll

19   see you back Monday morning.

20             (The jury is not present for the following:)

21             (Sidebar conference off the record.)

22             (Sidebar conference.)

23             THE COURT:  Anne, can we go on the record now.

24             We're going to mark for identification the

25   copies of the slides, the non-exhibit slides that

1    Mr. Kane used during his closing.

2         MR. KANE:   Exhibit 450 entitled, "The Many

3    Entities and Shell Companies of John Fall."  Not in

4    order, 454, "Who am I?  The Many Fake Names and Aliases

5    of John Fall."  453, "Who Banks This Way?  The

6    Transfers Between Accounts."  452, "Who Banks This

7    Way?"  451, "Changing Companies Over Time to Evade

8    Detection."  And 455, "IRS Notices and Warnings."

9         THE COURT:   Thanks.  We're off the record.

10        (Discussion off the record.)

11        (Adjourned at 4:20 p.m.)

C E R T I F I C A T I O N

      I, Anne M. Clayton, RPR, certify that the foregoing is a true and correct copy of the transcript originally filed with the clerk on February 16, 2016, and incorporating redactions of personal identifiers in accordance with the Judicial Conference policy. Redacted characters appear as a black box in the transcript.

/s/ Anne M. Clayton

_____

Anne M. Clayton, RPR

February 16, 2016

_____

Date